# TEXAS DEFENDER SERVICE

# CAPITAL TRIAL PROJECT

presents

# DEATH PENALTY MITIGATION SEMINAR

Cosponsored by:

## ABA DEATH PENALTY REPRESENTATION PROJECT

TEXAS BAR CENTER

AUSTIN, TEXAS

FEBRUARY 8TH & 9TH, 2001

Exhibit A1 - Texas Feb. 2001

| PEOPLE TO INTERVIEW | INFORMATION THEY MAY LEAD YOU TO | RECORDS THEY LEAD YOU TO |
|---|---|---|
| All family members | (This is covered in a previous section in this Manual). | |
| Neighbors | True family situations, Domestic violence, Neglect, discipline of children | Police reports Social service records |
| Friends | True personality traits, Other friends, relatives, Substance abuse, domestic Problems, social problems, | Rehab information, ER records, police reports, EMS records |
| Friend's parents | Observations of client and Client's family, mannerisms, Family situations, interaction With peers | Pictures and other memorabilia |
| Teachers | Observations, behaviors, Interaction with peers and Authority figures, stories about Client and client's family, grades, Names of other teachers and friends, reputation | School records, annuals, pictures, memorabilia, special education records, awards |
| Coaches | Sportsmanship, peer Interaction, discipline, Academics, GPA, names Of peers and asst. coaches, Observations | Newspaper articles, trophies, ribbons, other awards, score-books, pictures, |
| Guidance counselors | Personal interactions, stories Of client/client family, Counseling and school Observations, information About contract providers With the school, names of Friends, favorite teachers | Counseling records, behavioral records, special education records, disciplinary action records |

Exhibit A1 - Texas Feb. 2001

| Sponsors of extra-Curricular activities | Names of peers, other Sponsors, competitions, Personal interactions, Sportsmanship | Awards, trophies, pictures, clippings, other memorabilia |
|---|---|---|
| School principals | Personal observations, Disciplinary actions, Behavioral problems, Family situation, peers | School records, disciplinary records, juvenile court records |
| Employers | Names of coworkers, Family problems Observations | Evaluation/attendance, Personnel records, Write-ups. |
| Coworkers | Other coworkers, mannerisms Substance abuse problems, Family problems, behavioral Observations | Pictures |
| Clergy/other Church leaders | Client's faith and beliefs, Family situations, Mannerisms, "demons" Teachers, peers | Church records, baptismal records, social service records, other "assistance records". |
| Military | Stations, CO's Recruiter, peer | DD214 and other Records, Disciplinary Reports, Discharge Information, School/evaluations. |

## H.    ORGANIZING THE CASE FILE IN A DEATH PENALTY CASE
By: Jennifer G. Word

The task of organizing the file should be looked at as building the file for a Decade of Litigation.  Once you have been assigned a Death Penalty Case you are joining the legacy of your client's life that may last as long as a Decade.  When you begin this endeavor never assume that you will be the only Attorney or Defense Team that will work on your client's case.  This case may not only go through Appellate, Post-Conviction, & Clemency proceedings but possibly multiple Trial Attorneys and Defense Team Members.

0003

Exhibit A1 - Texas Feb. 2001

- Motions
- Voir Dire
- Records

p.   Timelines
- Client's Life
- Injuries
- Psychological treatment
- Events from crime
- Etc......

Although the above is an example, each case will have additional factors that may require a separate file section or it may not need some of the suggested sections. You should look at this as setting up a User Friendly Guide where any defense team can be of maximum assistance to the client. As long as you set up a file system that works for you in an organized fashion where someone else could pick up your file and work on the case you have accomplished building the file for a Decade of Litigation.

## I.   SOCIAL HISTORY
By:  Jennifer G. Word

The social history is the narrative of your client's life. The report will detail incidents, specific facts and experiences involved in your client's life from birth until and including incarceration for the crime at issue.  This is an essential tool in a Death Penalty case because this report not only informs the team of information pertaining to the client's life but can be used to provide an overview of the client's life to experts involved in the case. The report must contain information from reliable sources and preferably two corroborating sources before being cited in the report, unless the information comes directly from a certified record.

The social history is not a report in which you will be able to gather all the information needed in one visit.  You will need to interview the Client multiple times, interview family members, teachers, coaches, etc.,collect and review all records pertaining to your client and their family.  Although as this is a process that will continue through out the case you can start with an initial document labeled Client X's Social History placing each of the suggested categories filling in information as you receive it.  You may have several drafts until the time of trial.

The following is an example of categories that a social history should at least consist of:

1.   Birth
2.   Home Environment
3.   Family History
4.   School History

Exhibit A1 - Texas Feb. 2001

5.    Occupational History
6.    Legal History
7.    Military History
8.    Sexual History
9.    Dating/Marital History
10.    Psychological History
11.    Physical Abuse
12.    Sexual Abuse
13.    Substance Abuse
14.    Medical History

Although this is not a mandated list of categories each case will consist of most of these categories, But each case will have it's own factors to consider when defining the necessary categories to give a complete narration of your client's life. Hopefully the above list will be a good starting point.

Once you have identified the categories that fit the factors of your case you need to place information pertaining to each of these in your report. As suggested above formulate a working document with just the categories and place the information in the report as you obtain it. The Client's full name should appear at the top of the report centered with Social History in bold and in a font larger then your text (possible larger then your category titles), then each category should be in bold, underlined, and in a font size larger then your report text . The  following will provide you with a simple example:

**DRAFT**

### CLIENT X'S
### SOCIAL HISTORY

### BIRTH

### HOME ENVIRONMENT

Now you have your categories next you need to fill in the information.  The following will give you some examples of what  types of  information go under which categories:

Birth
- Interview of the mother
- Birth records client
- Pre-natal records client's mother
- Family interviews-mother's pregnancy, Delivery, Arriving Home Etc...
- Illnesses, Injuries, substance abuse

Home Environment
- Family composition

- Household conditions
- Discipline
- Income source
- Neighborhood

Family History*
- Father
- Mother
- Siblings
- Spouse
- Aunts/Uncles
- Grandparents
- Children (dependents)
- Any other significant family members

*For each of these note age, occupation, deceased (cause of death), history of sexual/physical abuse, and current relationship with client

School History
- Schools attended
- Grade last completed
- Academic performance
- Disabilities (Special Education)
- Special abilities or strengths
- Interview Teachers-conduct, homelife, personality etc….
- Truancy
- Suspensions/Expulsions

Occupational History
- List of employment
- Age of first employment
- Work ethic
- Problems with employers
- Awards/recognition
- Favorite job
- Financial status

Legal History
- Juvenile record
- Juvenile institutions
- Dispositions/Adjudication's
- Probation/ Parole
- List of charges-dates, counties, atty. etc….
- County detention centers
- Correctional facilities

Chapter 4 - 25

0006

Kentucky's 2000 Death Penalty Manual

Military History
- Type of enlistment
- Awards
- Discharges
- Locations
- Training
- Education
- Disciplinary
- Reason for enlistment

Sexual History
- Age first intercourse
- Diseases
- Number of partners
- Sexual orientation
- How was majority of this information acquired

Dating/Marital Relationship History
- Age began dating
- List of significant girlfriends/boyfriends
- Current marital status
- Length of relationships
- Reason for ending relationships
- Number of marriages
- Number of divorces
- Reason for separation/divorce
- What is their crowd into-drugs, activities, etc……..
- Who introduced them/how they met?

Psychological History
- Inpatient care
- Outpatient care
- Age of treatment
- List of institutions
- Diagnosis
- Medications

Physical Abuse
- Teacher interviews
- Neighbor interviews
- Social service records
- Medical records
- Family interviews
- Police reports

Sexual Abuse
- Medical records
- Police reports
- Court proceedings
- Family interviews
- School officials
- Social services
- Neighbor interviews

Substance Abuse History
- Age began usage
- Types of drugs
- Frequency
- Treatment facilities
- Support groups
- Arrests/convictions-drug related

Medical History
- Hospitals
- Surgeries
- Injuries
- Head injuries
- Loss of consciousness
- Family physicians

The above by no means is a complete description of all the information that may fall into the narrative of you clients life. The client interview could fall under anyone of the above categories as a source of information. The important thing is to obtain as much information regarding your client's life as you can and give as detailed a narrative as possible that explains your client's life history.

J. **FREQUENTLY INVESTIGATED MITIGATION FACTORS**
By: Valerie Bryan

1. This section is provided as a basic primer to frequently occurring mitigating factors or mitigation issues requiring investigation in capital cases. The factors discussed herein have been suggested by mitigation specialists performing capital defense work at the Department of Public Advocacy. The list and information provided is intended to be a helpful beginning step in the search for information and understanding.

a. **Mental Retardation:** "An individual is considered to have mental retardation based on the following three criteria: intellectual functioning level (IQ) is below 70-75; significant limitations exist in two or more adaptive skill areas; and the condition is present from childhood (defined as age 18 or less)." (AAMR, 1992)

"The AAMR process for diagnosing and classifying a person as having mental retardation contains three steps and describes the system of supports a person needs to overcome limits in adaptive skills.

The first step in diagnosis is to have a qualified person give one or more standardized intelligence tests and a standardized adaptive skills test, on an individual basis.

The second step is to describe the person's strengths and weaknesses across four dimensions. The four dimensions are:

1) Intellectual and adaptive behavior skills
2) Psychological/emotional considerations
3) Physical/health/etiological considerations
4) Environmental considerations

Strengths and weaknesses may be determined by formal testing, observations, interviewing key people in the individual's life, interviewing the individual, interacting with the person in his or her daily life or a combination of these approaches.

The third step requires an interdisciplinary team to determine needed supports across the four dimensions. Each support identified is assigned one of four levels of intensity - intermittent, limited, extensive, pervasive."
(http://thearc.org/faqs/mrqa.html )

http://www.thearc.org/

http://members.amaonline.com/nrogers/mr.htm

http://mrrc.bcm.tmc.edu/othercenters.html

**b.     Attention Deficit Hyperactivity Disorder/Attention Deficit Disorder:**
"Attention deficit disorders are characterized by a person's inattention, distractibility, impulsivity, and in some cases, hyperactivity. It occurs in both children and adults, and interferes with the person's ability to function normally in their day-to-day activities, such as work, school, and at home."
(http://adhd.mentalhelp.net/)

"According to epidemiological data, approximately 4% to 6% of the U.S. population has ADHD.  ADHD usually persists throughout a person's lifetime. It is not limited to children. Approximately one-half to two-thirds of children with ADHD will continue to have significant problems with ADHD symptoms and behaviors as adults, which impacts their lives on the job, within the family, and in social relationships.

ADHD is very likely caused by biological factors which influence neurotransmitter activity in certain parts of the brain, and which have a strong

genetic basis. Studies at NIMH using a PET (positron emission tomography) scanner to observe the brain at work have shown a link between a person's ability to pay continued attention and the level of activity in the brain. Specifically researchers measured the level of glucose used by the areas of the brain that inhibit impulses and control attention. In people with ADHD, the brain areas that control attention used less glucose, indicating that they were less active. It appears from this research that a lower level of activity in some parts of the brain may cause inattention and other ADHD symptoms.

There is a great deal of evidence that ADHD runs in families, which is suggestive of genetic factors. If one person in a family is diagnosed with ADHD there is a 25% to 35% probability that any other family member also has ADHD, compared to a 4% to 6% probability for someone in the general population." (http://www.add.org/content/abc/factsheet.htm )

http://wholechild.net/addadhd.htm

http://www.addclinic.com/

http://user.cybrzn.com/~kenyonck/add/Links/

c.      **Prematurity/Low Birth Weight:** "Low birth weight is the major cause of infant illness and death in the United States. This term describes infants born weighing less than 2500 grams or 5.5 pounds, including those born prematurely (before 37 weeks). As a group, these infants have higher rates of developmental problems, subnormal growth, and health problems than other children. By school age, children born at low birth weight are more likely to have mild learning disabilities, attention disorders, developmental impairments, and breathing problems." (http://www.cyfc.umn.edu/kidscount98/lowbw.html)

"The factors that contribute to low birth weight are complex. They include broad determinants of health, such as maternal age, multiple births, socio-economic status, social support and the beliefs and values of society. Other maternal factors include nutrition, work, personal habits such as smoking, alcohol and drug use and access to health services.

Women over 45 years and under 20 years of age are more likely to have a baby who is low birth weight.

Poor families are at higher risk of having low birth weight babies. The percentage is 1.4 times higher in the poorest neighborhoods than in richest neighborhoods. A significant number of women live with violence or fear of violence. Women who experience violence during pregnancy are more likely to have a low birth weight baby." (http://www.cfc-efc.ca/docs/00000011.htm )

Exhibit A1 - Texas Feb. 2001

For a detailed list of risk factors associated with low birth weight, please go to http://www.cfc-efc.ca/docs/00000011.htm online.

http://www.comeunity.com/premature/

http://www.aapi-online.org/

http://www.futureofchildren.org/LBW/16LBWBIB.htm

**d.      Personality Disorders:** Personality disorders comprise most of Axis II from the DSM IV.  They vary tremendously in appearance and effect upon functioning from individual to individual.  The underlying commonality amongst the personality disorders is their pervasive nature.  Personality disorders affect the person as ongoing constants within their lives-others may view these traits as a person's "character".   It is only when these traits cause dysfunction that significantly affects the day-to-day life of the individual is the condition characterized as a disorder.

One personality disorder is a completely different and unique study from another, so a description of risk factors applicable generally to all personality disorders is not possible.  For more specific information pertinent to the ten different types of known personality disorders, review pages 629-673 of the DSM-IV.
The personality disorders are categorized into Clusters A, B, and C.  Cluster A types are often described as odd or eccentric.  Cluster B disorders exhibit emotional, dramatic, or unstable behavior.  Cluster C is defined by anxious or fearful behavior.

http://www.psycom.net/depression.central.borderline.html

http://www.concernedcounseling.com/disorders/antisocialpersonalitydisorder.htm

http://mirconnect.com/glossary/antisocialpersonalitydisorder.html

**e.      Schizophrenia:** "…is a disturbance that lasts for at least 6 months and includes at least 1 month of active-phase symptoms (i.e., two [or more] of the following: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, negative symptoms)." (DSM-IV, pg. 273)
Many times people with this Axis I major mental illness are termed "psychotic", and that is the predominating feature of the illness.  Schizophrenic symptoms are defined by behavior that has broken with reality in some aspect, through thought, affect, or action.
It is becoming apparent that schizophrenia is a biological, genetically passed disorder.  "…schizophrenia runs in families, and twin and adoption studies indicate that such familial aggregation is largely accounted for by genetic factors.  However, the same studies also indicate that familial genetic transmission can account for only a portion of the cases of schizophrenia; for example, the

concordance rate in monozygotic twins is approximately 40 percent, suggesting that non-genetic factors must also have a role." (Moldin, 1997)

http://www.schizophrenia.com/

http://www.pslgroup.com/SCHIZOPHR.HTM

http://www.psychologyinfo.com/schizophrenia/index.htm

f.      **Bipolar Disorder:** "The essential feature of Bipolar I Disorder is a clinical course that is characterized by the occurrence of one or more Manic Episodes (see p. 328) or Mixed Episodes (p. 333)." (DSM-IV, pp350-351) Several "mood disorders" can resemble Bipolar I Disorder, or manic-depressive illness.  These similar mood disorders are described, as are their subtle differences from Bipolar I Disorder, in pages 359-366 of the DSM-IV. (It should be noted that the difficulty in using the DSM-IV lies in the process of "differential diagnosis" which observes a hierarchy of classifications for the mental illnesses and systematically rules out incorrect disorders through symptoms, duration, frequency, and level of dysfunction.  Familiarity with the DSM-IV and this process is encouraged, but the intricacies of diagnostic procedure are best left to those we hire for assistance.)

http://bipolar.miningco.com/health/bipolar/

http://www.mhsource.com/bipolar/

http://www.brain.com/about/content.cfm?ID=17

g.      **Depression:** "Depression is one of the most common mental disorders affecting 340 million people in the world today, accounting for a full 10% of productive years lost throughout the world. No one is immune from depression - it occurs in people of all social classes, all countries and all cultural settings. One in four women and one in ten men can expect to develop depression during their lifetime."
(http://www.depression-net.com/)

"We do not yet know all the causes of depression, but there seems to be biological and emotional factors that may increase the likelihood that an individual will develop a depressive disorder. Research over the past decade strongly suggests a genetic link to depressive disorders, depression can run in families. Bad life experiences and certain personality patterns such as difficulty handling stress, low self-esteem, or extreme pessimism about the future can increase the chances of becoming depressed." (http://www.hoptechno.com/book34.htm)

http://depression.cmhc.com/

Exhibit A1 - Texas Feb. 2001

http://www.brain.com/about/content.cfm?ID=25

http://www.healingwell.com/depression/

h.      **Anxiety Disorders:** "Anxiety disorders are the most common psychiatric condition in the United States. About 25 million Americans experience anxiety disorders at some time during their lives; the lifetime risk for an anxiety disorder is nearly 25%. Nevertheless, only about a quarter of those who experience this problem seek help. In recent years, a number of different anxiety disorders have been classified; the two primary ones are generalized anxiety disorder (GAD), which is long-lasting and low-grade, and panic disorder, which has more dramatic symptoms. Other anxiety disorders include phobias, performance anxiety, obsessive-compulsive disorder (OCD), and post-traumatic stress disorder (PTSD). Anxiety disorders are usually caused by a combination of psychological, physical, and genetic conditions, and treatment is, in general, very effective." (http://anxiety.mentalhelp.net/anxiety/anxiety2.htm)

"Studies suggest that an imbalance of certain substances called neurotransmitters (chemical messengers in the brain) may contribute to anxiety disorders. Advanced imaging techniques have revealed over-activity in the locus ceruleus, the part of the brain important in triggering a response to danger, in people experiencing anxiety, indicating that some people's brains may be more vulnerable to the disorder. Scientists are now beginning to identify different areas of the brain associated with anxiety responses." (http://anxiety.mentalhelp.net/anxiety/anxiety4.htm)

http://anxiety.mentalhelp.net/

http://www.long-beach.va.gov/ptsd/stress.html

http://www.aaets.org/trresp.htm

http://www.ncptsd.org/RQ_Subjects.html

http://www.adaa.org/

http://www.concernedcounseling.com/disorders/obsessivecompulsivepersonalityd isorder.htm

i.      **Substance Abuse:**   The topic of substance abuse covers a wide range of disorders varying greatly in effect upon the individual and their level of functioning.  For a general list of substance abuse signs and symptoms go to http://www.addictions.com/signs.htm online.
The Department of Veteran's Affairs performs extensive research in this area of study, as substance abuse disorders are prevalent amongst the veteran population.

To access their medical library online, go to
http://www.sf.med.va.gov/medlib/index.htm

For published research and current data regarding substance abuse, go to
http://www.samhsa.gov/oas/oasftp.htm

http://www.tznet.com/busn/advocate/substance.html

http://www.casacolumbia.org/

http://www.ncadd.org/

**j.     Traumatic Brain Injury:** "The term head injury refers to an injury to the brain which is usually the result of an accident, or sometimes an assault. Often the injury results from a blow to the head such as may be suffered in an automobile accident, a fall or a gunshot wound. The injury may also occur as a result of lack of oxygen (such as in drowning), or as a result of lack of blood supply to the brain (such as following a cardiac arrest). People with multiple injuries (as in serious auto accidents) often suffer brain injury by more than one of these mechanisms." (http://www.texoma.com/business/biotech/thia-faq.htm)

There is a tremendous amount of published research into traumatic brain injury online.  For data regarding TBI and its impact among several different populations, go to http://www.biausa.org/

http://www.neuroskills.com/index.html

http://www.tbiguide.com/

http://www.braincenter.org/

**k.     Childhood Abuse/Neglect:**  What  is considered "child abuse and neglect" is defined by law.  For a direct link to an online version of the Child Abuse Prevention and Treatment Act, go to
http://www.acf.dhhs.gov/programs/cb/policy/capta.htm

"In 1997, CPS agencies determined just under almost 1 million children were victims of substantiated or indicated child abuse and neglect."

"Neglect is the most common form of child maltreatment. CPS investigations determined that 54 percent of victims in 1997 suffered neglect; 24 percent, physical abuse; 13 percent, sexual abuse; 6 percent, emotional maltreatment; and 2 percent, medical neglect. Many children suffer more than one type of maltreatment."

"According to a 1992 study sponsored by the National Institute of Justice (NIJ), maltreatment in childhood increases the likelihood of arrest as a juvenile by 53

0014

percent, as an adult by 38 percent, and for a violent crime by 38 percent. Being abused or neglected in childhood increases the likelihood of arrest for females by 77 percent. A related 1995 NIJ report indicated that children who were sexually abused were 28 times more likely than a control group of non-abused children to be arrested for prostitution as an adult."
(http://www.calib.com/nccanch/pubs/factsheets/infact.htm )

http://child.cornell.edu/

http://www.athealth.com/Practitioner/Newsletter/FPN_3_27.html

http://www.suite101.com/welcome.cfm/child_abuse_and_recovery

l.      **Poverty:**  The poverty threshold is adjusted every year.  For a link to the 2000 poverty threshold statistics, go to http://aspe.hhs.gov/poverty/00poverty.htm

"There are substantial differences between the overall poverty rate and the poverty rates of individuals in certain demographic subgroups. Most notably, blacks, individuals in female-headed households, and Hispanics have poverty rates that greatly exceed the average. The poverty rates for individuals in female-headed households remained above 35 percent over the 1959-96 period. The poverty rate for all blacks and Hispanics has remained near 30 percent during the 1980s and mid 1990s. The poverty rate for the aged, which exceeded the overall poverty rate in 1959, fell below the overall poverty rate beginning in 1982. It was 10.8 percent in 1996. The poverty rate for whites was below the overall poverty rate throughout the entire 1959-96 period. It was 11.2 percent in 1996. The poverty rate for children exceeds the average rate; it was 20.5 percent in 1996."
"Female-headed families with children and unrelated individuals are more likely to be poor than other families with children or families with aged members. In 1996, 42.3 percent of female-headed families with children were poor, compared with 8.5 percent of families in which males were present. Although only 6.4 percent of all families with an aged member were poor, 20.9 percent of all aged unrelated individuals and about 20.7 percent of non-aged unrelated individuals were poor."

(http://www.ssc.wisc.edu/irp/faq3.htm )

http://www.census.gov/hhes/www/poverty.html

http://aspe.os.dhhs.gov/poverty/poverty.htm

http://www.ssc.wisc.edu/irp/

*(Check in the section of this manual containing forms and samples for a bibliography of related articles.)*

# Substance Abuse and Mitigation

Robert L. Smith, Ph.D.
20525 Center Ridge Road,
Westgate Tower, Suite #518
Rocky River, Ohio 44116
440.333.6622

0016

Substance Abuse and Mitigation

I.    Impact of Substance Abuse/Dependence

    A.    90% of capital cases involve some level of substance use.
    B.    Substance abuse is an aggravator in and of itself.
        1.    It is important to link substance abuse to other issue(s) to make it mitigating.
        2.    The public perception can be broken down as follows:
            a.    Choosing to take drugs is the result of moral weakness or of a character flaw. Therefore, moral significance is attached to the initial Choice.
            b.    The client made a Choice to take the drugs or drink – a volitional act.
            c.    Even if the client was under the influence of drugs at the time of the crime it does not matter. The client was still capable of volitional acts even though intoxicated. (The Juror brings in personal experience.)
            d.    The Juror or others that the juror knows, similarly situated to client, were able to stop using drugs. (i.e., moral significance is attached to failure to quit)

II.    Investigating Substance Abuse

    A.  It is important to conduct a multi-generational social history. Many of the substance abuse/addiction indicators are familial.
        1.  Evidence that the client abuses substances is bolstered by manifestations of similar problems in other family members.
        2.  It is important to examine any developmental, abuse, or trauma issues in the life of the client in order to explain why the client started using drugs and why the client was susceptible to addiction.
        3.  It will be necessary to distinguish the client from siblings or peers who did not develop the same problems as the client (e.g., abusing drugs, developing an addiction, violent behavior) even though they lived in a similar environment.

III.    Acquiring Records

    A.    Federal CFR Release Language

                                        Exhibit A1 - Texas Feb. 2001

1. I understand that my records may be protected under the federal regulations governing Confidentiality of Alcohol and Drug Abuse Patient Records, 42 CFR Part 2, and cannot be disclosed without my written consent unless otherwise provided for in the regulations. I also understand that I may revoke this consent at any time except to the extent that action has been taken in reliance on it. I specifically waive the protection of 42 CFR Part 2 with regards to the requested records and consent that they be delivered to _____.

B. Types of Records
   1. Pharmacy
   2. Physician
   3. Hospital (including birth records)
   4. Psychiatric
   5. Treatment Centers
   6. Halfway House Records
   7. School
   8. DFS, DYS
   9. Military
   10. Employment
   11. Criminal Justice Records
      a. Probation or Parole
      b. Jail/Prison
      c. Arrest

C. It is important to acquire records for the client, family members and other significant contacts in the client's life.

IV. Witness Interviews

A. It is important to talk with individuals who had direct contact with the client or who had the opportunity to observe the client using alcohol and or other drugs.
   1. Family
   2. Friends
   3. Neighbors
   4. Doctors (Medical/Psychiatric)
   5. Counselors from Substance Abuse Treatment Programs
   6. Ministers, Priests, etc.
   7. Teachers
   8. Coaches
   9. Police Officers in Neighborhood
   10. Individuals Identified in Records

11. Individuals who Witnesses the Client's Behavior before, during and/or after the Offense

B. Be creative about finding sources to corroborate the level and severity of the client's drug or alcohol use:
1. Photos
2. Home Movies
3. Diaries

V. Characteristics of Substance Use

A. In addition to information regarding the client's life and use of drugs or alcohol, it is important to describe the characteristics of substance abuse:
1. How often did the client use substances
2. What kind of substances did the client use
3. How much of the substances did the client use
4. Over what period of time did the client use substances
5. In what way were the substances ingested
6. Identify examples of the client's behavior while under the influence of alcohol and/or drugs
7. Identify examples of how the client's personality and/or health changed after he or she began using substances

B. It will be important to explain to the family, friends, etc. that while normally they would think this kind of information would be hurtful to the client and they may be reluctant to speak of it, in this instance it is essential that they provide accurate, candid information.

C. Uncorroborated testimony of a client that he or she abused drugs or alcohol is almost useless and may in fact be hurtful to the case.

VI. Choosing the Right Experts:

A. What area of specialization:
1. Psychologist – with experience in the area of substance use and abuse.
2. Psychiatrist – with experience in the area of substance use and abuse.
3. Toxicologist – one who studies the nature, effects, and detection of poisons and chemicals within the system. Also involves issues of treatment for the toxic effects and sickness caused by the substances involved.
4. Pharmacologist – one who studies the composition, uses and effects of drugs.

B.    How to Select an Expert:
    1.    Ask other Attorneys who have presented this kind of evidence as mitigation.
    2.    Interview the potential expert:
        a.    What is their experience in the field?
        b.    What is their philosophy regarding substance abuse and addiction?
        c.    Has their experience jaded them?
        d.    Do they think that substance abuse and addiction is a character flaw or indicative of laziness?
        e.    Do they think that everyone who commits a crime while under the influence of alcohol and/or drugs is not guilty?  Avoid the Extremes.
        f.    What is their education and background?
    3.    The Pharmacologist (sometimes Toxicologist) – can inform you and the jury about the nature of substances used/abused and their physiological effects.
        a.    Another expert is necessary to make the issue mitigating rather than aggravating.
    4.    The Psychologist (sometimes Psychiatrist) – should be experienced in the area of substance abuse so that he or she can make the necessary connections between the client's life history and the development of the addiction. The expert should have a battery of tests that he or she is able to employ for objective data.

VII.   What to Give the Experts

A.    Everything the Prosecutor knows:
    1.    Materials regarding the case – Police reports and witness statements.
    2.    Information on the Law and your jurisdiction.  How a mental disorder can and cannot be used as a defense in your jurisdiction (statutes, case law, jury instructions)
B.    Things the Prosecutor may not know:
    1.    Records – regarding client and family members
    2.    Witness Interviews – those who will not be able to testify should be interviewed personally by the expert
    3.    Interviews with client
C.    Keep in mind that whatever is considered by the expert might be discoverable by the Prosecutor if the expert testifies.

VIII.  Making it Mitigation – Meeting the Aggravation

**0020**

A.   The substance abuse/dependence <u>must</u> be connected to some other mitigating or non-aggravating factor in the client's life. Must respond to: "Why did the client take the substance in the first place?"

1.   Developmental Issues (e.g., incest, physical abuse, abandonment) – Themes: self medicating, etc.

2.   Physical and/or Emotional Trauma – Themes: self medicating, . .

3.   Medical Treatment – Themes: medical treatment involving drugs initially prescribed by physician.

4.   Culture – Themes: peers, recreational use, economics, and family history.

5.   Psychiatric/Psychological – Themes: self-medicating, drugs may initially be prescribed by physician.

6.   Heredity/Genetics – Themes: family history, physiology, and predisposition.

B.   Substance use and/or dependence diminish one's ability to weigh consequences or exercise good judgment.
Must respond to: "Why should it make a difference that he or she is a substance abuser or dependent?"
And/Or
"Why should it make a difference that he or she was suffering the effects of the substance at the time of the crime?" (e.g., Def. High, Def. Crashing, Def. In withdrawal)

1.   Someone who uses drugs or alcohol to a degree that it permeates every aspect of their life does not have the same capacity for rational decision-making as someone who does not. Their decision-making and conduct is much more impulsive.

2.   Someone who kills while under the influence of the effects drugs or alcohol may not be as cold and calculating and therefore not as culpable as some one who is not. They may even be out of touch with reality at the time of the crime.

3.   Impact of substance abuse/dependence on cognition and behavior

a.   Underlying Physiological factors – The effects of the drugs on the client's ability to think or act.

b.   Brain damage from chronic use, injury, etc.

c.   Psychotic reactions that may not be predictable by client.

d.   Progression of addiction - Understanding dependency – "Why can't they just stop taking the substance?"

      e.      Underlying psychological or psychiatric factors
      f.      Underlying medical problems

IX.    Presentation

A.    First:  Lay witnesses testify to provide the history and foundation.
    1.    Very specific/anecdotal/powerful
    2.    Introduce Photos, videos, etc. . .
B.    Second:  Introduce the records that support the lay witnesses and upon which the experts will rely.
C.    Third:  Have Social Science Experts testify – Charts
D.    Fourth:  Drug Expert – Pharmacologist, Toxicologist, or Psychopharmacologist.
    1.    Charts demonstrative evidence
    2.    Drug paraphernalia
E.    Fifth:  Neurologist or Neuropsychologist
    1.    Brain Scans
    2.    Showing physical effects of the drug use on the brain
F.    Sixth:  Psychologist or Psychiatrist
    1.    Testing Examples
    2.    DSM IV
    3.    Time Lines
    4.    Family Tree
    5.    Putting the client's addiction into the context of his or her life-history
    6.    Discussion of impact of substance use at time of offense. (If applicable)
G.    Seventh:  Follow-up with a strong lay witness who can support the experts' findings again with anecdotal evidence.  Basically, it is most persuasive to "sandwich" the evidence presented by the expert with evidence from lay witnesses.

# GOOD PERSON EVIDENCE

Reprinted with permission from

Kentucky's Department of Public Advocacy

Edward Monahan, Esq.

TEXAS DEFENDER SERVICE
CAPITAL TRIAL PROJECT
DEATH PENALTY MITIGATION SEMINAR
AUSTIN, TEXAS
FEBRUARY 8TH & 9TH, 2001

Exhibit A1 - Texas Feb. 2001

Understanding Remorse

Whether or not the client is truly sorry for his or her acts will be an important part of the jury's deliberations. Various actions by the defendant immediately after the offense, during the time of incarceration, or at trial can demonstrate that the client has sincere remorse. Counsel must identify these various indicators, discern how they can be entered into evidence, and demonstrate to the jury that the client has sincere remorse over the crime committed.

## 2. Indicators of Remorse

Indicators of remorse may include:

### a. Confession

Counsel should talk to the police officers who took the confession to discern the client's state of mind or emotion at the time the confession was taken. Whereas a written confession may seem cold and heartless on paper or when being read by a police officer from the stand, in actuality the client may have been extremely remorseful at the time the confession was given.

### b. Contemporaneous Statements

It is not uncommon for prisoners to make statements to jailers or other inmates expressing remorse for the crime that they have committed. These remarks may not come to light at trial unless counsel takes the time to talk to jailers and other inmates.

### c. Remorseful Acts

If the client made overtures of forgiveness to the victim's family by letters, statements in the courtroom, or through mutual friends and family, and there is seemingly no gain to be made by the client in making these acts, they may be indicators of sincere remorse.

### d. Demonstrable Trauma

It could be remorse if the client is visibly effected by the knowledge or remembrance of the murder committed. This may include a suicide attempt that is explicable as remorse rather than depression at being caught.

### e. Denial.

There have been cases in which the proof is irrefutable: eye witnesses, physical evidence, even arrested at the scene, in which the client claims complete innocence. In these cases, the defendant's own personal horror and remorse over the act they have committed, may force the memory of the act into a part of the client's subconscious that is not readily available.

## 3. Remorse in the Capital Trial

Insincere or faked remorse becomes gross aggravation. As much third-party corroboration, especially from police or correction officials, that the client has contemporaneously expressed remorse in various situations, will carry more weight with the jury than in courtroom activities.

At the same time, the jury will be very attentive to the defendant's demeanor during the trial: especially during critical testimony. Though counsel doesn't want to coach the client, the client should be informed that he or she does not have to put on a stoic attitude during the course of the trial. If he or she feels sincere remorse, it should be expressed during the trial.

Be especially aware, that remorse testimony will invite rebuttal from the prosecution. Just as contemporaneous statements can be indicators of remorse, the prosecution may pull in jailers, police officers or fellow inmates who will testify that the client made particularly callous remarks concerning offense. It takes very little to rebut and undermine evidence of remorse.

## 1. Introduction to Religion

There was a time when attorneys thought that religion was the key to any mitigation hearing: either the client had found Jesus and was saved or the Christian faith taught forgiveness not retribution. Though some capital practitioners can use these themes effectively, for most, they aggravate rather than mitigate the offense.

## 2. Issues Relevant to Religion

Counsel should consider the following issues if he or she is considering religious mitigation:

### a. The Death Qualified Jury

The jury is death qualified. If they have any religious compunctions it is either that the death penalty is supported by their faith, e.g. Church of Christ, Baptists, Pentecostals, or they are liberal and they pay little attention to their denomination's anti-death penalty stand, e.g. Methodists, Presbyterians, Catholics. Either way, religion is not very helpful.

### b. Client's Personal Religiosity

If the client's personal religiosity is an issue, counsel should consider:

#### 1) Religious Prior to Offense

Evidence of religiosity prior to the offense may help to demonstrate "good person" mitigation but it may also beg the question of hypocrisy. Another issue that may arise is that the person exposed to religion "should have known better".

#### 2) Religious After the Offense

Evidence of religiosity after the offense may help to demonstrate "positive prisoner" mitigation but it may also beg the question of "jailhouse religion" and all the negative connotations that brings. Also, if the client has had any infractions while incarcerated, it may negate this mitigation.

### c. Consistency

In one case, the argument was made that the client should not be killed for two reasons; first, he is insane and does not appreciate the wrongfulness of his actions; two, he is a born again Christian. The triers if fact did not respond well to the juxtaposition of those two arguments. If religion is utilized, it must be consistent with other elements of the mitigation.

### d. Proof Texting

There are many attorneys who feel that quoting the Bible is mandatory in the closing argument of a capital case. If counsel is tempted to do this, he or she should consider (in light of the death qualified jury):

#### 1) Credibility

If there is one thing that post-trial juror interviews show, it is that jurors do not like or believe defense counsel. Quoting the Bible will probably only exacerbate this distrust.

#### 2) Rebuttal

Though the overall theme of the Bible is forgiveness, there are just as many quotes concerning retribution and punishment as those encouraging mercy and forgiveness. Any subtleties will probably be lost on the death qualified jury.

## 3. Religion and the Capital Case

If religion is going to introduced in the capital case, counsel should tread softly. If the religious conviction is authentic and demonstrable on either the part of the defendant or counsel, then introduction of the issue should be considered. If, however, there is any evidence which undermines the sincerity on anyone's part, religion should be avoided.

# DEATH PENALTY MITIGATION MANUAL

# FOR

# TRIAL ATTORNEYS

## TEXAS DEFENDER SERVICE

## CAPITAL TRIAL PROJECT

### OCTOBER 2001

Exhibit A2 - Texas Oct. 2001

# WHAT TO LOOK FOR

# AS YOU GATHER INFORMATION

# AND DOCUMENTS

**0027**

## WHAT TO LOOK FOR AS YOU GATHER INFORMATION AND DOCUMENTS

By Joseph Ward, Mitigation Specialist, Austin, Texas

### "Genetic Loading"

Look for:
1. Epilepsy
2. Diabetes
3. Brain Tumors
4. Liver or Pancreas Disease
5. Mental Illness
6. Depression
7. Alcoholism
8. Drug Addiction
9. Mental Retardation
10. Neurological Disease
11. Senility
12. Strokes
13. Endocrinology
14. Heart Disease

### Fetal Development

Look for:
1. Father's Alcoholism
2. In Utero Toxins:
   a. Prescribed drugs
   b. Mother's alcoholism
   c. Organic solvents
   d. Industrial toxins
   e. Clay eating
   d. Illegal drugs
   f. Over the counter drugs
   g. Cigarettes
3. Pregnancy Edema
4. Pregnancy Nutrition
5. Maternal Illness
6. Maternal Injuries

### Birth Trauma

Look for:
1. Length of Labor
2. Interruption of Labor
3. Drugs during Labor
4. Alcohol during labor
5. Use of forceps
6. Bleeding
7. Infant skin color

**0028**

Exhibit A2 - Texas Oct. 2001

8. Hypoxia
9. Apgar Score
10. Birth Weight
11. Body Measurements
12. Body Formation
13. Drugs at Birth

**Infant Development**

Look for:

1. Breast milk
2. Colic/fussiness
3. Nutrition
4. Developmental milestones
5. Environmental toxins
6. Home remedies
7. Physical size
8. Head injuries
9. Fevers
10. Physical injuries
11. Illnesses
12. Listlessness
13. Hyper/nervousness
14. Perseveration (repeated response when stimuli stopped or repeat answer to different question)
15. Rashes
16. Vermin
17. Family dynamics
18. Mother's Mental Health
19. Caretakers

**Childhood Development**

Look for:

1. Nutrition
2. Physical Illness
3. Physical injury
4. School Performance
5. Toxins
6. Perseveration
7. Hearing difficulty
8. Speech difficulty
9. Alcohol
10. Drugs
11. Physical environment
12. Family dynamics
13. Child labor
14. Caretakers

**0029**

## Development Trauma

Look for:

1. Loss of significant others
   a. Death
   b. Abandonment
   c. Forced removal
   d. Parental hospitalization
   e. Parental incarceration
2. Dysfunction in the home/chaos
3. Sexual assault
4. Witnessing sexual assault
5. Physical assault
6. Witnessing physical assault
7. Psychological trauma
   a. Degradation
   b. Humiliation
8. Witnessing psychological trauma
9. Hunger
10. Failure in school
11. Racism
12. Community rejection

## Head Injuries

Look for:

1. In utero beatings
2. In utero accidents
3. Physical assaults
4. Car accidents
5. Falls
6. Explosions
7. Fevers
8. Shaking
9. Fights
10. Work accidents
11. Near drowning
12. Boxing/sports
13. Surgery

## Physical Manifestations

Look for:

1. Headaches
2. Dizziness
3. Numbness
4. Appetite loss
5. Weight changes
6. Lumps/bumps

**0030**

Exhibit A2 - Texas Oct. 2001

7. Appearance
8. Physical asymmetry
9. Sexual drive changes
10. One-sided weaknesses
11. Hearing difficulty
12. Visual disturbances

Case 6:04-cv-00164-ADA  Document 3-1  Filed 10/25/12  Page 32 of 156

# INVESTIGATING SOCIAL HISTORY:

# WHO TO TALK WITH

0032

Exhibit A2 - Texas Oct. 2001

## INVESTIGATING SOCIAL HISTORY: WHO TO TALK WITH

A thorough investigation into your client's background is the cornerstone of the mitigation case. Without an in-depth fact gathering process, defense counsel will not know what case to present, not to mention how to present it. This investigation requires talking to anyone who may have insight into who your client is, how he grew up, what his life was like before the offense, and any other relevant information. Below is a list of individuals who are generally worth talking with when compiling a social history of your client. This list is certainly not exhaustive and obviously your investigation will be tailored to the case.

### Family Members

Defense counsel must interview the defendant's family. Your clients family can provide a view of your client that no one else can. Not only have they witnessed your client grow up, but they may have experienced many of the same things that your client experienced. This is especially helpful when your client is mentally ill or otherwise impaired so that he can not give reliable accounts of his past.

Your investigation should not be limited to your client's immediate family. Just interviewing the client's parents and some of his siblings may not reveal secrets that the family does not want told. Often less connected family members, such as an aunt or a cousin who knows your client well, may reveal stories of abuse that more immediate family members may be too afraid or guilty to disclose. An abusive father, for example, will rarely come right out and explain to defense counsel how he beat his children and his spouse regularly when drunk, whereas his sister-in-law will give a play by play account. Ex-Spouses are usually eager informants. It is often those family members who are not closely connected with the family or who have had a falling out with the family that provide the most information.

Do not be surprised if the family is in denial about many things. They cannot accept the fact that Johnny committed the horrible crime that he is charged with. They don't want to admit that there were signs of ongoing sexual abuse by family members that were ignored. They may be used to, and consider as normal, the conduct that most would view as reprehensible.

It is best to drop in on family members of your client at home. First of all, visiting the home of your client's family will speak volumes about them. The neighborhood, number of people living at home, the cleanliness of the house, empty beer or liquor bottles and other living conditions will reveal the environment in which you client lived. Furthermore, individuals will feel more relaxed in their own home rather than in the uncomfortable setting of a law office. This sense of security will make it easier for family members to talk about painful subjects. Use common courtesy. When you make an appointment to show up–be there. It might be easy to take a condescending attitude with you when you visit a dysfunctional family in a run down trailer park. Leave that attitude at home. You need to set a tone with your team that the family will be treated with respect, no matter how difficult it may be.

There are varying thoughts on whether to interview family members in a group or individually. Group interviews are sometimes unavoidable if many family members live in close quarters. A group interview will allow you to see dynamics between family members and how they relate to

**0033**                                                      Exhibit A2 - Texas Oct. 2001

each other.  The information that you receive in a group interview is definitely not as detailed or reliable as that obtained when interviewing a family one on one.  An abused spouse will not give a detailed account of the beatings she receives on a regular basis from the man sitting next to her.  Therefor, it may be helpful to talk briefly with the whole family in a group initially and meet with individual family members later.  Interviewing the family separately will also prevent the prosecutor from insinuating that the family "all met together and cooked up this story."  The investigator's interviews may be more productive if the family member is talked to alone.  The investigator might take the person out of the house for a cup of coffee at a spot where the family member will feel more comfortable taking.

Several places in this manual you will see a discussion of the "alpha personality" in the client's family.  In some cases you will find that there is one person in the family that is the dominant personality.  This is someone that the client may trust, seek the approval of, or rely on in times of stress.  One way to find this person is to ask the client who are the five most important people in the client's life.  Then ask each of those named by the client (there may be no one or certainly might be less than five who are the most important people in the client's life).  A consensus will begin to build.  Find out who is visiting the client in jail, who your client is writing letters to and who is calling your office regularly to find out "what is going on."  Find that person who the client responds to and who really has the interest of the client at heart.

This is the person that you want to make sure is in a limited loop during your investigation of the case.  Certainly you are not to share any confidential information with this person, but they need to be able to understand the process and how hard the team is working to save your client's life.  If you have that opportunity for a plea, it is the alpha personality that you want involved in that discussion.  A client who will not respond to the lawyer may turn to the alpha personality for guidance.  If you have convinced that person of the wisdom of the plea they may be able to help your client see the light.

### Friends of the Family
Friends of the family are also good sources of information.  They, like more distant family members, may have witnessed abuse or neglect in the family and will have much less to lose in recounting this information.

### Friends of Your Client
Depending on who your client is, getting to know his friends from the time the offense was committed can prove especially enlightening.  Was your client in a gang?  Were his friends much older or much younger than him?  Did your client date?  Your client's friends know things about your client that his family will not.  Often your clients family will not know about his drug use or drinking.  His friends will.  Who your client's friends are will also give insight on the lifestyle of your client prior to the offense.

### Teachers, Coaches, Clergy, and other Role Models
It is very helpful to talk with your client's teachers, ministers, and any other respected individuals who know your client.  They may be good sources of information on problems your client may have had learning or dealing with others in a more formal setting.  Furthermore, they may be credible character witnesses at trial.  Many of these people will tell you that "I don't

know anything about this case and don't know how I can help." A suggested response might be "It is not necessary that you know anything about this case.  In fact, it is important that you do not.  The prosecutor will be trying to get a jury to choose to kill Johnny.  They need to know as much about Johnny as they can.  I just want you to provide them with a 'snapshot' of Johnny's life, nothing about what they say Johnny did, but what he was like when you knew him.  Johnny needs your help now more than at any other time of his life."

## Health Care Professionals Who Have Treated Your Client or Family Members

After examining any records that may have been kept about your client or his family, it is useful to talk to the doctors, psychologists, or other professionals who have treated your client or his family.  They may recall suspicious injuries that suggest abuse, drug and alcohol problems in the family, neurological, psychological or physical impairments in the family, any inherited problems, or even if your client had medical insurance or was on medicaid.  Ask if there were any physical signs that would indicate fetal alcohol syndrome or other organic injuries.  The chapters entitled "Psychological and Neurological Impairment" and the "Checklist of What to Look for While Gathering Records" can help counsel and the mitigation investigator recognize signs of organic injuries and how to deal with them in the mitigation case.

## Social Workers

Whether it was in relation to a call about neglect or abuse, an application to receive disability payments, or problems at school, most capital defendants will have had some contact with social services.  Social workers who may have met with your client or visited the home can be excellent sources of information, as well as good witnesses.

Your mitigation investigator may be a social worker and she will be able to make some valuable contacts for you.

## Co-Workers or Employers of Your Client

How your client performed at work will give some insight into your client's abilities and personality.  If your client was a good worker, employers and co-workers may make good penalty phase witnesses on good character and even adaptability arguments.  If your client was incompetent at work, there may be suggestions of psychological or neurological impairment.

## Police Officers Who Know Your Client or His Family

Chances are your client and probably some of his family members have had run-ins with law enforcement.  Especially in small towns, police officers and offenders get to know each other very well. Police officers may be able to talk about putting your client's father in the drunk tank on a regular basis.  Few would be a better witness on how the system may have failed your client than the police officers who picked up your client every time he got out of TYC or the state hospital.

## Lawyers

If your client has had previous contact with the judicial system, he will most likely have had a lawyer.  Your client or his family may have had a lawyer in connection with criminal charges, a divorce, an accident, or any other matter.  Depending on the representation, the lawyer may have extensive files on your client or his family.  Undoubtably, a previously appointed or retained

**0035**                                                                 Exhibit A2 - Texas Oct. 2001

lawyer will have useful information about your client or his family.

## Corrections Officers

Corrections Officers from your client's previous incarcerations or your client's present incarceration can give excellent information on your client's behavior. Their job was to watch your client. They will know if your client got in fights, helped other inmates, went to church services, or tried to educate himself. They can be good sources of adaptability evidence, character evidence, and may also be able to give counsel the heads up on any bad acts committed by your client during incarceration. A corrections officer once testified for a client in a penalty phase about how the defendant has worked to get a terminally ill AIDS patient released from jail so that he could die at home and how the defendant bought candy bars for another AIDS victim who was too sick to eat anything else and had no money. There was not a dry eye in the place and the jury returned a life verdict.

## Family of the Victim

This can be a psychologically daunting task, but it is a must. The family of the victim should be contacted. Any effort to somehow reduce the rage that the victim's family feels against your client is worthwhile. Furthermore, the victim's family may not support the death penalty. This can be a very strong factor in negotiations with the prosecutor as well as in mitigation at trial. A more complete discussion of how to approach the victim's family is included later in this manual. See the chapter in this manual entitled "Deceased's Survivors and a Plea."

## Surviving Victims/Witnesses at the Scene of the Offense

Besides interviewing these individuals in relation to guilt or innocence, it is also important to talk with them about factors that relate to mitigation. Was your client the principle in the crime or was he just along for the ride? Was he surprised or attacked? Any information that may in some way lessen your client's culpability for the offense is important to get from these witnesses. When the jury is considering its answer to the *Penry* issue described in C.C.P. Art. 37.071(2)(e)(1) they are ·to consider the defendant's "moral culpability" and "moral blameworthiness". C.C.P. Art. 37.071(2)(f)(4).

The investigation is the most important part of mitigation as it controls where the rest of the case will go. Your expertise at trial can only go as far as the facts that you have to work with and your expert's opinions are only as good as the information about your client provided to them and you. Substantial time and effort should be put into locating, interviewing, and developing a rapport with those who knew your client prior to the offense. When new information is discovered, go back and talk with those who may know something about it. Often people will be more open on a second visit or if you can demonstrate to them that you already know something and they are just filling in the details.

4

# DSYFUNCTIONAL

# FAMILIES

Exhibit A2 - Texas Oct. 2001

## DYSFUNCTIONAL FAMILIES

Almost without exception, the client facing capital murder charges was raised in a dysfunctional family where at least one of the parents had a serious criminal history, was mentally ill, absent, abusive, addicted, or mentally/physically unable to meet the needs of the family.

In dealing with the issue of the dysfunctional family, it is always important to remember that there are many factors that can cause family dysfunction. There often is, but need not be any "villain" who has purposely made the family dysfunctional. Perhaps the family has become dysfunctional as the result of a natural disaster, an untimely death, the fact that one or both parents are retarded or mentally ill, or simply that various types of negative parenting have been passed down from generation to generation. The end result is that the client has a very chaotic and distorted view of the world.

## I. THE DYNAMICS OF A DYSFUNCTIONAL FAMILY
Many of the various types of family dysfunction have some of the following characteristics:

### Parenting Problems
The parents are there to provide structure, consistency, sustenance and a host of other important factors to a stable family environment. In most circumstances, a dysfunctional family has its root in the fact that one or both parents are in some way ineffective in their role. Some of the ineffective care givers fall into one or more of the following categories:

#### A. Absent Parents
One or both of the parents have abandoned the family at some point or because of death, incarceration, illness, or some other natural disaster are incapacitated or dead and are no longer an integral part of the family unit.

#### B. Negative Parents
One or both parents bring to the family unit habits or behaviors that have an overall negative effect upon the family unit. This may include a parent who is an alcoholic, engages in criminal activity, is sexually, physically, or psychologically abusive, suffering from some mental disease or a victim of a dysfunctional family as well.

#### C. Multiple Parents
The client may have been exposed to one or two parents, several step-parents and a long line of "significant others". Not all of these influences may have been bad. However, each of their expectations of the child and their exercise of discipline may have been different and inconsistent.

### Environmental Conditions
There may be situations in which a family will become dysfunctional through no fault of its own. Environmental factors which may lead to family dysfunction may include:

#### A. Victimization or Natural Disaster
It is not uncommon for a family to become dysfunctional after becoming the victims of a

Exhibit A2 - Texas Oct. 2001

crime or a natural disaster which results in the loss of human life or significant monetary instability.

### B. Poverty and Financial Loss

Families can become dysfunctional either because of the numbing effects of poverty, or the shock of a large financial loss. Because of long-term poverty, family structures may never develop, whereas with severe financial loss a relatively functional family may disintegrate.

### C. Transience

Families that, for financial or other reasons, move regularly from place to place are often dysfunctional. If your client's family worked as migrant laborers, for example, transience would be a big factor in your client's life.

## Other Family Dynamics

Beyond the parents, other members of the family can have a significant impact on the degree to which a family functions. Factors that can prove to be disruptive to the family include:

### A. Intrusive Relatives

An elderly grandparent or other relative who is brought into the home to live out the last years of life may divert the parent's attention from the needy child. This may result in failure to intervene properly on the part of the parents or deep resentment by the client.

### B. Displacement

A sibling may usurp the attention and care the client requires. This may include a sibling who suffers from a debilitating illness requiring extreme amounts of attention. Other examples might include the "gifted" child through whom the parents vicariously live out their lives or simply the youngest child who becomes the focus of the parent's affection and concern.

### C. Disruptive Relative

Aunts, Uncles or in-law who sexually, physically or psychologically abuse other members of the family can be a disruptive force. A member of the household with an extreme illness, either physical or psychological, can also be disruptive and cause family dysfunction. A disruptive family member may be a sibling who exhibits criminal or anti-social behavior and causes extreme disruption in the family. This could be the anti-social big brother that is always getting his siblings (your client) into trouble. Should the prosecution try to characterize the client as having an anti-social personality disorder, it will likely point to incidents of "conduct disorder" (aggression to people and animals, destruction of property, deceitfulness or theft, serious violations of rules. *DSM-IV*, 312.8).

It is one thing if a client was engaging in the conduct on his own, but a completely different picture is presented when his "conduct disorder" was the result of coercion by an abusive older brother. It is one thing if a client is an habitual run away because he doesn't respond to authority or does not want to obey the rules of the family. It is an entirely different matter if the client runs away from the home because he is being

sexually abused by an alcoholic uncle who has moved into the house.

## II. THE EFFECTS OF A DYSFUNCTIONAL FAMILY

Family dysfunction can cause any number of behaviors that result in the client coming into contact with the criminal justice system.. These effects can include:

### Psychological Effects

The individual's psychological stability may be affected in the following ways:

#### A. Violent or Criminal Behavior

The victim of various forms of family dysfunction may harbor extreme rage against others or accept violent behavior as a norm. Children raised in certain settings may grow to be adults who accept stealing, prostitution, and other criminal acts as normal.

#### B. Substance Abuse

The client may have turned to substance abuse either because one or both of the parents was doing drugs (modeling his behavior after their behavior) or to escape the painful effects of having to live with such a dysfunctional family.

The family may suffer from a genetic predisposition to substance abuse that is at the root of the family dysfunction. This is where the genogram comes in handy._ The mitigation investigator can diagram the family tree, noting next to the name of each family member any substance or mental health problems. As with the time line, often an _pattern begins to emerge. Occurrences, _that _seem to be totally unrelated, can be shown to have a distinct relationship to each other when diagramed on a genogram.

#### C. Sexual Dysfunction

A child who has been sexually abused often grows up to be an adult with serious sexual problems.

### Medical or Neurological Effects

The long-term effects upon the physical well-being of the client who has been exposed to neglect, deprivation or physical beatings can be serious. Some of these effects may include:

#### A. Neurological Damage

Neglect, deprivation, beatings to the head and other factors may result in severe neurological damage that manifests itself in negative behaviors. The neurological damage may be subtle and may not be revealed by any imaging tests that can be ordered by a neurologist. However, neurological testing, by a carefully selected neuropsychologist, may establish neurological impairment.

#### B. Socially or Physically Debilitating Injury or Disease

Malnutrition, injuries received at the hands of an abusive parent, or untreated illnesses may have severely impaired the client's ability to function in society. This, combined with a low IQ, may mean your client is mentally retarded.

**0040**                                                                 Exhibit A2 - Texas Oct. 2001

**C. Avoiding the "but his brother hasn't killed anybody" Response**
The first question the prosecutor will ask when cross-examining the sibling who has just painted a vivid picture of extreme family dysfunction is, "Have you ever killed anyone?" The answer to this will probably be "no". The prosecution will use the relative normalcy of the sibling, who experienced the same life shaping forces, as a way of diminishing the impact of family dysfunction mitigation. Anticipate this approach and consider asking the question yourself on direct. You can then tick off the different factors identified by your mitigation specialist that distinguish the life or genetic experiences of the siblings.

Counsel must do more than just paint a picture of dysfunction. Counsel must paint the client life into the picture in such a way as to graphically illustrate the client's particular vulnerability to the forces of dysfunction. Anyone who has grown up in a family with brothers and sisters understands that siblings are not always treated alike. "Some of the people exposed to... brutalizing experiences... lead quiet lives of desperation, while, for some, that desperation gets very, very loud." This is illustrated by the example of Gary Gilmore, the first person in the United States that was executed after Furman. Gary's younger brother, Mikal, a writer for *Rolling Stone* magazine, wrote of his dysfunctional family:

> What had gone wrong in my life, I realized was because of my past, something that had been set in motion before I was born. It was what Gary and I shared more than any blood tie: we were both heirs to a legacy of negation that was beyond our control or our understanding. Gary had ended up turning the nullification outward -- on innocents, on Nicole, on his family, and on the world and its ideas of justice, finally, on himself. I had turned the ruin inward -- either way it was a powerfully destructive legacy...."(Mikal Gilmore, *Shot in the Heart* (1994).

Family dysfunction can be very compelling evidence that may foster compassion, empathy and understanding among the jurors. But unless counsel demonstrates what the client's particular vulnerability was to these negative forces (and the relationship of the experiences to his crime) the value of this powerful mitigation will be lost.

## Child Abuse
One aspect of the dysfunctional family that is often central to a death penalty case is child abuse. Many capital defendants, at some point in their development, were abused by a parent, relative, or other trusted adult. Any trial team's experience with capital cases will reveal the pattern of physical, emotional, or sexual abuse and the direct effect on how an individual behaves later on in life. Please refer to the table of contents for reference to a Department of Justice study that provides statistical support for the connection between an abusive background and violent behavior later in life. The relationship between an abusive background and violence may be viewed as a "double edged sword". Counsel may be discouraged from using this evidence, fearing that the jury will view the client as permanently damaged goods. Permanently damaged goods cannot be salvaged and therefor must be eliminated from society by execution. It is the trial team's job to show that the client's dysfunctional past was not of his choosing. While certainly he should be punished for his violence, it is not fair that he be killed for conduct that was the inevitable result of something that was imposed upon him. The client committed

violence acts in part because there was no supervision and control over him. This supervision and control can be provided by the Texas Department of Criminal Justice in an administrative segregation unit or with perhaps a less restrictive classification. The client does not have to be killed.

The connection between life experiences and a heinous crime, however, is not always clear to juries. Merely presenting evidence of even the most horrific childhood abuse will usually not be enough to sway a jury to spare your clients life. Defense lawyers must present a causal connection between the moving accounts of abuse and the crime. "[T]oo often jurors and judges, although they may have some emotional reaction to evidence, fail to treat child abuse as a meaningful component in their decision. They report that they feel sad and are touched by accounts of the client's childhood but fail to see any connection between that evidence and his later 'choices' to commit such 'heinous crimes." (Logan, Deanna Dorman "From Abused Child to Killer: Posting Links in the Chain" Champion, January/February 1992, p.36, (hereafter *Logan*).)

The importance of showing this connection to the jury is evident from a 1989 survey on death penalty attitudes among death qualified California jurors. In that study, the interviewers asked specific questions regarding mitigating factors that would make a life verdict more likely. More than half of those surveyed (55.6 percent) said they would be more likely to vote for life if they knew that the murder was committed while the person was under extreme mental or emotional disturbance. The numbers were much lower for child abuse. Only 36.5 percent of those surveyed said evidence of serious child abuse would make them more inclined to vote for life. Child abuse evidence standing alone is not as persuasive to a jury as evidence of emotional disturbance standing alone - what the lawyer must communicate to the jury is that past child abuse *causes,* or at the very least *contributes,* to emotional and mental disturbance at the time of the crime. The link is critical. (Haney, C., Hurtado, A. and Vega, L. "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," *CACJ Forum*, 1992, Vol. 19, No. 4, p. 44.)

## Physical Abuse
Most members of the jury will have received a "spanking" or two as a child. It is important to emphasize to them that the abuse that your client suffered as a child was not an occasional spanking but that it was extreme. In presenting this evidence, defense counsel should focus on:

### A. Third Party Corroboration of the Abuse.
In many seriously abusive families, Child Protective Services (CPS) will have been called to the home. Documentation from CPS, or the testimony of a CPS case worker who may have visited the household, is very effective. A full search of your client's medical records may reveal emergency room visits. Records of these visits are tangible documentation of the abuse. Your client may still have scars on his body from beatings he received. These should be documented and presented to the jury. Another valuable source of information and testimony are siblings and non-abusive family members who may be able to testify to the abuse that went on in the home.

### B. The Unfairness of the Punishment and Your Client's Vulnerability
Often your client will have been singled out for punishment and abuse because of some handicap that may have frustrated other family members. If your client has a learning

Exhibit A2 - Texas Oct. 2001

disability or is retarded, family members may have abused him because he was simply unable to control his behavior, follow their directions or was simply "easy" to pick on.

### C. The Identity of the Abuser

The abuser should be presented to the jury as horrible and as despicable as he was. Although your client may feel uncomfortable by demonizing a parent, it is vital to emphasize to the jury that the environment your client was raised in was very different from the life that included the occasional spanking experienced by a juror.

### D. Long Term Effects of The Abuse

There are often psychological and neurological effects of abuse that stay with an individual throughout his life. Blows to the head or incidents of choking may have done permanent neurological damage. Furthermore, even minor physical abuse can leave profound psychological wounds.

### E. Normalcy of the Abuse

As described in other sections of this manual, one of the difficulties in eliciting information of the abuse your client may have suffered is that your client may not recognize it as abuse. Your client may not understand that being beaten with a belt buckle until blood is drawn or being locked in a closet for long periods of time, without food or water, is abnormal discipline. If the jury is made to understand that your client internalized this level of violence, and saw it as normal, they may better understand the roots of his violent behavior.

## Sexual Abuse

Exposure to sexual abuse either as a victim or as a helpless observer, can have a profound impact on an individual. Even if your client is male, don't rule out the possibility that there may be an issue of sexual abuse. Your client may have witnessed his sister or mother being abused or may have been abused himself as a child.

Evidence of sexual abuse can be very effective with a jury when presented correctly. Although jury members may be able to discount physical abuse due to their own experience, jurors will find sexual abuse particularly abhorrent.

Evidence of sexual abuse, as with any evidence of abuse, must be presented correctly to have a mitigating effect on the jury. Merely presenting evidence of abuse may make the jury feel bad for your client as they sentence him to death. This evidence must be presented in a way that explains how the abuse that your client suffered as a child contributed to the crime.

Effects of Sexual Abuse:

### A. Behavioral

Sexually abused individuals may be withdrawn, depressed, have short attention spans, or be overly compliant or self abusive. They may abuse other's children or their own.

### B. Psychological

**0043**                                                                 Exhibit A2 - Texas Oct. 2001

Dissociative disorders are often related to sexual abuse. Various forms of sexual dysfunction, self-hatred, sleep terror, eating disorders, and memory loss may also be present in the abused child.

Evidence of sexual abuse, as with any evidence of abuse must be presented correctly to have a mitigating effect on the jury. Merely presenting evidence of abuse may make the jury feel bad for your client while they sentence him to death. This evidence must be presented in a way that explains how the abuse that your client suffered as a child contributed to the crime.

## Child Psychological Abuse

Just because a parent does not physically hit his or her child does not mean that abuse is not taking place. It is now generally recognized that psychological maltreatment may be as serious a problem, both in scope and effect, as physical or sexual abuse. While much more difficult to discover and prove than some forms of physical abuse, counsel must nonetheless explore this avenue and attempt to develop, when applicable, a credible case that the client was psychologically maltreated.

### A. Issues Relating to Psychological Abuse

Emotional abuse has been defined as a pattern of psychologically destructive behavior inflicted by an adult on a child. This pattern may take any of the forms that are described briefly below:

### B. Spurning

Spurning includes belittling, denigrating, and other non-physical forms of overtly hostile or rejecting treatment. Shaming the child for showing normal emotions or consistently singling out one child to criticize and punish, often in public, are just some of the forms of spurning.

### C. Terrorizing

Children can be terrorized by placing the child in an unpredictable chaotic circumstance which is recognizably dangerous or by setting rigid or unrealistic expectations and threatening extreme loss, harm or danger if expectations are not met. Children's fears and vulnerabilities may be exploited and violence may be threatened.

### D. Isolation

Unreasonable limitations on the child's freedom of movement within his or her environment, limitations or restrictions on the child's social interactions, or isolating the child from non-dangerous sources of information or ideas, can be forms of psychological maltreatment.

### E. Exploiting/Corrupting

It is psychological maltreatment for a parent or adult to permit or encourage antisocial behavior such as prostitution, substance abuse, violence, or other criminal activities.

### F. Denying Emotional Response

It is not uncommon for parents to fail to express affection, caring, and love for the child. Some parents may actually punish their children for showing normal sensitivity to

particular situations, i.e., a boy who cries and is punished by his step-father for not being "manly" is an example of denying an appropriate emotional response and is a form of spurning. Parents may also psychologically abuse their children by interacting only when absolutely necessary and providing no nurturing or caring.

## Bad Parenting and Substance Abuse

There is a relationship between a parent's substance abuse and the emotional maltreatment of children in the family:

> A significant number of psychologically, physically and sexually abusive parents have serious alcohol and drug dependency problems... Each chemical increases the user's underlying tendencies to be more in touch with his or her own immediate needs and less attuned to the needs of others, including children. Intoxicated parents are poor role models for their children, and it is not surprising that there are second and third generation alcohol and drug abusers. See National Institute on Alcohol Abuse and Alcoholism, "The Genetics of Alcoholism". *Alcohol Health and Research World*, Volume 19, Number 3, 161-256, 1995 and Van den Bree, M..; Johnson, E.; Neal, M.; and Peikens, R. "Tenetic and Environmental Influences on Drug Use and Abuse/Dependence in Male and Female Twins". *Drug and Alcohol Dependence*, 52(3):231-241, 1998.

> When operating under the influence of drugs or alcohol, parents are more likely to insult, disparage, threaten, and coerce children than when in a chemical-free state of mind. Some may repress any recall of their noxious behaviors having occurred during "blackouts" and some may rationalize their conduct as obviously unintended and attribute it to "whiskey talk". The children, however, respond with anxiety, sadness, and fears of danger to the hostile comments and behaviors of parents, whatever the parents' state of mind. When the expressions of hostility and rejection are particularly intense, as is often the case when one is intoxicated, or when the ability to respond to a child's needs is particularly impaired, the child often feels worthless and desperate. *Family Violence: A Clinical and Legal Guide*, American Psychiatric Press, (1996) Sandra J. Kaplan, pp. 45-46.

## Psychological Abuse and the Capital Case

As with any form of abuse, most jurors will understand the negative effects of this type of treatment upon children. As with physical and sexual abuse, the jury must be reminded these are factors from which they protect their children at all costs, but the client was not protected and the end result was the aberrational behavior that resulted in the instant offense.

The availability of this type of mitigation presents a great opportunity for the trial team during *voir dire*. Many jurors will initially not be moved by descriptions of the client's abuse during childhood. This type of evidence is nothing more than an excuse for your client's heinous, incomprehensible and unforgivable crimes. Jurors can be asked during *voir dire* about their own children, the relationship that each juror has with their child or children. The juror can be asked to describe the love and attention that is given to their child and how each juror would go out of their way to protect their child. Then ask each one "Why do you do this for your child?" "Why is this important to you and your child?" "What would happen to your child if these things were

**0045**

not done?" "What would happen to your child if he or she was exposed to...[the same life experiences that the client has]?"

These types of *voir dire* questions are most effective during general *voir dire* if counsel has that opportunity. The jurors can educate each other on the importance of a child's life experiences.

Another issue to discuss with the jurors during *voir dire* is the concept of "choice." The prosecutor will beat the trial team and the client over the head with the notion that "the defendant had a choice" and he chose wrong and should be sentenced to death so he cannot do it again. If the subject is approached properly, jurors will come to understand that the client really had no choice of who his parents were, how they treated him, what kind of background they came from, what his genetic makeup is or what his IQ is. These important risk factors were not chosen and, as the Department of Justice's 1995 study "Risk and Protective Factors for Serious, Violent and Chronic Juvenile Offenders in the Community" establishes, they precurse deliquency and violence if the client did not receive proper intervention.

These are the characteristics that the client was born with and over which he had no control. The genetic and environmental characteristics controlled him. Follow an ugly kid home from school and you are likely to find ugly parents.

As already mentioned, psychological abuse is much more difficult to identify and demonstrate than forms of physical abuse. Therefore, it may be imperative to have the anecdotal and historical information provided by family members and CPS workers interpreted by a psychologist or other professional in child development.

### Divorce
Most jurors will either have been party to a divorce or have a close friend or family member who has been divorced. Therefore, the fact that your client comes from a broken home, will not alone be considered all that mitigating by the jury. Divorce, however, has an undeniable impact on the life of those involved, especially the children. When asked what the worst moment of his life was, one death row inmate stated that it was not the mistreatment in prison for 14 years or anything related to his crime, but it was the fights that his parents would have during their divorce.

The issue of your client coming from a broken home can easily be woven into other facts in mitigation about his background and upbringing. The divorce may not only have caused childhood trauma, but may also have contributed to financial hardship, instability in living arrangements, and a lack of good role models growing up. There may also be factors that made your client particularly vulnerable to the effects of a divorce. Furthermore, juries are generally aware of the degree of emotional, financial, and familial hardship that divorce usually brings. When these factors are put in the context with the other mitigating factors in your client's background, the jury may be able to better understand how the client's life evolved as it did.

### III. CONCLUSION
It is rare that a client who stands charged with a capital offense, comes from a fully functional family. The mitigation specialist, particularly one with a social work background, should be able

Exhibit A2 - Texas Oct. 2001

to identify the signs of a dysfunctional family. More importantly, this team member should be able to help the trial team understand how little control the client had over the dysfunction of his family, but also how the family's problems exerted a great deal of control and influence on his life. The relationship between the client's tragic life and the capital murder that he committed must be shown to the jury. The trial team can then help the jury to understand that this theory (or supporting theme) is not an excuse, but a very real explanation of why the client committed the violent crime. Finally, the jury must be made to understand that while the client's tragic life led him to commit a violent crime in the free society, the Texas prison system has the appropriate supervision and security to prevent him from being a "future danger" in the prison society.

Exhibit A2 - Texas Oct. 2001

# SUBSTANCE

# ABUSE

## SUBSTANCE ABUSE

There are probably few issues as pervasive in a capital trial as substance abuse. There is a good possibility that at the time of the crime, the client, the deceased, or both were under the influence of a psychoactive substance. Counsel must develop such facts as relevant and persuasive evidence for the negotiation and guilt phases of a capital trial.

For purposes of the penalty phase, however, whether the client was under the influence of drugs and/or alcohol at the time of the crime is not as important as *why* the client uses such substances and the nature and extent of the substance use. Counsel must explore a number of different avenues for counsel regarding the client's substance abuse. Several are described below._

First, the client may have a genetic predisposition to alcohol or other substances that can help diminish the volitional aspect of the addiction and the crime.

Second, certain psychoactive substances can result in severe neurological, psychological, physical and social changes which may have impacted the client's life long before the capital crime. For example, inhalants may cause brain damage that can result in cognitive deficits.

Finally, long-term substance abuse may well point to other underlying problems such as child abuse, sexual abuse, psychological or neurological impairment, that predated the substance use and help to explain it. Drug or alcohol abuse ultimately has more mitigating potential if it is shown to be a natural consequence of other trauma the defendant suffered. Counsel must make the jury understand why the client turned to drugs. For example to Dr. Craig Haney:

> Many of the victims of early abuse and neglect turn to alcohol as a form of "self-medicating" to reduce their emotional pain. Indeed, often their parents' own drug and alcohol abuse provides them with the most salient model for resolving interpersonal conflict and reducing stress or depression. Crain Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation* 35 Santa Clara L. Rev. 547 (1995) at 584.

In addition to showing *why* the client is a substance abuser, it is equally important to show the jury *how* the substance abuse facilitated or contributed to the capital crime. While it cannot be said that drug use *causes* crime or a life of crime, it is certainly a risk factor for future criminal behavior, including violence. "Although drug use does not appear to initiate a criminal career, a large volume of research clearly indicates that frequency of drug use has a strong impact on the extent, direction and duration of that (criminal) career." *Id. at 585*. In the subculture in which drug users find themselves, criminal behavior is not only the norm, but it is expected and even respected. According to Dr. Haney, the connection between the use of certain drugs and violent crime has additional dimensions:

> Psycho-pharmacologically, cocaine use produces long periods of sleeplessness and increased paranoia, heightening the probability of aggressive behavior. Economically, cocaine use requires access to fairly large amounts of money, which some are able to obtain only through criminal, sometimes violent, activity.

And the subculture of drug use itself exposes drug users to patterns of violent behavior that, because of their drug use they are more likely to be integrated with (including the access to, familiarity with, and experience in using lethal weapons.) *Id.*

In addition to explaining how drugs and alcohol affected the client's life and contributed to resulting violence, counsel should also be prepared to present evidence regarding the relationship between the client's substance abuse history and the likelihood that he poses a future danger to society even in prison. In other words, counsel should be aware that the client' potential access to drugs or alcohol in prison (if he is not sentenced to death) will very likely be an issue at sentencing. Counsel should consider what evidence can be presented to persuade the jury that the prison system is sufficiently regulated to minimize the client's access to such substances. Prison officials will say that prison administrators don't do everything possible to keep out drugs and alcohol. To the extent that the client's substance use was a response to stimuli he confronted in the "free world" but will not face in prison, that fact may mitigate the risk of the client's continued substance use if he is spared the death penalty.

Your toxicologist may only be able to say that the drug or alcohol ingestion impaired your client's judgment. This opinion, while essential to accounting for the client's involvement in the crime based on his use of drugs or alcohol, is not sufficient to persuade the jury to spare the client's life. Instead, the case in mitigation must demonstrate that the substance abuse has changed the client in fundamental ways.

**Investigating and Establishing Factors Related to Substance Abuse**

The following is an illustrative, not exhaustive, list of issues to consider:

**A. Heredity and *In Utero* Exposure to Toxic Substances**
Many individuals have familial predispositions to alcohol and drug abuse or dependence. Experts now agree that at least part of that predisposition is attributed to genetic factors. This has been established repeatedly by twin and adoption studies. For additional reading in this area you might consider Anthenelli, R.M., and Schuckit, M.A. "Genetic Studies of Alcoholism", *International Journal of the Addictions*, 25:81-94, 1990 and National Institute on Alcohol Abuse and Alcoholism, "The Genetics of Alcoholism", *Alcohol Health and Research World*, Volume 19, Number 3, 161-256, 1995. If you would like more cites, please contact Texas Defender Service at (512) 320-8300.

This possibility makes it absolutely essential that counsel conduct a thorough *multi-generational* social history. In exploring the effects of substance abuse on the client, counsel should also keep in mind the debilitating effects which these substances have on a developing fetus, and investigate the possibility that the client may have been exposed *in utero* to toxic substances. Disorders such as fetal alcohol syndrome (FAS) or fetal alcohol effects (FAE), which result from the pregnant mother's excessive use of alcohol, are increasingly recognized as conditions which can help explain violent or aberrant behavior.

**0050**                                                    Exhibit A2 - Texas Oct. 2001

## B. Self-Medicating

Individuals who, for whatever reason (economic, social, etc.), have no access to "real" health care may use drugs or alcohol in an attempt to ameliorate the symptoms of their own medical or mental health problems. This phenomenon is often referred to as "self-medication." Individuals often self-medicate for symptoms of various physical, psychological, and neurological disorders which may never have been properly diagnosed. Individuals also self-medicate to cope with the stresses of severe emotional, physical or sexual childhood abuse. Unfortunately, dependency and abuse are common. Just as post-surgical patients who are lawfully prescribed pain medication by doctors are at a high risk for becoming dependent on such drugs, those who self-medicate may be unable to stop using drugs or alcohol even if the event or experience that originally triggered the need to self-medicate subsides or recedes in the past.

## C. Differential Effects of Substance Abuse

Drugs and alcohol can affect individuals in vastly different and unpredictable ways. For some individuals, small amounts of certain substances can have acute psychological short-term effects. Others, especially those who have built up a tolerance to a substance and frequently ingest amounts of substances which would kill someone else, simply experience their usual "high"/"low". In addition, although long-term use of alcohol or certain drugs can result in profound neurological, physical, psychological, and social debilitation, in many cases severe damage has been caused by a single first-time use of a substance. Finally, counsel should be alert to the fact that a particular individual may have a dramatically different experience on a single occasion, compared to all other occasions on which the individual used the particular substance (*i.e.*, don't assume that every time your client ingested a particular drug, the client's experience was the same; thus, the fact that the client had used methamphetamine on other occasions without acting violently does not preclude the possibility that on the night of the crime, his use of that drug strongly influenced his violent behavior.)

## D. Withdrawal

Withdrawal can occur due to reduction or cessation of chronic abuse of certain types of substances. Withdrawal is not uncommon from alcohol, amphetamines, cocaine, opioids and sedatives. The symptoms of withdrawal can affect the client's mental state severely (*e.g.*, if the client was interrogated at length while undergoing withdrawal, that fact is essential to judging the voluntariness of any waiver of rights the client may have made during that period). It is now recognized that withdrawal symptoms or avoidance of withdrawal can result in criminal or violent behavior.

In investigating the possible influence of withdrawal phenomena on your client, it is important to obtain evidence about the client's appearance or behavior immediately after the crime (which often include jail records or interviews with people who had contact with the client at those times).

## E. Exacerbation of Preexisting Mental Disorders

Many disorders are exacerbated by intoxication or withdrawal from some substances. These disorders include: Bipolar Disorder, Post-Traumatic Stress Disorder, Panic

**0051**                                                    Exhibit A2 - Texas Oct. 2001

Disorder, Schizophrenia and Borderline Personality Disorder. Counsel should investigate the possible presence of primary mental disorders such as these and consult an expert about the additional influence of intoxication or withdrawal on the client's conditions counsel should consult an expert about the additional influence of intoxication or withdrawal on the client's condition.

## Identifying Substance Abuse

Identifying substance abuse in the client and his or her family can be facilitated the following ways:

### A. Self-Reporting

The client and his or her family[1] may provide information regarding their drug and alcohol use. However, issues that must be kept in mind are:

#### 1. Inaccuracy/Faulty Memory

The respondent may not know which substances he or she was taking at the time or may not have an accurate recollection of the quantity of drugs ingested. Since most illicit drugs are not "pure," they are often cut or laced with other substances which may result in differing effects. Because of this widespread practice, drug users rarely know the contents of the substance they are ingesting. It may also be necessary to engage an expert to translate the respondent's descriptions of drugs (by their appearance or "street names") into pharmaceutical terms.

#### 2. Deception or Exaggeration

Respondents may be embarrassed to discuss their drug use or dependency and may understate their drug usage. This is especially difficult if the client's mother, or the client herself, used drugs or alcohol during pregnancy. Counsel should explain why accurate information about these subjects is vital to the client's case, and should reassure the respondent that no judgments will be made about person, that you are only interested in the information. Additionally, It is also possible that individuals may exaggerate the type and/or the amount of substances taken. Because of the status ascribed to the use of various drugs, individuals may feel pressured to embellish their drug use to impress nearby friends, family or even counsel.

### B. Documentation

Records from various institutions are likely be more reliable in determining types of substances abused as well as the extent of the treatment, if any, received. Information may include:

#### 1. Drug/Alcohol Related Criminal Activity

---

[1] Drug or alcohol use by other members of the client's family may be as important in understanding the client's development and behavior as the client's own substance abuse history. Thus, in preparing an appropriately thorough social history of the client, this investigation should be undertaken with respect to all such individuals, whom we describe collectively in this subsection as "respondents."

**0052**                                                      Exhibit A2 - Texas Oct. 2001

Documentation of arrests or infractions may provide additional information about what kind of substance the respondent may have been using, and when such incidents occurred.

### 2. Treatment
If the client as received any drug/alcohol treatment the records from the treating facility or professional should describe the extent of the abuse and whether treatment was successful.

### 3. Hospital Records
Hospital records may reveal admissions or emergency room visits as the result of overdosing or drug-related accidents. Such incidents may also have been followed by arrests, which generate additional documentation.

## C. Psychological or Behavioral Indicators
Drug or alcohol use (long or short-term) may result in specific types of behaviors. These include:

### 1. Amnesia
Short term or permanent amnesia can result from the use of certain psychoactive substances such as alcohol and sedatives.

### 2. Dementia
Long term abuse of psychoactive substances such as alcohol, inhalants and sedatives, may result in dementia and loss of brain function.

### 3. General Functioning
Substance abusers often show complications in dealing with daily functioning including problems in personal relationships, job performance, earning abilities, malnutrition and deterioration in general health.

### 4. Hallucinations
Short or long-term use or withdrawal of alcohol or hallucinogens may cause hallucinations or delusional behavior. This includes the "DTs" (*delirium tremens*) from alcohol withdrawal as well as "flashbacks" from prior use of psychedelics.

### 5. Violence
Alcohol, amphetamines and hallucinogens are closely associated with, and more frequently implicated in, violent behavior than are barbiturates, heroin and marijuana.

### 6. Other Effects
Short and long-term psychoactive substance abuse may cause extreme paranoia and persistent or temporary psychotic disorders, mood disorders and anxiety disorders in the client.

Exhibit A2 - Texas Oct. 2001

Make sure to interview everyone who had contact with the client following the homicide. If he was arrested shortly after the crime, the arresting officers will probably not tell you anything that will help–but their reports might. The intake officers at the jail are likely to be more helpful. Your client may have been videotaped as he was processed. Most jails have medical intake forms that arrestees are required to fill out when they are "booked" into custody. Jails require such forms to minimize their own liability, but the documents may nevertheless accurately depict how the client was acting. How the jail responded to your client's condition or behavior is even more important. He may have been seen by a nurse or doctor shortly after arriving, put in "detox" to go through withdrawal, or subjected to regular monitoring. Check to see if a blood sample was drawn after arrest. Did others drink about the same amount as your client and can testify both as to what they drank/ingested and confirm that he was partying right along with them?

### Continued Use While Incarcerated
The simple fact of incarceration does not eliminate your client's access to illicit substances. Counsel must consider this in assessing the degree of substance abuse, how it may affect communication with the client, and the client's ability to effectively assist or her defense. Counsel should assume that jail or prison dealers can provide the client with anything for which he or she asks, and should monitor the client's mood and behavior closely. If counsel observes mood swings, lethargy or other dysphoric behavior in the client, counsel should examine whether these might be the result of the client's ongoing abuse of psychoactive substances.

### Overcoming the "I've Been Intoxicated Too, But I Never Killed Anyone" Attitude
At least 90% of adults in the United States have had some personal experience with alcohol, many experiencing negative effects the day after. It is probably safe to assume that most jurors in capital cases have consumed alcohol to excess at some point in their lives. A majority will have had some kind of indirect experience, with psychoactive substances, especially marijuana, amphetamines, cocaine, and other common street or prescription drugs. From the jurors' perspective, alcohol and drugs do not cause murders; after all, the jurors themselves have had drug and alcohol experiences and have never killed anyone.

Counsel must illustrate the aspects of the client's life or the circumstances surrounding the offense that were unique or exceptional, and unlike the ordinary circumstances involved in an average person's experiences. Demonstrating genetic or biological predisposition to substance abuse is one way to diminish the jury's tendency to blame the client for his own addiction or abuse. If the client did not know the quality or quantity of the substance ingested, as is common with street drugs, the jury may also tend somewhat less to regard the intoxication. If the long term is chosen by the client. If the long-term effects of drug use have been particularly debilitating because the client suffers from other significant handicapping conditions–whether physiological, psychological, or both–the jury may see the client's substance abuse be seen as a mitigating factor in that context.

Because of the attitudes associated with substance abuse and dependence, as well as the ignorance concerning the underlying causes and results of addiction or abuse, substance abuse alone should never be relied upon to mitigate the offense. Counsel must be able to use this one

**0054**                                                   Exhibit A2 - Texas Oct. 2001

factor to corroborate the number of *other* mitigating circumstances which collectively must demonstrate the unusually harsh realities of the client's life.  The jury should understand how and why the client came to the place in his life where he she committed the instant offense.

Because widespread negative attitudes toward drugs and alcohol exist in the communities where capital cases are to be tried, counsel should pursue a thorough juror questionnaire to be completed prior to trial.  Numerous prospective jurors will respond that if drugs or alcohol contributed to a crime, the penalty for the crime  should be *more severe*.  Such jurors, who cannot consider the mitigating impact of an important part of  the mitigation case, should be challenged for cause because they will "fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require [them] to do." *Morgan v. Illinois*, 505 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

## Types of Substances

### A. Alcohol
More than one half of all murders and their victims are believed to be under the influence of alcohol at the time of the murder.  The connection between alcohol and violence is unquestionable.

If the client is an alcoholic or was drunk at the time of the offense, defense counsel will need to address this issue.  Although juries tend to view drunkenness as less mitigating than other contributory conditions, it may be possible to the client's chances of a life verdict by showing that his actions resulted from intoxication at the time of the crime.

Many clients were introduced to alcohol at an early age even by parents or other role models.  Some research also suggests that children of alcoholics may be predisposed to alcoholism.  Being able to point to an external factor as a cause for the client's alcoholism and related acts will help rebut the prosecution's inevitable response that the client chose to become intoxicated.

### B. Cocaine
Although cocaine use is less prevalent than several years ago, clients will have a history of cocaine usage.  Cocaine is a highly substance made from the leaves of the coca bush.  Cocaine is both a powerful stimulant and a pain killer. The cocaine "high" induces feelings of euphoria, elation, self confidence, excitement, and restlessness.  Cocaine may also produce nausea, headaches, tremors, grandiosity, anger, and impaired judgment.  Because of the extreme euphoria that a person experiences when high on cocaine and the sudden and unpleasant drop (or "crash") which follows after the effects wear off, there is a powerful tendency among cocaine users to seek additional cocaine as the effects of the high" are wearing off.  It is common for individuals to go on binges for several days, with little or no sleep, spending thousands of dollars to keep themselves and friends high on cocaine.  Cocaine is also a physically addictive drug; symptoms of cocaine withdrawal include fatigue, insomnia, irritability, and paranoia.

There are two different forms of cocaine which have different qualities as well as different societal acceptance.

### 1. Powdered Cocaine:

Powdered cocaine is "snorted" up the nose or injected. It is generally sold by the gram. Although a single dosage (about 1/10 of a gram) costs only about $10 or so, an evening's worth of cocaine can be very expensive because the cocaine high lasts such a short time. Chronic snorting of cocaine can result in sinus problems as well as frequent nosebleeds. Powdered cocaine has often been associated with white professionals, but it is consumed by people from all walks of life.

### 2. Crack

Crack cocaine is generally considered a street drug of the poor, but its usage also goes far beyond that stereotype. Its association with gangs and urban blight, however, has given it a reputation which has caused penalties for distribution of crack cocaine to be exponentially higher than that of powdered cocaine. For the same reasons, the public perceives "crack" as a uniquely destructive drug and feels fear and anger toward people who use or distribute it. Crack is produced by extracting the active chemicals in powdered cocaine, mixing them with sodium bicarbonate and baking them into a hard white substance. This substance is then broken up into small pieces or "rocks". These rocks are smoked and the user experiences an immediate and intense high with much the same characteristics of powdered cocaine. Crack is relatively less expensive than powdered cocaine, but carries with it the same short term effect and consequent need for more crack

Cocaine usage is very difficult to work with as a mitigating factor. Cocaine, more than any other drug, has been associated with violence. If cocaine is an element in the case, however, defense counsel must show as best he can how the client's actions were effected by the drug and the client's actions in taking the drug were not the product of an unfettered free will.

Cocaine and alcohol can combine to create another substance called cocaethylene, which is stronger than the sum of the two substances when ingested separately.

### C. Amphetamines/Speed (Crank)

Amphetamines are another powerful stimulant with a close relationship to the criminal justice system. Also known as "speed," the drug may be addictive and can have lasting psychological effects on the user. Frequently, a particularly severe "crash" or withdrawal follows heavy use. The "speed" user experiences euphoria, confidence, relief from fatigue, increased mental alertness and suppressed appetite. It is common for a speed user to remain awake for days at a time while taking the drug (such a short-term burst of heavy use is called a "run").

Speed can be taken as a pill, snorted, injected, or smoked. The duration of the effects vary and those of the smoked form of the drug ("ice") can last as long as 24 hours. Amphetamines can be prescribed for medical purposes and are often abused. Recently,

Exhibit A2 - Texas Oct. 2001

the amphetamine Ritalin has been widely used to treat attention deficit disorder (ADD or ADHD).

The heavy usage of amphetamines can result in amphetamine psychosis. Chronic users can experience paranoia, an inability to differentiate reality from illusion, and even full-blown psychosis that is indistinguishable from paranoid schizophrenia. Some individuals report memory loss of hours and even days.

Juries are skeptical of claims that the crime was committed under the influence of a drug-induced psychosis. Such defenses therefore require additional support. Defense counsel must present expert and lay witnesses to describe the client's state of mind in the midst of his psychosis. As with all substance abuse mitigation, efforts must also be made to trace the roots of the client's addictions and identify the factors which predisposed the client to addiction and violence.

### D. Hallucinogens
There are many other hallucinogens, some are readily available such as sillocybin (mushrooms) and morning glory seeds. Hallucinogens are primarily taken orally and may come in just about any form. These drugs alter the senses. In low doses, hallucinogens may just enhance colors and sounds; higher doses, however, may render the user completely unable to distinguish reality from hallucinations. Most hallucinogens produce effects which last anywhere from four to ten hours. They are not generally addictive and therefore entail no classic withdrawal symptoms.

Hallucinogens may become relevant in capital cases where the drug has placed the user in a psychotic state, during which the user acted violently. In such circumstances, it is essential to demonstrate to the jury that, because of the drug, the client could not know that what he was doing was wrong.

### E. Inhalants
Inhalants are very commonly abused by the young, the poor, and the uneducated. Many household products will result in intoxication if inhaled ("huffed"). Such substances as paint, glue, some cleaning products, and gasoline are commonly inhaled, producing effects such as dizziness, slurred speech, loss of body control, mental confusion and emotional instability.

Because these features of acute inhalant intoxication make it difficult or impossible to engage in complex goal-directed behavior, few murders are committed under such conditions. Paint huffing or the inhalation of other substances, however, is a sign that your client may have severe neurological damage. By their nature, the substances that people inhale are very toxic. This alone may cause brain damage. Furthermore, some methods of inhaling such substances involve oxygen deprivation, which can cause additional brain damage. Brain atrophy, temporal lobe epilepsy, and decreased IQ may result from the combination of certain inhalants.

Exhibit A2 - Texas Oct. 2001

Evidence that the client has used inhalants should be presented as part of the client's social history, and treated as a strong indicator for the presence of other basic social dysfunction and a flag for the investigation into possible neurological impairment.

**F. Heroin**

Heroin is a highly addictive street drug. Heroin is closely related to morphine, codeine, and opium, all of which are made from an extract of the opium poppy flower. Heroine may be snorted, smoked or injected. Often individuals begin using heroine by snorting or smoking it, then with increased exposure to the drug begin injecting it.

Heroin users rapidly become psychologically and physically addicted to the -substance, and may inject heroin regularly for years at a time. As a result, heroin may be best known for its severe withdrawal symptom, which include vomiting, diarrhea, bone and muscle pain, and involuntary muscle jerks and ticks, and which may last up to a week. Fearing the extreme symptoms of withdrawal, heroin users are highly motivated to maintain their habit and often turn to crime for the money necessary to do so. If your client was a heroin user and committed a crime for financial gain (*e.g.*, a robbery or burglary), it may have been related to seeking money for heroin.

Like any other type of substance abuse evidence, heroin addiction in isolation is not a convincing mitigation theory. A complete documentation of your client's addiction, the control the drugs had on him at the time of the offense and the addictions role in the crime will be needed to help the jury understand your theory. Stopping your presentation with evidence of mere drug use will likely serve as aggravating evidence in the jury's eyes.

**G. Other Drugs**

Your client may have a history of using other drugs such as marijuana, MDMA ("ecstasy" or "X"), sedatives (Valium, Xanax, etc.), or PCP. The key principle to keep in mind is that drug use is related to other life experiences, and counsel must thoroughly investigate the relevant circumstances that led to, or surrounded, the use of any drugs by the client or significant people in the client's life.

**Resources**

An excellent resource on substance abuse is M. J. Landry, *Understanding Drugs of Abuse* (1994), which provides concise and helpful descriptions of drugs and patterns of abuse and addiction. The *Physician's Desk Reference* (*PDR*) describes the appearance and effects of most prescription drugs.

# "GOOD PERSON"

# EVIDENCE

Exhibit A2 - Texas Oct. 2001

## "GOOD PERSON" EVIDENCE

Some years ago, when bifurcated capital trials were an innovation and defense attorneys were new to the very concept of mitigation, "good person" evidence was frequently all that was proffered at the punishment phase. Attorneys considered "mitigating evidence" to be evidence that somehow, regardless of the brutal homicide for which he stood convicted, the client was nevertheless a "good person." Over the years, the capital defense bar has come to recognize the ineffectiveness of limiting a mitigation presentation to this kind of evidence, and has learned to conduct the type of wide-ranging, painstaking social history investigation described in this manual. This is not to say, however, that there is no place for "good person" evidence in the well-prepared and presented capital trial. It is fortunate when we have the opportunity to present evidence of the good things that our client can do or has done. Such evidence can actually increase the impact of the evidence that reveals the many hardships the client has suffered throughout his life, by showing that, despite all the roadblocks thrown in front of him, he overcame those to accomplish some good things.

The potential importance of such evidence is underscored by recent empirical data on the behavior of California capital juries. *See* S. Sundby, *The Jury as Critic: An Empirical Look at How Capital Jurors Perceive Expert and Lay Testimony* (1997) 83 Virginia L. Rev. 1109 [hereinafter Sundby]. Professor Sundby's jury interviews in 36 California capital cases reveal some surprising results:

> The obvious credibility problem with family and friends witnesses is their inherent bias in favor of defendant. As would be expected, jurors frequently noted that such testimony was predictable; knew that his family and friends were going to say what a wonderful guy he was. Yet, despite the predictability of such testimony, jurors rarely held it against a defendant; on the contrary, they frequently identified family witnesses as among the most favorable defense witnesses. Indeed, probably because such testimony is expected, it was the absence of such testimony that was unfavorably noted: "After it was all over, I asked [the defense attorney], I said, "Couldn't you find in this man's life one person as a character witness? *Id.* at 1151-1152.

In other words, "If his own family won't even testify for him, he must be a monster." A review of jurors' statements regarding family and friends' testimony revealed both an emotional and a factual component dimension to its effectiveness. At the most basic emotional level, such testimony shows that someone cares about the defendant and believes that he has some redeeming value. Professor Sundby notes:

> At first, it may seem odd that such a basic point must be made with the jury. But in a capital case before the defense presents its case in mitigation, the jury will have heard evidence that is overwhelmingly negative: the brutal details of the murder for which they have convicted the defendant, the defendant's past history of violent crime, and often testimony from victims of the defendant's other crimes. The jury is likely to be leaning heavily towards a death sentence and it may be extremely important and come as something of a surprise to the jury that

the defendant has people who care enough about him to be there on his behalf. Such testimony may present the first sliver of an insight that there is good in the defendant, as well as evil. *Id.* at 1152-1153.

The effectiveness of "good person" evidence depends greatly on how it is presented:

Family and friends testimony was effective only when presented in sufficient detail so as to present a coherent and full factual picture of the defendant. Without such a factual backdrop, the jury was likely to view such character testimony derisively, as an effort to manipulate them: "It seemed that the reasons they gave [as to why the defendant was of a good character] . . . actually there were two, were very lame. Like as a character reference this one kid who went to school with [him], part of the high school while he was there, said "Oh, he was such a good student; he was very good at writing, not writing stories, just good penmanship." That [was] the only thing, maybe he was nervous or something, but that's all he actually said–everybody liked him and he had very good penmanship. It was lame. And then the other one, whatever reasons or examples that he gave were unbelievable to me. It was something about what a great guy that he spent his whole weekend, camping, running around pulling Volkswagens out of ditches. We just thought, when you're camping, how many Volkswagens are in ditches? How wonderful was this for a character reference? That was just to prove what a wonderful person he was."

That such testimony would be viewed as feeble hardly can be surprising. For some reason, when measured against the defendant's grisly murder, good penmanship just does not seem very weighty. But even this type of testimony might have carried some weight if the defense had a larger factual context within which such testimony could be considered. For example, if the defendant had come from a highly abusive background or had very limited mental abilities, the jury might view as noble or worthy any efforts by the defendant to succeed or help others, even if such efforts were fairly modest. Without such a context, though, random descriptions of a defendant's "good deeds" are likely to seem almost insultingly trivial to the jury when contrasted with the defendant's crime. *Id.* at 1161-1162.

Especially lethal were any attempts to overplay insignificant acts or any over reliance on "stale" evidence:

A number of jurors noted what they believed were defense efforts to overplay insignificant acts as being important. One juror's comment typifies the reaction: "The girlfriend I'm speaking of had a little boy and [the defendant] liked the little boy, so that's why they thought he was a nice guy. See, that was for him, character, for him." In a different case, a juror stated: "[The defendant] was a wimp, I mean he was a nothing that was going, operating on false steam. He came in with all these character witnesses that were testifying to what a

wonderful man he was.  It was all forty years ago, when he went to high school, when he lived . . . with his family, when he was in the Navy." *Id.* at n.113.

Of course, it may be unfair to criticize counsels' mitigation presentation too harshly, because we don't know what they had to work with.  Sometimes, aging "good guy" stories from the Navy and accounts of the defendant's good penmanship may seem like nuggets in an otherwise hopeless situation.  The point, however, is that counsel must not stop after finding just the "nugget." Instead, counsel must consider that "nugget" as a bead somewhere along the strand of the client's life.  It does not stand alone.  It is there because of something (*i.e.*, it's the consequence of something) and it likely relates to something else (*i.e.*, it's likely embedded in a web of other significant events or relationships).  Counsel must take the sometimes considerable time necessary to trace where that nugget came from and how it will help the jury decide not to kill client.

If counsel can avoid these pitfalls and present "good person" evidence in proper context and in sufficient detail, then such evidence can make a significant contribution to a life verdict. This Chapter will explore some important aspects of developing and presenting "good person evidence."

## Investigating and Developing "Good Person" Evidence

Good person evidence, just like evidence of abuse and neglect, should be gathered throughout the course of developing the client's comprehensive social history.  In fact, when interviewing the client's family members and friends, talking about what was *good* about the client and his background may provide a much-needed break from long accounts of horrible living conditions. To make such evidence vivid and compelling for the jury, it is absolutely essential that counsel spend the time and effort necessary to take family members and other witnesses (*e.g.*, teachers, employers, co-workers, etc.) beyond the simple phrase that the client "was a good person." Instead, counsel must work with these witnesses to uncover their credible anecdotes or colorful stories which demonstrate the client's goodness.

Demonstrative evidence is also important can also be valuable, although counsel must be careful not to present items such as early childhood photos out of context. Professor Sundby describes a case in which childhood photos of the client were presented as part of his sister's testimony describing his childhood history of horrific abuse at the hands of his father. "With such background, the jury can look at a picture of the defendant 'in his little sailor suit (when) he was only four or five years old,' and, for at least a moment, see the defendant as someone other than the adult sitting twenty feet away on trial for two repulsive torture murders. Without such a context, though, the introduction of childhood pictures is more likely to be seen as just an effort to play on the jury's emotions." *Id.* at 1158.  In establishing "good person" mitigation, counsel should explore the following possibilities:

### A. Family Person
Is there evidence that the client has been a responsible member of his or her family, a loving and responsible parent, or an attentive child?  How has the client

added to the lives of those close to him?  Most important how will the family and friends feel if the client is sentenced to death?

## B. School Records

Is there a record that the client tried hard as a student despite suffering from debilitating handicaps?  Did he excel up until a particularly traumatic event or physical injury?  Did he win any special awards or citations?

## C. Military Records

Was the client in combat?  Did she or he distinguish themselves in any positive way? Was the client honorably discharged?  Did the client receive any decorations or citations? If the client was rejected or discharged from service, was it because of a disability that needs to be explored?

## D. Employment Records

Has the client been a steady and responsible employee? Does the client possess any particular skills or talents which reflect intelligence or depth of character or which might be helpful in a prison setting? Has the client received any special recognition or awards for outstanding work?

## E. Criminal Records

Does the client have a significant criminal record?  While incarcerated previously, did she or he attempt to cooperate within the prison and take advantage of rehabilitation opportunities or help others to do so?

## F. Religion

Has the client been active in any religious setting?  Has the client performed any particular good deeds?  Is she or he respected by reputable members of the community?

## G. Community

Is there evidence that the defendant was active in community projects and made a positive contribution?

## H. Artistic Ability

Is there evidence that the defendant has *real* artistic abilities as a writer, poet, painter, etc. Beware that juries may be especially skeptical of such evidence. As one juror in Professor Sundby's article put it: "Most people in prison write poetry.  My wife was in jail for five years.  They're all very artistic and poetic because they've got nothing else to do.  They get profound when they've got a lot of time to think." *Id*. at n. 87.

## I. Drugs and Alcohol

Are there records to indicate that the client has attempted to seriously address drug and alcohol problems? Any evidence of successful completion of a treatment program either before or after the offense?

**0063**

## J. Anecdotal Information

Are there any stories from family, friends, co-workers or others regarding exemplary or heroic acts on the part of the defendant?

## K. Offense Related Evidence

Are there indications that the client has actively sought to cooperate with the authorities? Did the client turn himself in before he was targeted as a suspect? Has the client expressed sincere remorse and a willingness to attempt to reduce the impact to the victims?

"Good person" mitigation themes fall into three broad categories:

## A. The Client Was Good Before the Offense

The theme here is that the client has been a relatively good person and that the offense is aberrational. Specific mitigation themes include:

### 1. Out of Character

If the client has indeed displayed "good character" during the majority of his or her life, it should of course be possible to characterize the crime as a striking deviation from the client's normal routine or behavior. It may also be possible under such circumstances to trace the criminal behavior to a specific cause such as head trauma or acute psychological disorder.

### 2. Skilled/Responsible Worker

The client has exhibited skills that are generally respected in our society. These skills may carry over into the prison setting where the client can continue to be productive and contribute to society.

### 3. Lack of Criminal History

Similar to "Out of Character" above, but this circumstance may be more provable through concrete evidence than based on the subjective opinions of friends and co-workers. Obviously, the client's record must be clean. Offenses which may not seem so bad to a criminal defense attorney may appear very aggravating to a death-qualified jury which has just convicted the client of capital murder.

### 4. Religion

Counsel must approach this potentially mitigating evidence, which is an extremely sharp two-edged sword, with great caution. Though religious activity may indicate a desire to be "good," it can also be interpreted as proof that the client "knew better" and thus knowingly "sinned." Jurors are also generally skeptical of "jailhouse conversions." Counsel must present the client's spirituality in a manner that minimizes the likelihood that the jurors will see it as self-serving. Among other things, counsel must conduct jury selection with an eye to eliminating prospective jurors who believe that "an eye for an eye" is not only the law of the but the law of the land.  "An eye for an eye" is from the old testament

**0064**

and does not express the Christian view of forgiveness that is expressed in many parts of the new testament.

Another difficulty in presenting religion-based mitigation is that the theme must be consistent with other themes of the case. For example, juxtaposing the argument that the client deserves mercy because he is insane with the argument that the client deserves mercy because he is a born again Christian, does not work. A jury will pick up on the inconsistency and it will detract from both themes.

### 5. Overwhelming Odds

For clients who may not have shown conventionally "good" character prior to the crime, counsel may need to orient the jury to the relative nature of the word "good." *I.e.,* even small accomplishments are admirable if the client has had to struggle to overcome overwhelming odds due to biological, social, cultural, or psychological factors.

## B. The Client Was Good After the Offense

These categories of mitigation relate to activities that occurred after the offense and which seem to indicate that the client is truly remorseful, willing to cooperate with authorities, or a good candidate for rehabilitation.

### 1. Remorse

Remorse has been shown to be a very important consideration for jurors in capital cases. In a recent study, the Capital Jury Project surveyed more than one hundred fifty capital jurors about their reactions to particular evidence at trial. In every case, at least one juror stated that a showing of remorse would have made a difference in her deliberations. Evidence of the defendant's remorse was especially important to jurors when the crime committed was not especially "vicious." Eisenberg, Garvey, and Mills, *But Was He Sorry?  The Role of Remorse in Capital Sentencing,* 83 Cornell L. Rev.1599 (1998). In fact, in cases where the crime committed was not "vicious," evidence of remorse was more of a factor than expectations that the defendant would be dangerous in the future.

Evidence of remorse may be found in many places. If the client confessed to the crime, he probably expressed a lot of remorse in the process, which may be apparent if the confession was audio or videotaped. Aside from questions of voluntariness, law enforcement officers need to be questioned closely about the client's state of mind before, during, and after his statement. It is likely that the client at some point during the confession expressed grief for the victim and tremendous guilt and sorrow for what he had done. The client may have made remorseful statements to corrections officers at the jail, expressed regret or grief to members of his family, or may even have written a letter to the victim's family. This all can be used as effective mitigation.

## 2. Confession and Cooperation

Many capital cases involve a confession by the defendant. If it is impossible to suppress the confession at the guilt phase, counsel may nevertheless be able to use the confession to the client's advantage. The client has made no attempt to hide his or her actions and has freely and willingly cooperated with the authorities. (Counsel should move *in limine* to prohibit the prosecutor from informing the jury of any unsuccessful pretrial motion to suppress the confession). Cooperation is especially effective mitigating evidence if the client is a one of two or more participants in the offense, and is arguably not the main actor. This fact, of course, can be used in plea negotiation as well as at the penalty phase of the trial. This sort of evidence would include, for example, the client's surrender to the police, a confession, helping the police recover evidence of the crime, and any other actions taken by the client that help the police.

Counsel should take care, however, with this type of evidence. The prosecutor will attempt to minimize the client's actions as self-serving and not all that useful to the police anyway. The evidence of cooperation must be independently corroborated and must show that the client in fact aided the police. Admitting what he has done after being confronted with overwhelming evidence of guilt may not be persuasive evidence of remorse. In addition, where more than one defendant is involved in the offense, there is a fine line between being remorseful and cooperative, and being a snitch.

Counsel should keep in mind, however, that some clients come to feel acute remorse only after they have been forced to confront the reality of their actions and the profound suffering they have caused, both of which may require time to reflect and/or contact with other people (*e.g.*, the client's family). It may be possible to explain to jurors why a defendant went "on the run" after the crime, obviously unwilling to accept responsibility for his actions, and yet now is feeling genuine remorse.

## 3. Rehabilitation

Rehabilitation is a dangerous word in a capital trial. Nevertheless, some jurors are capable of understanding and appreciating the fact that certain aspects of the client's behavior pre-trial, or treatment that has been offered is available for the debilitating handicap that precipitated the offense, can make the client an excellent candidate to be a productive member of *prison* society. To make the best possible use of such evidence, it is important to request that the judge instruct the jury that a life sentence means life Exhibit A2-1 Texas October 2001 client is entitled to such an instruction on request).

# ADAPTABILITY

# AND

# PRISONER EVIDENCE

Exhibit A2 - Texas Oct. 2001

## ADAPTABILITY AND PRISONER EVIDENCE

The jury has two choices. They can sentence the client to death or send him or her to prison for life, with some possibility of parole in 40 years. The type of prisoner the client has been, and will be in the future, could have a profound effect on the jury's decision.

In 1986, the U.S. Supreme Court ruled that it was error to exclude from the sentencing hearing, the testimony of jailors and a regular visitor regarding the defendant's good behavior during the seven months he spent in jail awaiting trial. *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). The Court reasoned that evidence of adjustment to life in prison goes to a feature of the defendant's character that is highly relevant to a jury's sentencing determination. Moreover, since the defendant expected these witnesses to testify that he had made a good adjustment to jail, the testimony was not speculative as to future events and therefore not objectionable on those grounds.

Based on the testimony of witnesses during the sentencing phase, the jury may believe that the client will be a safe and productive member of the prison community. This belief could be the deciding factor for a jury that is torn between a sentence of life and death.

### Your Client Will Adapt Well to a Life in Prison
Despite the ease that some state psychiatric witnesses seem to have in predicting that capital defendants will definitely kill again, predicting whether an individual will be dangerous in the future is almost impossible. Age plays an important role in future prison violence. Inmates who are over thirty have one half of the infractions as those under twenty. Those over sixty have one-tenth the infractions. Furthermore, capital offenders have a much lower rate of infractions than the general prison population. In the end it is much easier for a jury to accept these statistics if counsel can offer them good prisoner evidence.

### Prison/ Jail Records
If your client was incarcerated prior to committing the capital offense, his prison disciplinary records can be helpful mitigation, assuming that these records are positive. The use of records from prior incarceration needs to be done with caution. Usually in the sentencing phase of a capital trial, almost any prior offense that your client would have been incarcerated for is admissible and will be used as aggravation by the prosecutor. There is usually no reason to hold back on presenting evidence that reveals that your client has been in prison.

If this prior offense is not brought out by the prosecutor, then defense counsel needs to calculate whether the value of the records is outweighed by any prejudice that may be created by revealing the offenses. Furthermore, your client's disciplinary record needs to be spotless. Make sure that you have a complete copy of your client's records and DO NOT rely on your client's representation (usually in good faith) that his prison conduct record is great. The warden and guards will not view an incident from the same perspective. One disciplinary write-up for a tussle with a guard or an inmate or the wrong comment to a jailhouse snitch may transform your mitigation case into a nightmare of aggravating evidence.

Your client will also be in the position to create excellent mitigation evidence while awaiting

**0068**                                                    Exhibit A2 - Texas Oct. 2001

trial. Constantly reiterate to your client that one slip-up at the jail may cost him his life. A clean jail record will be helpful to show your client will not be dangerous in the prison setting.

**Witnesses For Adaptability**

### A. Corrections Officers

Ultimately, the jury will be most concerned with the client's threat to guards and other "free world" people. Jurors may care little about the threat that the client will pose to other inmates. If guards or other prison officials are willing to testify on the client's behalf and, in a sense, say that they are willing to "let the client live the rest of his or her life with them," the jury may be willing to forego a sentence of death. An added bonus would be a situation, and this has occurred, where an inmate actually saved the life of a correctional officer.

If you are going to subpoena a guard who has told you good things about your client, take a few extra steps to make sure that he or she is willing to testify. Confirm exactly what they are to say and make sure it is consistent with the records. Explain the reason for the subpoena – "If you are not under subpoena and get in a car wreck on the way to the court house, the judge will not continue this case or give me any other relief." This will keep the witness from reacting negatively when the subpoena is served.

*Skipper* evidence is valuable, but it can be dangerous because counsel is calling someone who is not used to helping out an inmate in this way. The guard may think that if he does this for one inmate he will have to do it for all the inmates. Make sure that the jailer will not "blind-side" you.

### B. Clergy, Teachers and Other Free World Visitors

The danger of "free world" visitors is that many may come across as dupes who have been conned by the client. This is especially true in cases of jailhouse religious conversion. Counsel must consider carefully the credentials, experience and credibility of these types of witnesses. A teacher who can testify about the positive strides made by the client once a learning disability such as dyslexia was discovered or an experienced volunteer who can compare the client's progress to hundreds of others he or she has taught will be very credible witnesses.

### C. Family Members

A client's mother or father can testify to how good incarceration has been for the client, how it has broken a drug habit and brought the client back to his or her senses. Despite incarceration, the client may have continued to take an active role in the lives of his or her children and demonstrated that incarceration will not adversely effect the parent-child relationship.

### D. Experts

If the client suffers from a disorder that will abate in the structured prison environment, with institutionally administered medicine, or because specific variables are missing, i.e. drugs for the addict or children for the pedophile, an expert can provide helpful

testimony. In Positive Prisoner cases, the prison adjustment expert may render opinions about the client's future adaptability to prison and what support structures exist that are not there in the "free world". He can relate the support structures in the prison system that will keep your client from offending again, thus removing any reason for killing him.

Other good experts on adaptability are jail personnel who may know your client or even prison guards who knew your client from a prior incarceration. Obviously, care should be taken in presenting evidence of a prior incarceration to avoid the impression that your client will never learn and will only get worse.

The State will try to get the jury to kill your client by getting them to answer "yes" to the special issue contained in Tex. C. Crim. P. Art. 37.071(2)(b)(1), finding that there is a probability that your client would commit criminal acts of violence that would constitute a continuing threat to society. The State will say that your client has an anti-social personality disorder or that he scores in the high range on the Hare Psychopathy Checklist-Revised.

Some may not view the issue of future dangerousness to be an issue to deal with in a mitigation paper. However, it will be presented at the punishment phase of the trial when you are putting on your mitigation. If your client's perceived future danger to society is not attacked then, all of your mitigation efforts may be lost.

### E. Other Prisoners
Obviously, the least credible of all witnesses will be other prisoners. However, there may be a specific event, or set of circumstances, where only prisoner testimony will do. Some of these examples are discussed below.

## Your Client Will Be Productive in Prison
If your client has taken advantage of educational, spiritual, or any other rehabilitating opportunities while incarcerated, it may be useful to present this. However, care should be taken with this type of evidence. The jury may not perceive a life sentence as punitive if your client is viewed as too productive and comfortable at the prison. The seriousness of a life sentence must be emphasized with the jurors beginning with *voir dire*.

It can be extremely effective mitigation if your client spends his energy while incarcerated helping other inmates. Evidence that your client is teaching another inmate to read, or leads church services may convince a jury that your client is worth more alive than dead. This will also suggest to the jury that your client is not the demon that the solicitor has painted, but a helpful individual who made a very serious mistake.

## Disabilities That Made Your Client Dangerous Can Be Treated in Prison
If your client committed the offense, in part, due to a psychological disorder or neurological damage, it will help to explain to the jury how a prison setting will eliminate any risks that your client will become violent because of his disability. It may be helpful to present evidence on the effects that psychological drugs will have on your client's behavior in prison. Also, helpful may be evidence of the influence that a structured environment will have on his conduct. Within this

**0070**

structured environment, your client will not be faced with circumstances that he cannot handle. This will assure the jury that the violence committed by your client will not recur in prison. Furthermore, it can be very useful to call a prison official to explain the security arrangement that protects the staff and other inmates under every reasonably anticipated circumstance. You should emphasize that although your client will not pose a danger to anyone inside the prison, the security has been designed to address the worst case scenario.

So that counsel might understand the security, first hand, she could tour the facility and learn how extensive the security is. Currently there are video tapes that document a "day in the life" of an inmate in administrative segregation in the Connelly Unit and the Michael Unit. With the appropriate foundation prior to the offer of such a video, it can show jurors just how secure these facilities are and how little opportunity an inmate has to commit violent acts. For more information on the tapes and other expert witnesses in this area, call John Niland at Texas Defender Service, (512) 320-8300.

**0071**

# KENTUCKY DEPARTMENT OF PUBLIC ADVOCACY
# DEATH PENALTY MANUAL



Exhibit A3 - Kentucky 1990

## 3. Methods of Reaching Goal

### A. The Social History of the Client

In order to truthfully relate the who, how and why of the client, it is necessary to construct and produce a social biography of the client. In order for the decisionmakers to understand a person's actions, the actions must be placed in an extensive social history of the person's life. Otherwise, there is no perspective, no real sense of who, how and why. To be understood and digested by the triers of fact, the social history, especially the causes of anger and rage, must focus on specifics, facts, incidents, experiences, not mere general conclusions. It must be corroborated, documented, brought to life.

After you collect all the information, make a chart listing what you've found. For example:

| DATE | ACTIVITY |
|------|----------|
| 1/5/65 | John was born |
| 3/3/73 | John's parents divorce |
| 5/3/73 | John arrested for stealing |

Then create a narrative social history. You will find both of these helpful and revealing. You probably will have revealed

1990 DPA Death Penalty Manual 155

Exhibit A3 - Kentucky 1990

to you the relationship between an event in your client's life and his criminal activities. Your experts will also find this compilation of social information very helpful.

## B. Obtaining Information

Lawyers have been trained primarily to be advocates; people who argue; marshall evidence; give opinions; reason; and talk. Constructing a social history does not much involve these skills; rather, it involves skills that are not highly developed or used by lawyers - interviewing; actively listening to what is said; going to the place witnesses live their lives; observing nonverbal information, listening to what is not said; compassionately asking for information in open-ended ways; asking for information on feelings, emotions, sensitive, intimate experiences. Ask for information in new ways: when did he laugh, cry, when was he most proud, disappointed. Talk to family members separately and in groups. You will get different kinds of information and interaction. Recognize that, if you want something from people, you have to give them something. That may be giving them your time, your care, your stroking them.

## C. Obstacles to Obtaining the Information

Roadblocks to finding out the intimacies of a person and his family are many. We must recognize the obstacles and struggle to overcome them.

If we are a different race, sex, or are culturally different, these differences can interfere with obtaining the information. If the person we interview is not verbal, if the person does not trust us, if the information we are looking for is humiliating, if the person does not believe we care, the information we seek will be difficult to obtain. If we represent authority and authority has caused the person we are interviewing problems, we have to recognize that and work through that perception to find the witness willing to reveal themselves or others. If the person feels we are going to use them or blame them, they are unlikely to want to help us out unless we somehow overcome that feeling. We have to understand that not revealing information may be a necessary defense to life, itself, to the persons's self-concept.

If a person is reluctant to share with you, begin by talking about why they have problems sharing with you. Acknowledge their feelings of fear, shame, improperly telling on others, and your feelings.

Nobody is going to reveal information unless they feel *safe* in doing so.

## D. Timing

Begin this penalty phase investigation early. Allocate this investigation effort as the highest priority in the entire case. Get as much help as possible with finding out the information and constructing the social history of the client with all its layers.

## E. Yourself

We first have to deal with our own thoughts and feelings about the client and his acts. If we have conflict, anger or fear, we must recognize those feelings and understand their origin. We must ourselves understand the why of our feelings and the why of our client's actions, and we must want him to live. We have to win the penalty phase first with ourselves; otherwise, no future trier of fact will be convinced through us that the defendant should live.

As we investigate the client's life history, we must connect with our feelings of sadness, anger and discomfort towards the defendant's life and actions so we can convey these feelings, as well as facts, to the jury in a way that the jury feels connected, or at least understands, the shaping events of the defendant's life.

## F. The Client

The client, himself, must relate his life to you. This is likely to require large amounts of time on many occasions, listening to the client reveal himself. Think how long it would take for you to relate your life with completeness to a total stranger, especially the negative, embarrassing aspects of your life. In order to do it well you must establish a relationship with your client so that he is able to reveal who he is from the inside, intimately. You must obtain all the texture, each thread of the life of this person. You must obtain his trust. He must feel *safe* in revealing himself to you.

## G. The Family of the Client

It is essential to interview the client's family to find out about how they have influenced who the client is. Remember they are the biggest factor in telling him who he is, in constructing your client's self-concept. To a very large extent, they explain him and his acts.

Be sure to explain to them precisely who you are; that you are representing the client; that you've talked to the client and that you and the client very much need their help now and for the long haul.

Explain the extent of confidentiality; the need to tape record and take notes; the importance of finding out who the client is from them so the jury can understand who they are making this life and death decision about; and that it is important to know the good and the bad, in all their details. You must obtain their trust. Engage them in helping you.

Explore beyond the immediate family - grandparents, aunts, uncles, cousins, those that have died in the family. Grandparents and others can give good prenatal and early childhood information: was the child wanted, what was the economic and social position of the parents, how did parents treat the child. They can tell you things parents have forgotten or do not want to relate.

## H. Records

### 1. Importance of Obtaining all Records Early

It is critical to get all important records of your client in order to find and document the favorable information in his past (e.g., no prison writeups; documented emotional difficulties; past abuse), and to know about the unfavorable (e.g., prior record, unsympathetic mental diagnosis). You want to be able to present all the favorable threads of the fabric of your client's life. Importantly, you want no surprises at trial. So even if the records reveal little, it is important to know that.

Make sure you find out if any records have been lost, destroyed, or removed, along with what and why. You may want to get this in writing upon order of the court, if necessary. Check for any archived records.

Records can take a long time to obtain. Request them early. Just because you request all records does not mean that you get them all. In fact, presume you did not receive all the records. Request them often. When you receive them, contact the place you have received them from and check to see if you have all the records they in fact have. If you do not, ask what you have not received and why. You will want to physically look at their entire file.

Check to make sure the place you request records from gives you the records from all their locations and from each of

the contacts the client had with the place on prior occasions, not just the most recent contacts.

If you're going to want to introduce the actual records, find out who the custodian is and get the necessary authentication.

Get multiple release forms signed by your client as early as possible.

### 2. Medical and Mental Health Records

Check with all indicated places where medical or mental treatment was received including local comprehensive care offices, KCPC, Veterans Administration and family doctors. Often institutions will have their own release forms. You want the entire file for each contact with the place, not just the latest file. Make sure you ask for every conceivable record and "any others," e.g. discharge summary, medical and social history exams, consultations, reports, x-rays, EKGs, lab results, psychological test data and results, IQs, evaluations or information from other people or agencies, counseling notes.

### 3. Correctional Records, Logs

If the client has been previously incarcerated, obtain all correctional records at each place of incarceration. Again, you want all "files" and everything in each file. Correctional institutions often have separate "files" at different locations, including:
- a. Inmate
- b. Medical
- c. Central Correctional Office in Frankfort
- d. Investigation/Informant
- e. Social Worker
- f. Probation and parole officers
- g. Presentence investigation.

You are entitled to these records through discovery, RCr 7.24(2), and under *Bush v. Commonwealth*, Ky.App., 702 S.W.2d 46 (1987), and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

### 4. Military Records

The special release form the military requires is at the end of this article.

### 5. Adoption Records

Obtain them from the county and the Cabinet of Human Resources. You are entitled to them under KRS 199.570(1). They often contain valuable information in the home study.

### 6. School Records, Transcripts

Get all the transcripts and files from all the schools. Also, talk to significant teachers and school friends of your client.

### 7. Prior Offense Records

You are entitled to these records via discovery under *Gadd v. Commonwealth*, Ky., 665 S.W.2d 915 (1984). Also, talk to your client's previous lawyers and probation officers.

### 8. Employment Records

Many employers keep a lot of information on their employees, including medical information, counseling statements, polygraph results.

### 9. Letters, Photos

You will want to look at any letters your client has written or received, and obtain photos of him and his family and friends to construct a complete visual social history.

### 10. Open Records Act

When appropriate make use of the Open Records Act, KRS 61.872, and the Freedom of Information Act, 5 U.S.C. 552. *See Tribune Co. v. Public Records*, 493 So.2d 480 (Fla.App. 1986).

Once the information is obtained and digested from all possible sources, you need to summarize and organize it, so that you can provide it to any corroborating expert and so that you can present it well to the triers of fact.

## 4. Investigation Required to be Effective

In any case, but especially in a capital case, defense counsel must explore all possible defenses and all mitigating factors. The failure to do so renders counsel's assistance defective. *See, e.g., People v. Frierson*, 599 P.2d 587 (Calif. 1979); *Dillon v. Duckworth*, 751 F.2d 895 (7th Cir. 1984); *House v. Balkcom*, 725 F.2d 608 (11th Cir. 1984); *Douglas v. Wainwright*, 714 F.2d 1532, 1553-58 (11th Cir. 1983); *King v. Strickland*, 714 F.2d 1481 (11th Cir. 1983); *Pickens v. Lockhart*, 714 F.2d 1455 (8th Cir. 1983); *Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982); *Kimmelman v. Morrison*, 477 U.S. ___, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); *Wade v. Armontrout*, 798 F.2d 304 (8th Cir. 1986); *Thomas v. Kemp*, 796 F.2d 1322 (11th Cir. 1986); *Middleton v. Dugger*, 849 F.2d 491 (11th Cir. 1988) (failure to investigate psychiatric and school records); *Evans v. Lewis*, 855 F.2d 631 (9th Cir. 1988) (defendant's mental condition).

## 5. Sample Social History Questions

Below are suggested areas and questions for inquiry of your client, his family, friends and others in the process of developing his life history. You, no doubt, will expand on all areas.

### A. Birth, Growth, Development

1. Complications with pregnancy/birth, maternal illness, toxemia, bleeding, premature birth, jaundice, respiratory? Doctor who delivered or assisted, midwife.

2. Any difficulties with achieving early developmental tasks? Babysitters can answer these questions also.

3. Memories of childhood?

4. Was the child planned and wanted?

### B. Names, Locations and Relationships

1. Obtain full name, address, phone number, ages of all immediate family members, spouses, nieces, nephews, spouses; present and past jobs.

2. Obtain relatives with whom client had significant contacts.

3. Obtain relatives with whom client had significant contacts who are dead, dates of death.

4. Do a family tree.

### C. The Home and Neighborhood

1. Describe the home and the physical conditions in which the family lived. How did your physical conditions and home compare to neighbor's home?

2. How many times has the family moved? What are the addresses, description of homes?

3. Have there been others beside family members living in the home?

4. How close is your family?

5. Years defendant was at home, when left home and why.

### D. Relationship between Parents and Client

Describe fully the relationship between the client and his parents, parental figures in regards to:

1990 DPA Death Penalty Manual 160

Exhibit A3 - Kentucky 1990

1. Emotional support and nurturing, expressed and felt love;

2. Praise for positive accomplishments, behavior;

3. Discipline philosophy (whether discipline was excessive or appropriate for infraction; whether administered fairly among siblings);

4. Specific instances and patterns of infliction of physical harm or pain (burning, beating, cutting, whipping);

5. Sexual abuse, harassment, aberrant sexual modeling; What were the important values of parents in raising children.

### E. Relationship between Client and Siblings

Describe the relationship between client and each sibling as to:

1. Sexual relations (voluntary, coerced);

2. Infliction of physical harm;

3. Manipulation of parental authority;

4. How did the defendant treat the brothers and sisters?

5. What brother or sister was the defendant closest to? Furthest from?

### F. Relationship With Others

1. How Did The Defendant Get Along With:

a. Non parent adults;
b. Age-group peers;
c. Older children;
d. Younger children;
e. Baby sitters.

2. Who Were Client's Best Friends At Each Stage Of Life:

a. Preschool;
b. Grade school;
c. High school;
d. College;
e. Now.

3. Who Were Client's Enemies Or People Who Gave Him Problems At Each Stage Of Life And Now.

### G. Marital/Love Relationships

1. Is client married? who, when;

2. Children;

3. Has client been involved in any long term relationships? Describe;

4. What are the positive and negative experiences and feelings in these relationships;

**1990 DPA Death Penalty Manual 181**

Exhibit A3 - Kentucky 1990

5. Any abuse of children, spouses, lovers;

6. First sexual contact with either sex. Length of involvement.

## H. Relationship Between Parents

1. What is the best and worst of that relationship;

2. Ever separated, divorced.

## I. Church, Politics, Interests

1. What are your beliefs about God, religion;

2. Church involvement;

3. Parents' church involvement;

4. What are your political views;

5. What are parents' and friends' political views.

6. What are the interests of client, parents, sisters, brothers?

## J. Client's Schooling

1. Where And When Did He Attend Schools (Name, Address, Phone Number)

2. History Of Schooling:

a. Did client have any difficulties, was he set back;
b. Was he in any special schooling;
c. Was he disciplined;
d. Any unusual academic, vocational strengths or weaknesses, behavioral difficulties.

3. What was parent's involvement in client's schooling

4. How did parents feel about school

5. What was highest level of schooling completed by client, parents, siblings

6. What school personnel knew client well

7. Interruptions in formal education

8. Grades in school

9. Attendance

10. Illnesses in school .

11. Suspensions

12. Fights

0079

Exhibit A3 - Kentucky 1990

13. Friends From School

14. Teachers

K. Criminal Justice Contacts

1. Has client been in contact with the criminal justice system:

a. Juvenile;
b. Young adult;
c. Adult;
d. Recently;

2. What, when and where were the charges, convictions, dispositions;

3. Circumstances of each contact;

4. Behavior of client at time of each contact;

5. Attorneys who represented client;

6. Names of any victims, location;

7. Ever on probation, parole;

8. Ever violate probation or parole or have it revoked;

9. Any other family members in trouble with the law.

L. Medical and Mental History

1. Describe significant physical injuries of client;

2. Describe each of client's use of medical services;

3. Have you ever been in any accidents? Describe;

4. What has your drug use, or other substance abuse, been throughout your life, including alcohol;

5. Describe the use, type, and frequency of drugs;

6. When did you first use drugs; Why did you use drugs?

7. What drugs did you use most week before killings? Day of killings?

8. Did you ever use drugs to unconsciousness; ever use speed; describe with utmost detail;

9. Any sexual dysfunctions;

10. Any blackouts; describe when, where, from what, duration;

11. Any blackouts that have not been alcohol or drug related; any loss of consciousness not associated with head injury;

12. Any history of severe headaches, dizziness, seizures;

1990 DPA Death Penalty Manual 163

Exhibit A3 - Kentucky 1990

13. Ever sought medical treatment for any of these;

14. List each head injury you have suffered; indicate whether serious or not, and whether you lost consciousness;

15. Ever had a seizure, history of epilepsy; episodic, irrational behavior;

16. Ever experienced hallucinations, heard noises, saw things others did not, smelled things not there;

17. Were any of these not related to alcohol or drugs;

18. Any history of mental illness, epilepsy, seizures in family;

19. Any facial irregularities, eyes ever crossed;

20. Any incest in family;

21. Ever have slurred speech;

22. Ever have loss of appetite;

23. Any tics or repetitive nervous movements;

24. Any diseases in you or family;

25. Any mental difficulties in client or family;

26. Ever seen a psychiatrist, psychologist, social worker; Describe;

27. Any drug use in family, especially parents;

28. Was anyone in the family sick over a long period of time;

29. Was anyone in the family on daily medication, seizures, retardation;

30. Parents, siblings hospitalized, surgery;

31. Ever on radiation;

32. On medication now;

33. Ever abused, physically, mentally;

34. Were parents ever abused;

35. Were siblings ever abused.

M. Defendant's Employment

1. List all prior employment, name, address, phone number

2. Date of jobs;

3. Nature of employment;

4. Earnings;

5. Training;

6. Reasons for leaving;

7. Boss or supervisor's names;

8. Co-workers that have particularly good and bad things to say about defendant;

9. What periods was client unemployed; explain;

10. What job was most enjoyed, disliked? Why;

N. Military Service

1. Indicate dates, places of training and military service;

2. ID number;

3. Rank and M.O.S. (Military Occupation Specialty)

4. Type of discharge;

5. Describe client's experience in military;

6. Describe what taught about killing;

7. Describe any actual military killings or observation of killings;

8. Any medical, psychological, emotional, drug difficulties, treatments;

9. Who were each of your commanding officers?

O. Vocational Pursuits

1. Any hobbys;

2. Sports that played, liked; why?

3. Did client or family ever have pet(s);

4. What is attitude of client and family to pets, sports, hobbys;

P. Contact With Defendant

1. Who saw defendant in months before killings? Weeks before killings? Day before, day of;

2. Who had seen defendant after the killing occurred and before the arrest;

a. How did defendant seem?
b. Did you talk about the killings?

3. Defendant's attitude toward arrest;

1990 DPA Death Penalty Manual 165

Exhibit A3 - Kentucky 1990

4. Defendant's attitude toward the killings;

5. Visits of defendant in jail, in prison? Who? When?

6. Who has failed to visit defendant in jail? Why?

7. Do you write letters to him/her and does the defendant in return write letters to you? Describe. Obtain the letters.

Q. Present Incarceration

1. What has occurred in jail since arrest, favorably or unfavorably? (e.g., conduct, work, remorse).

2. Have you talked to or made friends with anybody else in jail;

3. Incurred any punishment?

R. Feelings: Self

1. What does defendant think of self, best and worst. Why?

2. What does defendant think of parents, best and worst. Why?

3. What does defendant think of siblings, best and worst. Why?

4. What does defendant think of friends, best and worst. Why?

5. What does defendant think of victims, best and worst. Why?

6. What people, concepts do you believe in?

7. Who has influenced you the most?

8. When have you laughed, cried, felt most proud, felt most disappointed?

9. When have you struggled, felt hardship?

S. Feelings: Parents

1. What do parents, siblings think of defendant. Best and worst. Why?

T. Stress

1. What has client been under of long and short duration, near time of killings;

2. How does stress affect client;

3. How does client handle stress.

U. Anger

1. What have been client's angriest moments. Describe when, where, what, why;

2. Who makes client angriest;

3. What is first memory of being angry;

4. Has client ever broken or smashed anything in anger;

5. Has client ever frightened anybody with anger;

6. Who has gotten angriest with client? When? How often? Over what?

7. What was client feeling?

8. How did client react, handle it;

9. Has client ever been incredibly frightened;

10. Have you ever wanted to hurt somebody? Why?

11. Has client ever been angry enough to kill something or somebody?

12. Has client ever been angry with himself;

13. Has client ever been so tense that he'd like to scream;

14. Has client ever experienced sudden changes in his mood;

## V. Control

1. Has client ever felt out of control;

2. Has client ever felt controlled? By whom? When?

## W. Other Feelings

1. Has client ever felt lonely, isolated;

2. Has client ever felt rejected, humiliated;

3. Has client ever felt despair, depression, anxiety;

4. When has client felt most hurt;

5. When has the client felt hateful, spiteful;

6. When has the client felt guilty, shameful, sorry;

7. When has the client felt worried, bored, useless;

8. What is happiest moment of client's life;

9. What is saddest moment of client's life;

## X. Death Penalty

1. Your feelings about the death penalty;

2. If defendant is convicted, is the death penalty an appropriate sentence;

0084                                                    Exhibit A3 - Kentucky 1990

3. What do you feel should be done with the defendant if he's done these things?

Exhibit A3 - Kentucky 1990

## 10. Nonstatutory Mitigating Circumstances

One of the clearest rules in this area of the law is that a defendant has an absolute right to prove evidence in mitigation that does not pertain to a specific mitigating factor, but that is relevant to either the character of the defendant or the crime he committed. "[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest of capital cases, not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 604, 98 S.Ct.2954, 57 L. Ed.2d 973 (1978). *See also Smith v. Commonwealth*, 599 S.W.2d 900 (Ky. 1980).

It is in the area of nonstatutory mitigating circumstances that counsel's knowledge of the case and his or her imagination can most fruitfully be used. Thorough knowledge of the defendant and his past are essential. Creative thought will follow thorough knowledge. Counsel can then intelligently decide what evidence to present and how to present it.

1990 DPA Death Penalty Manual 187

Exhibit A3 - Kentucky 1990

An examination of nonstatutory factors admitted in cases across the nation will demonstrate how important they are. In *People v. Murtishaw*, 29 Cal.3d 733 (1981), the Court viewed the fact that the defendant had turned himself in as a mitigating factor. The Court in *State v. Watson*, 628 P.2d 943 (Ariz. 1981), stressed the defendant's good conduct in prison as an important mitigating factor. The Court stated that the "two aggravating circumstances were outweighed by the mitigating circumstance. The fact that he has been a model prisoner and has attempted to further his education can and should be considered." *Id.* at 946-947. *See* also *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Sivale v. State*, 731 P.2d 192 (Idaho 1986). That the defendant saved another inmate's life was viewed as a mitigating factor in *State v. Holtan*, 287 N.W.2d 671 (Neb. 1980).

The love the defendant's family had for him was seen as mitigating in *Cofield v. State*, 274 S.E.2d 530 (Ga. 1981).

The exclusion of evidence that the defendant had invented an alternative energy source (while on death row) was error in *Jordan v. State*, 518 So. 2d 1186 (Miss. 1988).

Evidence of parole eligibility has been held to be sufficiently mitigating to be admissible. *Doering v. State*, 545 A.2d 1281, 1292-95 (Md. 1988).

Remorse is, of course, an important mitigating circumstance. *See Clark v. Commonwealth*, 257 S.E.2d 784 (Va. 1979); *Simmons v. State*, 594 S.W.2d 760 (Tex. 1980) *Vac. on other grounds*, 453 U.S. 902 (1981); *Pope v. State*, 441 So.2d 1073 (Fla. 1983). It has been found that defendants who express remorse will be given a lighter sentence than those who do not. "Effects of Defendant's Background and Remorse on Sentencing Judgments," Michael G. Rumsey, *Journal of Applied Social Psychology*, 1976, pp. 64-68. It has also been found that men responded better to evidence of remorse than did women. Women, on the other hand, responded better than men to evidence that the defendant came from a deprived background. Overall, juries as a whole, in that study, did not respond as well to background evidence as they did to expressions of remorse.

Evidence of the defendant's having given himself up, confessing, and then entering a plea of guilty has been viewed as mitigating. *Washington v. State*, 362 So.2d 658 (Fla. 1978).

The defendant's capacity for rehabilitation is an important mitigating factor in the appropriate case. "A person's potential for rehabilitation is an element of his character and therefore may not be excluded from consideration as a possible mitigating factor." *Simmons v. State*, 419 So.2d 316 (Fla. 1982). In *State v. Davis*, 477 A.2d 308 (N.J. 1984), the Court held that statistical evidence comparing the defendant with others similarly situated was admissible on the issue of potential for rehabilitation.

One of the more intriguing mitigating circumstances is that of proving some action by the prosecutor. For example, the prosecutor's plea offer to life imprisonment was called mitigating in *Cook v. State*, 369 So.2d 1251 (Ala. 1978) (Maddox, J. concurring). *See* also *Jeffers v. Ricketts*, 627 F.Supp. 1334 (D. Ariz. 1986). Allowing a co-defendant to plead to a life sentence can also be quite mitigating. *Bassett v. State*, 449 So.2d 803 (Fla. 1984).

Evidence of the defendant's innocence has been held to be a mitigating factor in *State v. Buell* 489 N.E.2d 795 (Ohio 1986). *State v. Stewart*, 341 S.E.2d 789 (S.C.1986). Significantly, courts have also allowed into evidence at the penalty phase the fact that the defendant passed a polygraph. *State v. Bartholomew*, 683 P.2d 1089 (Wash. 1984); *see also Hawkins v. State*, 436 So.2d 44 (Fla. 1983) where the Court accepted the polygraph on the issue of whether or not the defendant was the actual triggerman.

Other mitigating factors considered by various courts are as follows: the defendant was a war hero, *Halliwell v. State*, 323 So.2d 557 (Fla. 1975); defendant was not armed when the altercation began, *Thompson v. State*, 328 So.2d 1 (Fla. 1976); the defendant was father to two young children, *Jacobs v. State*, 396 So.2d 713 (Fla. 1980); the victim's father did not want the defendant to receive the death penalty, *Romine v. State*, 305 S.E.2d 93 (Ga. 1983); the defendant suffered from post-traumatic stress, *State v. Gadd*, 707 S.W.2d 846 (Tenn. 1986); the defendant served in the Salvation Army and was a Christian, *Hooper v. State*, 476 So.2d 1253 (Fla. 1985); the defendant is a slow learner, *Neary v. State*, 384 So. 2d 881 (Fla. 1980); the defendant behaved while on death row prior to his second trial, *Delap v. State*, 440

Exhibit A3 - Kentucky 1990

-THIRD EDITION-

# ALABAMA CAPITAL DEFENSE
# TRIAL MANUAL



THE EQUAL JUSTICE INITIATIVE OF ALABAMA

114 NORTH HULL STREET
MONTGOMERY, ALABAMA 36104
(334) 269-1803

**0088**

## GETTING STARTED



If your client is going to avoid a death sentence and you are going to be an effective advocate, you will have to start preparing the defense effort as soon as you are brought into the case. Capital cases are unique and require a special effort from the defense attorney. First, counsel must establish a good relationship with the client. It is critical that you immediately meet your client and begin to develop a working relationship that permits you to represent his or her interests fully at trial and in plea negotiations. Second, it is also important that you organize the defense investigation and start as soon as possible the task of gathering the information and records that will be critical to both the guilt phase of the capital trial and the penalty phase. Third, you must begin the process of sensitizing every player in the case to the fact that a person's life is at stake and that a heightened standard of care is therefore necessary throughout. Finally, you must prepare to understand fully your client's life and circumstances and not simply the crime charged. This chapter identifies a few devices to assist in organizing the defense effort and to help you get the case started.

### I. Investigating a Capital Case

Extensive pretrial investigation is absolutely crucial in a capital case. Too often death row prisoners in Alabama have been sentenced to death in trial proceedings where the sentencer knew very little about how the defendant came to be on trial for his or her life, what circumstances and factors brought the defendant to a capital trial, and what mitigating circumstances compel a sentence less than death. Similarly, many a defense lawyer has failed in establishing that his client was not guilty of a capital crime by failing to investigate the state's case or develop a defense strategy.

Courts and commentators have recognized that a defense lawyer in a capital case cannot be effective without adequately investigating the case and preparing for both the guilt and penalty phases. *See, e.g., Baxter v. Thomas*, 45 F.3d 1501, 1514 (11th Cir. 1995), *Jackson v. Herring*, 42 F.3d 1350, 1366-67 (11th Cir. 1995); *Armstrong v. Dugger*, 833 F.2d 1430 (11th Cir. 1987); *Thomas v. Kemp*, 796 F.2d 1322 (11th Cir. 1986); *Tyler v. Kemp*, 755 F.2d 741 (11th Cir. 1985); *Brown v. Blackburn*, 625 F.2d 35 (5th Cir. 1980). Defense counsel in a capital case has

> a duty to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses. There must be an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology, and present feelings. The affirmative case for sparing the defendant's life will be

27

Exhibit A4 - Alabama 1997

composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized.

Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.L.Rev. 299, 323-24 (1983) (footnote omitted).

The importance of a thorough investigation cannot be overemphasized. Even the most skillful lawyer's effectiveness can be undermined by inadequate knowledge about the facts of the case. A lawyer handling an inadequately investigated case is often ineffective not only at trial but also when seeking a disposition without trial, for it is not unusual for a prosecutor to agree not to seek the death penalty when confronted with the weaknesses in his own case or presented with exculpatory evidence discovered during the course of a defense investigation. Simply put, it is the obligation of every lawyer to find out as much as possible about a case as soon as possible. Speed is essential: Physical evidence disappears, memories fade, and witnesses move away or are forgotten. Thoroughness is just as crucial. Counsel can never gather too many details concerning the facts and circumstances of each case. The obscure detail or easily overlooked incident may become vital to defense strategy.

The clues to a theory of mitigation may often be found in written records -- doctor's records, hospital records (emergency room records can be especially helpful), school records, welfare department records, juvenile court or training school records, jail and prison records from prior convictions, employment records, marriage or divorce records, and any other piece of paper you think may exist. The search should also be expanded to include investigation into parents' and siblings' histories.

The goal of such a search is to discover the physical, social, psychological, and sexual problems with which your client has been forced to contend since his or her birth. The client, for example, may have been raised in a dysfunctional and/or abusive family, his mother's drinking may have caused him to be born with fetal alcohol syndrome, he may be mentally retarded or suffer from organic brain damage, or he may suffer from a mental illness such as schizophrenia.

For several reasons, the client and his or her family may not tell counsel about these matters. First, they may all be ashamed of mother's drinking, father's drug abuse, or any other family "secret." A dysfunctional family is quite adept at hiding this information. Second, they may not even be aware of the problem. What to them was Johnny's inability ever to obey his parents because of stubbornness may, on closer examination, be a trait characteristic of fetal alcohol syndrome. Third, counsel should bear in mind that studies show that child witnesses to abuse are often as traumatized as the abused sibling or parent. The point is this: although communication with the family is essential, counsel should *never* let the client or his family dictate the scope of the investigation.

The search for the client's family history should precede the hiring of a mental health professional. Although psychologists and psychiatrists all recognize the importance of an

28

accurate "history" (their term for your investigative efforts), they will not take the time to perform this laborious work on the limited fee the court will pay. They will be content to evaluate your client based only on test performance, and many "bad" evaluations are the result of such a limited inquiry. In order to ensure that your client is fairly evaluated, you must take up the challenge of investigating his or her "history."

## II. Working with the Client

Once you become involved in a capital case it is imperative that you immediately contact the client and establish a working relationship. First, someone accused of a capital crime is certain to have many questions, fears and anxieties about what kind of legal assistance he or she will receive. It is important that you be responsive to your client's questions and needs as much and as quickly as possible. Second, it is critical that the accused understand that he or she must not discuss the case, arrest or alleged crime with *anyone* except defense counsel. Finally, preparation for a capital trial will be unlike anything for which the accused has ever prepared. Your success will depend on having a relationship that permits you to explore those circumstances of the client's life and background that will eventually allow you to convince a jury that his life is worth saving.

### A. Establish a Line of Communication

As soon as you make contact with the accused, it is important that he or she clearly understand how to get hold of you. Make sure the client has your name, address and phone number and understands when you can and when you can't be available to answer questions. The client should know when he or she will see you next and what to do between visits to assist in preparing the case. Too often criminal defendants are unsure about when or if they will see an attorney and incriminate themselves by making statements or ill-advisedly trusting law enforcement personnel or other inmates. Make sure the client understands who is on the defense team and who is not. If your investigator, cocounsel and paralegal will have direct dealings with the client make sure that the client understands for whom they work.

### B. Assess the Client's Needs

It is important to assess the client's needs as early on in the process as possible. Anyone who has been involved in a capital offense is likely to be experiencing some kind of crisis. It is important for you to figure out what the client's immediate problems are if you are to prepare the case effectively for trial. Your client may be illiterate, emotionally unstable or have other special needs that you will have to identify quickly and begin to address. A client that is mentally retarded may need special assistance in understanding fundamental issues. You may need to involve an investigator or paralegal who can constantly make sure that the client is not undermining the defense effort because of a lack of understanding about what is

Exhibit A4 - Alabama 1997

happening. A mentally ill client may be incompetent to stand trial or need treatment to assist in the defense. It is important that defense counsel spend enough time with the client that a judgment can be made about these kinds of questions early in the development of the attorney-client relationship.

Counsel must understand that an arrest for a capital offense can create an unprecedented crisis for the client and her family. It is important that counsel be sensitive to this dynamic. A client who is overwhelmed with anxiety about what will happen to her children will need your help in understanding what will and will not happen.

### C. Begin to Gather Client Background Information

At the end of this chapter is a lengthy document that has been prepared to help guide you in gathering background information from your client. You will need as much information as your client can provide on his life history and the circumstances surrounding his present arrest. As discussed above, a client may need to discuss issues with you that have never been discussed with anyone. Family conflicts, abuse, or drug and alcohol problems may be important to understanding the crime or the circumstances of the accused's involvement in it. It is important that your client trust you as much as possible and understand that what is said to you is confidential and privileged.

### D. Educate the Client about His or Her Case

It is vital that you educate your client about the situation that he or she is in. Many capital defendants (as well as their lawyers!) may underestimate the likelihood that they will be found guilty or sentenced to death. Some will want to take foolish risks. Most defendants do not think of themselves as the kind of people who should receive a death sentence. You must make sure your client has an informed perspective on the reality of the death penalty in Alabama and the need to work constructively to avoid a death sentence. EJI attorneys are always available to assist in educating defense lawyers and clients about the sometimes arbitrary influences on capital cases and the importance of pursuing negotiated pleas.

## III. Laying the Foundation for a Fair Trial

As discussed in earlier chapters of this manual, counsel's duty to sensitize all players to the unparalleled stakes created by a potential death sentence and to ensure that a complete record is made of all pretrial and trial proceedings is an initial step in preparing the capital defense. At the end of this chapter are three motions that may assist counsel in this effort. A sample motion for full recordation is presented in this chapter. A specific request for transcription of all proceedings -- motions hearings, bench conferences, chamber conferences, jury selection, use of peremptories, etc. -- is particularly important under the recently amended Rule 10 of the Alabama Rules of Appellate Procedure. The second sample pleading seeks to have the trial court treat all pretrial and trial objections as being based on all state and federal constitutional provisions. Assisting in adequately preserving claims for

30

review, this pleading puts the trial court on notice that the defendant relies on all relevant state and federal constitutional grounds when objections are raised.

The third sample pleading is a motion that reviews the well-settled case law that elevates a capital case to a heightened level of review and care under state and federal requirements. The motion is an attempt to get trial courts to recognize expressly that because the state is seeking a death sentence, heightened scrutiny and protection must be afforded to the accused at every stage of the process.

These sample pleadings are just suggestions for beginning the sometimes difficult task of educating everyone involved in the capital trial process that increased attention and care will be required if the state is going to seek to take your client's life.

## IV. Client Background Records and Information

No capital case can be adequately litigated without your having first conducted a painstakingly thorough investigation into the underlying offense, the defendant's personal background and his or her life history. Critical to this process is the documentation of your client's background. Since you seek your client's entire life story you must utilize all existing resources that might assist you in better understanding how your client ultimately came to be sentenced to death. A primary source of information will be client and family interviews. While the information gathered from these interviews will direct subsequent avenues of investigation, the following sources of information should be considered in *every* capital case, regardless of what your client may tell you. If you have questions concerning any of these or other sources of information, please feel free to contact EJI for assistance.

### A. Birth and Death Certificates

Birth and death certificates are important not only for helping to establish a sequence of events but also because they may alert you to unusual occurrences in your client's history. Certificates for anyone born in Alabama can be obtained for a fee of about $12 from:

*Montgomery County Vital Records Department*
*3060 Mobile Highway*
*Montgomery, Alabama 36108*
(334) 293-6555
(This address is for walk-ins only, keeps *statewide* records)

*Alabama State Department of Health*
*Vital Records Department*
*P.O. Box 5625*
*Montgomery, Alabama 36103-5625*
(334) 206-5418
(For requests by mail from out of state)

31

Exhibit A4 - Alabama 1997

Similar government agencies exist in other states. While the Department of Vital Statistics ("DVS") is happiest when a request specifies an exact date of birth or death, it will check a specified period of years for the birth or death of a named individual. Requests by mail or in person require that an application be filled out. The application is available at the walk-in site or by mail from the State Health Department. Additionally, DVS in Alabama has begun requiring signed releases from the person whose birth, death or marriage certificate is sought, even though the vital events are matters of public record.

Note too, that all counties in Alabama have health departments, some of which maintain birth and death certificates. For this reason, if DVS' search yields negative results, it is advisable to check the appropriate county health department.

### B. Court Records from Prior Convictions

All state and federal court records pertaining to your client should be retrieved -- regardless of whether the court sits in Alabama or elsewhere. This will enable you to prepare to fight the state's case; to assess the validity of any alleged prior convictions (e.g., were they counseled); and to begin to amass records that may ultimately lead to mitigation. Family members' records should also be obtained.

To retrieve state circuit court records, you should contact the clerk of the particular court involved. The phone numbers for the federal district courts in Alabama are:

*Northern District*
*Birmingham, Alabama*
*(205) 254-1021*

*Middle District*
*Montgomery, Alabama*
*(334) 832-7380*

*Southern District*
*Mobile, Alabama*
*(334) 690-2940*

If records from federal courts within the Eleventh Circuit are no longer housed at the local courthouse, they are maintained at the Federal Records Warehouse in Atlanta, Georgia. Court records are maintained in two groups by date: pre-1960 cases and post-1960 cases. A telephone call establishing contact with a representative at the appropriate division before sending the request letter is advisable.

**0094**

*ALABAMA CAPITAL DEFENSE TRIAL MANUAL*
*Chapter Three - Getting Started*

Pre-1960 court records can be obtained from:

*National Archives Southeast Region*
*National Archives and Records Administration*
*1557 St. Joseph Avenue*
*East Point, Georgia 30344*
*(404) 763-7477*

Post-1960 court records can be obtained from:

*Federal Records Center*
*National Archives and Records Administration*
*1557 St. Joseph Avenue*
*East Point, Georgia 30344*
*(404) 763-7474*

In requesting court records from either division, you should provide as much of the following information as possible: (1) case name and number; (2) approximate time period; (3) court name -- district *and* division; (4) accession number; (5) box number; and (6) FRC location. The last three identifiers can be obtained from the district court. Typically, the clerks are very helpful, so a request should be made even if you are able to supply only very little information.

Records can be requested from either division in person, by letter, or through the federal district court where the case was disposed. There is a charge for copies and a varying turn-around period on record requests.

## C. Department of Youth Services Records

In Alabama, records generated by a Department of Youth Services campus or group home are maintained at that facility until the person's 18th birthday. After that date, the records are forwarded to the Department of Archives and History in Montgomery. The Department of Archives and History maintains the records until the individual's 24th birthday after which time they are destroyed.

While the physical location of the records may vary, copies may be obtained only through the particular facility or facilities where the client resided. To obtain copies, you should contact the records clerk at the facility and then send a request letter together with a signed and notarized release of information to that clerk.

The addresses and telephone numbers for the various campuses and group homes may be obtained from the Department of Youth Services:

33

0095                                                    Exhibit A4 - Alabama 1997

*Mr. James Dupree, Director*
*Youth Services Board*
*Route 5, Box 66*
*Mt. Meigs, Alabama 36057*
*(334) 215-8100 / 215-3801*

## D.  Medical Records

Medical records are among the most critical documents you can obtain in preparing your case. Evidence of previously undisclosed mental health problems or relevant physical infirmities may be contained within them.  Generally, copies of these records can be obtained upon presentation of a notarized release of information signed by your client.  For hospital records, typically you will need to supply the approximate dates of your client's hospitalization or treatment, and other identifying information such as date of birth and social security number.  Be sure to obtain records regarding your client's birth and her or his mother's pre-natal care.  A release is necessary for each hospital and treating physician.

In addition, copies of such records should be obtained on each member of your client's family. Evidence of a parent's breakdown, alcoholism, or hospitalization for abuse could also prove essential to the case.

## E.  Employment Records

Generally, former employers will supply employment records upon presentation of a signed release of information.  Be sure to inquire about medical and psychiatric records.

## F.  Federal Bureau of Investigation Records

Federal Bureau of Investigation records can be obtained from:

*Chief*
*FOIA & Privacy Section*
*Record Management Division*
*FBI Headquarters*
*9th and Pennsylvania Avenue, N.W.*
*Washington, D.C.  20535*
*(202) 324-3000*

For retrieval purposes, the FBI will request that you provide the client's full name together with any aliases, his date of birth and social security number, the dates he was tried and sentenced, the court or FBI case number (where possible), plus a notarized release of information signed by the client.

34

Exhibit A4 - Alabama 1997

*ALABAMA CAPITAL DEFENSE TRIAL MANUAL*
*Chapter Three - Getting Started*

G. *Federal Bureau of Prison Files*

These are maintained at the federal prison where the client was last incarcerated. To obtain these files, you need to request the records from counsel for the Bureau of Prison ("BOP") region in which that federal prison is located. In requesting the records, you will need to supply a notarized release of information signed by the client, the client's date of birth and his BOP registration number.

In requesting BOP records, you need to make clear that the request is made pursuant to both the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552(a). In addition, you should expressly request *all* records pertaining to your client and generated during his or her stay in the federal penitentiary system including, but not limited to, all medical, psychiatric, and psychological evaluations and all institutional records.

Since some BOP officials who handle these requests have indicated that certain medical, psychiatric and psychological records will be released only to a physician (in particular, an M.D.) and only after receiving a notarized release of information signed by the client naming an M.D. to whom those records should be forwarded, you will need to discern how the BOP individual handling your request will treat those records. Of course, if the BOP individual will release those records only to an M.D., you need to find a doctor who is willing to receive the materials and then turn them over to you.

Current counsel for the BOP region covering Alabama is:

*Sherree Sturgis, Esq.*
*Regional Counsel*
*Attn: Milton Williams*
*Bureau of Prisons*
*523 McDonough Blvd. SE*
*Atlanta, Georgia 30315*
*(404) 624-8129*

H. *Military Records*

Military records are an invaluable source of social, medical, and other information. Post-1960 military records for all branches of the United States military may be obtained from:

*National Military Personnel Record Center*
*Attn: [Navy, Marines, Air Force, Army]*
*9700 Page Boulevard*
*St. Louis, Missouri 63132*
*(314) 263-7131 [Army]*
*(314) 263-7218 [Air Force]*
*(314) 263-7200 [Navy, Marines, Coast Guard]*

35

Pre-1960 military records for all branches of the United States military were destroyed by fire. However, reconstructed records may be obtained by contacting records reconstruction at (314) 263-7213.



A notarized and signed release of information must accompany your letter of request. The release must specify the military branch in which the client served as well as the client's name while in the service; it must also expressly state that the release is for *all* records maintained regarding the client, including, but not limited to, all medical, psychiatric, and psychological evaluations and all institutional records.

Counsel's letter requesting the records must also request *all* records maintained regarding the client, including, but not limited to, all medical, psychiatric, and psychological evaluations and all institutional records. In addition, the letter should include the client's military identification number, his name while in the service, the relevant service branch, the dates of service, the type of discharge, and the unit to which your client was assigned.

A copy of the DD-2-14 military form (Discharge Paper) for veterans of all branches of the service from Alabama prior to 1975 may be obtained from:

*Alabama Department of Archives and History*
*624 Washington Avenue*
*Montgomery, Alabama 36104*
*(334) 242-4435*

### I. Jail Records

All jail records should be obtained relating to prior convictions as well as convictions that may have taken place since your client's arrest in the pending case. These should be retrieved regardless of whether the prison or jail is located in Alabama. Generally, jail records can be obtained with a signed and notarized release unaccompanied by a court order.

### J. Psychological/Psychiatric Records

If the state seeks a mental health examination to rebut your mitigation case, it will likely be performed at Taylor Hardin Secure Medical Facility or Bryce Hospital. You must be sure to challenge *any* suggestion that a state examination can adequately substitute for expert assistance to the defense. You should also ensure that the scope of the state's examination is limited. Mental health records, notes, files and data pertaining to current and prior treatment and evaluation of your client can be obtained with a court order from one or more of the following:

**0098**

*Medical Records*
*Taylor Hardin Secure Medical Facility*
*1301 River Road NE*
*Tuscaloosa, Alabama  35404*
*(205) 556-7060*



*Medical Records*
*Bryce Hospital*
*200 University Blvd.*
*Tuscaloosa, Alabama  35401*
*(205) 759-0773*

*Central Records*
*Alabama Department of Mental Health*
*200 Interstate Park Drive*
*Montgomery, Alabama  36193*
*(334) 271-9209*
*Fax (334) 240-3195*

### K.  Probation and Parole Records

The Board of Pardons and Paroles will not release probation or parole files without a court order.  Nevertheless, individual parole officers will sometimes, and unpredictably, give out information.

*Board of Pardons and Paroles*
*500 Monroe Street*
*Lurleen B. Wallace Building, 2ʳᵈ Floor*
*P.O. Box 302405*
*Montgomery, Alabama  36130-2405*
*(334) 242-8759*

### L.  School Records

Typically, these records are maintained by the County Board of Education.  However, the individual schools and schoolteachers should be contacted for possible additional records and for interviews. Generally, copies of these records can be obtained upon presentation of a notarized release of information signed by your client. Aside from your client's full correct name, other information helpful to retrieval includes the approximate attendance dates, your client's social security number, your client's address at the time of his attendance, and the names of your client's parents.

**0099**

*M. Sheriff and Police Department Files*

Often, but by no means always, Alabama sheriff and police departments require a court order. Sometimes, a notarized and signed release of information will do the trick. Also, often, but by no means always, these departments in other states will obey an order issued by an Alabama court. For this reason, discovery motions should be accompanied by proposed orders directing out-of-state sheriff and police departments to permit the inspection and copying of their files.

*N. State Corrections Records*

All prison records should be obtained relating to prior convictions as well as convictions that may have taken place since your client's arrest in the pending case. These should be obtained regardless of whether the prison is located in Alabama.

Generally, the Alabama Department of Corrections ("DOC") requires a court order before it will release records. All prison institutional files on a particular inmate are forwarded to the DOC after the inmate is released or passes away. The addresses and telephone numbers for the various state prisons may be obtained from the Department of Corrections:

*Department of Corrections*
*1400 Lloyd Street*
*Montgomery, Alabama 36130*
*(334) 240-9500*

Medical records generated by Alabama prisons and their medical providers are maintained by the Department of Corrections and may be obtained by sending a written request accompanied by a notarized release of information signed by the client to:

*Andy Redd, General Counsel*
*Department of Corrections*
*11 South Union Street*
*Montgomery, Alabama 36130*
*(334) 353-3880*

While this agenda for record-gathering may seem daunting, its payoffs for your client are inestimable. Nor is this list of course exhaustive. Creative and relentless efforts to document your client's history may prove invaluable in confronting the state's evidence at trial and presenting a mitigation case.

**0100**

Exhibit A4 - Alabama 1997

## II. Assembling the Defense Case

The basics are these: If a defendant is convicted of a capital offense, a separate hearing will follow to determine whether he will be sentenced to life imprisonment without parole or death. The sentencing hearing will be conducted as soon as practicable after the defendant is convicted under Ala. Code § 13A-5-45(a) (1975), so there will be no time to prepare between phases. The defense must present evidence of every mitigating circumstance it wishes to present to insure that it will be considered in mitigation. *See, e.g., Delo v. Lashley*, 507 U.S. 272 (1993) (per curiam) (holding that the Constitution does not require instruction that lack of criminal history be considered in mitigation where neither defense nor prosecution offered evidence on defendant's lack of criminal history). The court may consider any evidence it deems relevant to sentence, including any matters relating to statutory aggravating and mitigating circumstances. § 13A-5-45(c). The burden is on the state to prove the existence of any aggravating circumstances beyond a reasonable doubt. § 13A-5-45(e).

In Alabama, mitigating circumstances include those that are statutorily defined. § 13A-5-51. However, *they also include anything the jury considers as mitigating, without limitation or definition.* § 13A-5-52; *Lockett, supra; Eddings, supra; Skipper, supra.* The defense is allowed to present any "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). In other words, the jury and sentencing court must consider all mitigation evidence that is relevant to the circumstances of the crime or the character of the offender, regardless of whether this evidence is described in Alabama's mitigation statute. Ala. Code § 13A-5-51 (1975). Mitigating evidence is admissible without regard to some rules of evidence such as hearsay. *Green v. Georgia*, 442 U.S. 95 (1979) (per curiam); *Roberts v. State*, No. CR-93-1766, slip op. at 40-42 (Ala.Cr.App. May 23, 1997) (finding that the trial court erred in excluding hearsay evidence at sentencing). The scope of mitigation is thus quite broad. The law concerning nonstatutory mitigating circumstances is discussed more fully below.

### A. Investigating the Mitigation Case

Before the defense can plan its mitigation theories, every aspect of the client's life from birth until the start of trial must be investigated. For this reason, it is usually desirable to have one lawyer and at least one investigator whose primary responsibilities are to prepare for the penalty phase.

The investigation for the penalty phase must start at the first client interview. The process of investigation is extremely time consuming: It cannot be done in the last few weeks before trial. It will take several months and may necessitate delay of the trial. Counsel should commence investigation into the client's background and mitigating factors immediately. An investigation will include in-depth interviews with the client and all of the people in his or her life, including parents, spouse, children, siblings, teachers, ministers,

doctors, and others. Several interviews are often necessary to bring out all the relevant information, particularly when sensitive matters such as child abuse or sexual abuse are involved.

The investigation must take place wherever the client spent his or her life. If the client is from out of state, and all of his family members, schoolteachers, and friends are out of state, counsel must travel to the hometown to meet with the witnesses in person, obtain information from them, determine what they can contribute, prepare them to testify and begin making arrangements to have them brought into the jurisdiction at the state's expense. (See the sample "Motion For Funds to Secure Attendance of Out-of-State Witnesses" in Chapter 4.) Practice examinations can be useful to prepare mitigation witnesses. Counsel must also anticipate and prepare mitigation witnesses for cross-examination. Reviewing transcripts of penalty phase cross-examinations done by the prosecuting attorney in other capital cases can be very helpful to see what technique he or she has used to discredit mitigation witnesses. When possible, have another attorney put your witnesses through a practice cross-examination to see how the witnesses respond to pressure and to prepare them for unfriendly questioning.

The investigation must include obtaining all medical, mental health, school, employment and other records that relate to the client. These documents will provide the names of additional people to be interviewed who can give life to the information summa- rized in the records. You must request these records as soon as possible because many institutions require that their own forms be completed, some of the records may not be easily accessible, and some of the records may reference other sources that the defense will need to investigate. (For more detailed information on conducting a thorough investigation, see Chapter 3 - "Getting Started.")

Experts will often be needed to assist the defense at the penalty phase. Experts can help explain the meaning and impact of events in the client's life and how these experiences shaped the person sitting before the jury. To guarantee a reliable diagnosis, experts will need to have access to as much information as counsel can provide. Counsel should seek funds to retain needed experts at the beginning of the case. The importance of starting early cannot be overemphasized. There will not be time to argue for funds or to retain experts between the guilt/innocence and penalty stages of a capital trial.

Once this information is accumulated, counsel can begin developing a theory for the sentencing phase. In some cases, your sentencing theory can be developed at the guilt/innocence stage. Counsel can use voir dire to educate the jury about the meaning of mitigation and the mitigation that will be offered. What theory you choose will of course depend upon the circumstances of the case. If the accused does not have a lengthy criminal record, counsel may want to focus on the lack of any past criminal behavior. On the other hand, if the client has been in trouble since childhood, it may be important to identify

Exhibit A4 - Alabama 1997

significant causal factors that have contributed to his behavior. The theory should capture the most compelling aspects of the case, the client's life, and circumstances that say, "this person should not be killed."

For example, serious mental illness that would not rise to the level of mental incompetency or insanity may yet help explain the client's behavior. Severe impairment brought on by alcoholism or brain damage might provide insight into the defendant's actions. Physical or emotional trauma in youth or adulthood should be explored. The number and kind of mitigating factors available is limited only by the depth of counsel's investigation and creativity. Obviously you are in a much better position at the penalty phase if you have as many mitigating circumstances to present to the jury as possible.

### B. Ensuring that the Sentencer Considers All Mitigating Circumstances

Many capital defense attorneys, juries and judges continue to underestimate the utility and relevance of mitigating evidence that is not defined by any one of the statutory mitigating circumstances enumerated in Ala.Code § 13A-5-51 (1975). The Alabama statute specifically provides that mitigating factors shall include any aspect of a defendant's character or record that the defendant offers as a basis for a sentence of life imprisonment without parole. Ala. Code § 13A-5-52 (1975). The consideration of nonstatutory mitigation also has a constitutional basis. The United States Supreme Court held in *Parker v. Dugger*, 498 U.S. 308 (1991), that the failure of a state court to consider nonstatutory mitigating evidence in reviewing a death sentence violates Eighth and Fourteenth Amendment guarantees. Other death sentences have also been vacated where insufficient attention has been paid to the nonstatutory mitigating evidence presented. *See Ex parte Henderson*, 616 So.2d 348 (Ala. 1992) (concluding that the sentencer improperly rejected evidence of mental retardation); *Jackson v. Dugger*, 931 F.2d 712 (11th Cir. 1991) (requiring new sentencing when the trial court failed to give mitigating effect to evidence that defendant was a Vietnam veteran); *Hadley v. State*, 575 So.2d 145 (Ala.Cr.App. 1990) (concluding that the sentencer improperly refused to find existence of mitigating circumstances such as alcohol dependence and mental impairment).

Sentencing juries and judges are obligated under the Eighth and Fourteenth Amendments to consider any mitigation evidence that is relevant to the circumstances of the offense or the character of the offender, regardless of whether this evidence is set out in Alabama's mitigation statute. *Hitchcock v. Dugger*, 481 U.S. 393 (1987) (death sentence held to be unconstitutional where advisory jury was instructed to consider only mitigating factors set out in state statute and sentencing judge refused to consider nonstatutory mitigating factors); *see also Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). Nonetheless, many defense lawyers do not adequately investigate or develop mitigating facts about the accused or his background or character because such facts do not relate directly to the mitigation defined in Alabama's capital statute. Similarly, many circumstances relating to the offense, such as the lesser sentence of an accomplice, may be mitigating and relevant to an informed sentencing determination; often, however,

### III. Constructing the Defense Penalty Phase Argument

There is no boilerplate sample for a closing argument in a capital penalty phase trial. Defense arguments at the penalty phase will vary as much as individuals do. Thus, the penalty phase closing statement must be one that is tailored to the defendant as an individual. Defense counsel faces 12 persons on the penalty phase jury who have already said that they support the death penalty for capital crimes and that they are willing to impose death. Therefore, an eloquent argument which *solely relies* on an attack of the death penalty will not persuade the jury to give the defendant life. Instead, defense should prepare an argument that sums up the penalty phase evidence, reviews the testimony and documentary evidence, focuses on the law, reminds the jurors that the decision to consider mitigation can be made individually, and delivers the reasons why the defendant's life should be spared. Penalty phase themes may include: the fact under Alabama law, a defendant with a capital conviction will die in prison; explaining life imprisonment without parole; the defendant's mental or emotional difficulties; lingering doubt; adjustment to prison; remorse; the sacredness of life; the personal worth and contributions of the defendant, and those hardships that the defendant has had to face and how they limited his or her life choices. Whatever strategy the defense employs at the penalty phase, it should be a constant reminder of why this particular client should not be executed.

### IV. Confronting the Prosecution's Case

The state bears the burden of proving beyond a reasonable doubt the existence of one of Alabama's aggravating circumstances before a defendant convicted of capital murder can lawfully be sentenced to death. Defense counsel should insist upon notice from the state of the aggravating factors it will rely on and the evidence it plans to introduce in support of them. Counsel must have adequate notice and an opportunity to investigate the aggravating factors fully in order to satisfy the Eighth Amendment's reliability requirement. *See Gardner v. Florida*, 430 U.S. 349 (1977) (regarding need in that case to provide defense with presentence report so that defense would have opportunity to correct, explain or rebut any information therein).

Defense counsel must conduct both legal and factual investigations into the reliability and relevance of the evidence. For example, if the state seeks to introduce prior convictions, defense counsel must determine whether the defendant had a lawyer or pled guilty without being informed of his rights. *See Johnson v. Mississippi,* 486 U.S. 578 (1988) (Eighth Amendment requires reexamination of Mississippi death sentence where one factor considered in aggravation was prior New York conviction that was subsequently invalidated by New York Court of Appeals). Uncounseled convictions may not be used to enhance punishment. *See Burgett v. Texas*, 389 U.S. 109, 115 (1967).

593

Exhibit A4 - Alabama 1997

Bryan R. Shechmeister

# DEATH PENALTY COLLEGE

Sponsored By
Santa Clara University School of Law
California Attorneys for Criminal Justice
California Public Defenders Association
August 7 - 12, 1999



*In honor and in memory of Bryan R. Shechmeister . . . who taught us about our work, our selves - and that "childhood matters."*

Exhibit A5 - California 1999



## II.  Working with your Client

You cannot be effective in a capital case without getting to know your client well and thoroughly investigating his or her

**Exhibit A5 - California 1999**

entire life.  At the penalty phase, trial counsel will be faced with giving an account of how the defendant came to be on trial for life.  Defense counsel cannot do this without a clear understanding of the circumstances and influences surrounding that life.  Because the stakes are so high in a capital case, it will also be essential to spend a great deal of time with the client to facilitate the kind of working relationship that can withstand the pressures and obstacles inherent in capital litigation.  The client who meets his attorney only a few times before trial will not feel very comfortable or confident during what will be a very difficult experience.  Good attorney-client relationships are therefore key to the defense effort and must be approached thoughtfully and carefully.

In this manual there are client background questionnaires and other suggestions to help you better understand your client. However, there is simply no substitute for spending time with the client and developing a relationship that allows you to work effectively on his behalf.

III. Negotiating for Life

One of the most important aspects of capital litigation is plea bargaining.  In many cases, obtaining a sentence other than death may be the best victory possible.  Developing a plea strategy and enthusiastically pursuing plea settlement of the case is therefore critical in protecting your client's interests. Preparing for plea bargaining involves various tools and considerations.

First, one must marshal every convincing reason as to why a sentence less than death is appropriate. A lesser role in the offense, domination by another individual or other aspects of the crime may be important. The facts of the case are often not helpful in this regard. Counsel must also find the mitigating facts -- much like those that will be presented at the sentencing phase -- that will convince others that death is not necessary here. Meetings with the client, his family, former employers, and associates will eventually produce sympathetic factors -- such as mental illness, severe limits on intelligence, abuse as a child, or infirmity -- that counsel should keep in mind as you seek to convince decision makers that a sentence less than death would be the appropriate punishment for this offender.

Second, it is important that both client and counsel realize that a plea disposition in a capital case is hardly a "cop out". The general enthusiasm for the death penalty that presently exists, the severity of the crime and a host of other factors need to be explained to the client so that he or she appreciates that in many cases a sentence other than death is a major victory.

Third, one must be aware of the various people who may play an important role in persuading the district attorney to accept a sentence less than death and must convince each of them of the appropriateness of a life sentence. Most important in this regard is the victim's family. While surviving family members are often understandably hostile, it is not uncommon for them to decide against a death trial. Making an effort to win them over

Exhibit A5 - California 1999

to a plea is never the easiest task of the defense lawyer, but an attempt must be made in every case. Counsel should try to develop a rapport with the family and approach them when appropriate to discuss the disposition of the case. If possible, contact a mutual friend, or persuade a sympathetic minister to act as intermediary in presenting your argument for life. Others close to the district attorney may be helpful as well. Sometimes a law enforcement officer will express hesitations over the execution of your client after becoming familiar with him over the weeks of incarceration. Another law enforcement officer, the clerk of court, or other officials may be persuaded that it is best for all concerned to dispose of the case without trial. The trial judge often plays a central role in convincing the prosecutor that a plea is preferable.

Fourth, counsel should know what will convince the district attorney to agree to a sentence less than death. No matter how bad the case, several factors that are always present may cause the prosecutor to consider a plea disposition. One is the time and expense involved. A vigorously tried death case will cost the state many times the expense of an ordinary murder trial. The strict appellate scrutiny applied to capital cases may be another important factor. Family members, too, may be dissuaded by the length of appeals and the recurrent media attention in death penalty cases.

These general considerations and others specific to your case will be key. The state's primary concern is punishment of the guilty and protection of the community. In every case your

job is to convince the prosecutor that these objectives can be met without a death sentence.

Exhibit A5 - California 1999

THE PENALTY PHASE

## I.  Preparing for the Penalty Phase

The sentencing phase of a capital case involves a separate trial on the issue of punishment.  It must be approached as a major trial, not an afterthought.  It may very well be the only trial at which your client has a chance to prevail.  Defense counsel must thus work hard to turn the penalty phase into a significant event and must resist any efforts by the court or prosecution to encourage a shallow or perfunctory presentation on behalf of the person whose life is at stake.

The rules of evidence governing the sentencing phase of a capital trial are completely different from those at any other legal proceeding.  The evidence offered by the state during the penalty phase must relate to the aggravating circumstances it has alleged.  By contrast, the defendant may proffer any information about his background, character, or the crime as a basis for a sentence less than death.  Lockett v. Ohio, 438 U.S. 586 (1978); Eddings v. Oklahoma, 455 U.S. 104 (1982); Skipper v. South Carolina, 476 U.S. 1 (1986).  Trial counsel must be equipped to convince the jury that the client's life should not be taken.  Counsel must be prepared to show in a compelling manner how the client came to be at risk of losing his life.  Counsel must show why that life still has purpose and value.  Mercy will be a relevant factor.  Stanley v. Zant, 697 F.2d 955, 960 (11th Cir. 1983); see also Washington v. Watkins, 655 F.2d 1346, 1376 n.57, reh'g denied, 662 F.2d 1116 (5th Cir. 1981), cert denied, 456

U.S. 949 (1982). In sum, the penalty phase of a capital trial is unlike any other experience trial counsel is likely to have, because the stakes are extraordinary and the need for carefully planned and skillful advocacy is as great as it can ever be within the legal system.

Successful penalty phase litigation turns on proper preparation and investigation, and on knowing the client as well as anyone else in his life ever has. Ensuring that the sentencers fully consider nonstatutory mitigating evidence, being able to prevent the state from unlawfully applying aggravating circumstances, successfully limiting the state's ability to present victim impact evidence, and challenging judicial override of a life verdict from a sentencing jury are just a few critical aspects of penalty phase litigation that must be thoroughly considered and addressed.

## II. Assembling the Defense Case

Simply put, the case will have two distinct parts: If a defendant is convicted of a capital offense, a separate hearing will follow to determine whether he will be sentenced to life imprisonment without parole or death.

### A. Investigating the Mitigation Case

Before the defense can plan its mitigation theories, every aspect of the client's life from birth until the start of trial must be investigated, as discussed above. For this reason, it is usually desirable to have one lawyer and at least one

investigator whose primary responsibilities are to prepare for the penalty phase.

The investigation for the penalty phase must start at the first client interview. The process of investigation is extremely time consuming: It cannot be done in the last few weeks before trial. It will take several months and may necessitate delay of the trial. Counsel should commence investigation into the client's background and mitigating factors immediately. An investigation will include in-depth interviews with the client and all of the people in his or her life, including parents, spouse, children, siblings, teachers, ministers, doctors, and others. Several interviews are often necessary to bring out all the relevant information, particularly when sensitive matters such as child abuse or sexual abuse are involved.

The investigation must take place wherever the client spent his or her life. If the client is from out of state, and all of his family members, schoolteachers, and friends are out of state, counsel must travel to the hometown to meet with the witnesses in person, obtain information from them, determine what they can contribute, prepare them to testify and begin making arrangements to have them brought into the jurisdiction at the state's expense.

The investigation must include obtaining all medical, mental health, school, employment and other records that relate to the client. These documents will provide the names of additional people to be interviewed who can give life to the information

summarized in the records.

Once this information is accumulated, counsel can begin developing a theory for the sentencing phase. What theory you choose will of course depend upon the circumstances of the case. If the instant crime is the accused's first, counsel may want to focus on the lack of any past criminal behavior. On the other hand, if the client has been in trouble since childhood, it may be important to identify significant causal factors that have contributed to his behavior.

For example, serious mental illness that would not rise to the level of mental incompetency or insanity may yet help explain the client's behavior. Severe impairment brought on by alcoholism or brain damage might provide insight into the defendant's actions. Physical or emotional trauma in youth or adulthood should be explored. The number and kind of mitigating factors available is limited only by the depth of counsel's investigation and creativity. Obviously, you are in a much better position at the penalty phase if you have as many mitigating circumstances to present to the jury as possible.



Exhibit A5 - California 1999

# Locating and Interviewing Life-History Witnesses
## Russell Stetler

Exhibit A5 - California 1999

# LOCATING AND INTERVIEWING LIFE-HISTORY WITNESSES

## by Russell Stetler

### Director of Investigations

### New York State Capital Defender Office

Investigating the capital client's biography is a sensitive, complex, and cyclical process. It is cyclical, rather than linear, because witnesses will need to be reinterviewed when new information has been discovered. As veteran mitigation specialist Lee Norton has observed, "The investigation is not complete until the information uncovered becomes redundant and provides no new insight. It is insufficient to talk to witnesses only once because each new individual recalls different facts and anecdotes; if an aunt provides an account of a head injury which the mother forgot to mention, it is necessary to go back to the mother to ask about it. Similarly, an interview may reveal records that must be obtained, which in turn raise new questions, questions which necessitate interviewing several witnesses again."[1]

The complexity of the life-history investigation involves multigenerational evidence-gathering, tracing the client's migratory family to its roots in the rural South or from East Coast to West Coast by way of Oklahoma. The investigation encompasses all the forces which molded the client's life, both nature and nurture, the confluence and convergence of genetic predispositions and environmental influences. In the client's own generation, the investigation extends to siblings and cousins within the family, and to friends and acquaintances from every period of the client's life. Genetic predispositions are identified by carrying the investigation

---

[1] Lee Norton, "Capital Cases: Mitigation Investigations," Champion, May 1992, p. 45.

Exhibit A5 - California 1999

back in time, to include parents, aunts, uncles and grandparents, and forward if the the client has children. Investigation of the client's childhood includes the climate of caregiving in the home, the quality of relationships, hygiene, nutrition, education, exposure to toxins (in the air, in the dwelling, in utero, etc.), the social and economic status of the community, cultural values, and so forth. Witnesses range from neighbors and relatives to classmates and co-workers, cellmates and army buddies, clergy and social workers, teachers and correctional staff.

Interviews are sensitive because of cultural, psychological and other barriers that must be overcome to ensure that family secrets are disclosed. Concepts of remorse and shame have great cultural variability. A sense of loyalty may also obstruct cross-cultural disclosure. Regardless of the culture, life-history investigation is invasive of privacy -- seeking the darkest, most shameful and intimate secrets of the client's family. The investigation exposes raw nerves, retraumatizes, scratches at the scars nearest the heart.



HISTORY WITNESSES revised 8/17/96                    2

## Approaching life-history witnesses

Life-history interviews encompass many kinds of witnesses, so there is no single technique which will be appropriate in approaching the interview. Family members will be approached differently from neutral, third-party observers of family dynamics, such as welfare caseworkers, teachers, pediatricians, and other professionals. Within the family, there will be widely varying degrees of cooperation. Witnesses will often oscillate between denial and disclosure as painful truths unfold slowly while trust and rapport build up.

It is always helpful to know as much as possible about witnesses before approaching them. Interviewers need to be sensitive to the differences between them and the witnesses which may create barriers, including differences of race, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation. We must confront our prejudices, as well as theirs -- how we view them, as well as how they will see us. We must often ask whether there is someone else in the defense team who is better equipped to build a bridge to a particular witness. We must find what we do have in common with the witness and find a means of sharing whatever it is.

Sometimes friendly life-history witnesses can be interviewed by appointment, and common courtesy will dictate contacting them in advance. But reluctant witnesses find it much easier to hang up the telephone than to refuse to speak with an investigator on their doorstep. Reluctant witnesses often cancel interviews which have been set up by telephone, particularly if they are vulnerable to pressure from other members of their households or likely to contact police or prosecutors between the telephone contact and the scheduled appointment.

Witnesses should always be interviewed in person. The information needed in mitigation

LIFE-HISTORY WITNESSES revised 8/17/96                    7

                    Exhibit A5 - California 1999

is simply not disclosed to strangers over the telephone. Full disclosure comes only in person with great patience, no matter how skilled the interviewer.

Life-history witnesses should generally be interviewed in the setting which is most likely to evoke memories of the client – in the home, in the case of family members; at school, in the case of teachers; at work, if the witness is a former employer; etc. The goal of the visit is always to gather documents, snapshots, artwork, report cards, and other memorabilia, as well as to conduct the interview. The home environment or the school the client attended is itself a rich source of information about the client's social milieu.

Confidentiality and security are absolutely essential, so sometimes it will be more appropriate to interview family members one at a time in some neutral, safe setting, such as a coffee shop, church, or public place. Since the goal is to put the life-history witness at ease, it is important that the location be one where the witness is comfortable -- not a law office.

Always ask witnesses to suggest others who may have useful information, but never let one witness control or limit your access to others. The family member who is least invested in preserving secrets is the one you need to find, and concealing family members will discourage you from finding that key witness.

The key to eliciting sensitive information is patience on our part and trust on the part of the witness. Building that trust requires honesty and absolute discretion from the investigator. A witness needs to know that sensitive information will not be revealed to other witnesses in the course of the ongoing investigation. Promises, even small ones, must be kept. Never make promises that cannot be kept. Lee Norton has again summarized the task succinctly:

Locating lay witnesses is only half the battle. Once you have found them, you

LIFE-HISTORY WITNESSES revised 8/17/96                    8

Exhibit A5 - California 1999

must succeed in obtaining from them the information you need. In most cases lay witnesses are initially suspicious of people asking questions about the client because, like the client, their experiences have been with individuals wanting to hurt them. Thus, time must be spent demonstrating commitment and a sincere desire to save the client's life.

One of the greatest hurdles in communicating with and gaining the trust of lay witnesses is explaining that what they may have thought was "bad" about their friend or loved one is actually helpful information. For example, descriptions of the client's inexplicable outbursts from the age of about eight when he was involved in a near-fatal car accident help the mental health experts determine the presence and etiology of brain damage. In order to gain the cooperation of lay witnesses, the defense must take the time to explain not only what information is needed, but why it is important.[4]

Allow plenty of time for each interview, and understand in advance that follow-up interviews will be required. Help the witness to understand that the initial interview is only the beginning of a long process.

Family members may share the client's cognitive or psychiatric impairments. They may abuse alcohol or other substances. There may be skilled denial of traumatic events and learned silence as to the norms of society for relatives who have been mis-socialized and corrupted as they grew up. Even absent trauma and corruption, family witnesses are often simply poor historians, flawed by their perception and insight, selective memory, biases, and inability to articulate. Finally, they have "normalized" whatever their life experience was. They do not automatically identify the signs of trauma, abject poverty or neglect which were everyday occurrences in their particular social group. One family which grew up in a migrant camp, for example, did not think it was noteworthy that they lived without any plumbing; but a school teacher remembered in horror the squalor of human feces in the field where the children played.

Life-history investigators must be skilled in reflective listening. Questions must be open

---

[4]Norton, op. cit., p. 44.

LIFE-HISTORY WITNESSES revised 8/17/96                9

**0120**                                                    Exhibit A5 - California 1999

Mar 24 '97  14:45    P. 11/11

ended, and the witnesses' words must be mirrored in follow-up questions encouraging concreteness and detail. Judgmental labeling should be replaced with language that permits the witness to continue elaborating. Specific follow-up questions should encompass all the possibilities suggested by the witnesses' words and consistent with the ethnocultural context. As always, it is also important to explore with each witness strategies for corroborating what they know: who else knows what happened, or what document would verify it.

The investigator needs to be sensitive to the retraumatization which may occur when witnesses narrate painful memories. The combat veteran who describes the horrific death or maiming of a comrade to a stranger will suffer the consequences of that revelation. The investigator needs compassionate understanding of that process and should allow ample time to communicate that compassion to the witness. Follow-up contact is appropriate, to check in with the witness after intimate, humiliating, or painful revelations.

Conclusion

Life-history investigation typically involves hundreds of hours of work, including multiple interviews with key witnesses. Both locating and interviewing witnesses require meticulous attention to detail, careful preparation, and skills development. Capital case teams need to strategize about how to approach different categories of witnesses, how to follow up on what is learned in particular interviews, how to elicit the most sensitive information, how to maintain the trust of those who provide the most critical data, and how to process what is disclosed into a coherent, compelling and empathetic narrative.

LIFE-HISTORY WITNESSES revised 8/17/96                     10

                                    Exhibit A5 - California 1999

Death penalty litigation has been turned on its head in recent years; while the emphasis in capital cases once was predor nantly on generalized legal issues, the focus now is on the t ough investigation of specific facts of all aspects of each case.

There appear to be two main reasons for the shift toward factual investigation. One flows from the constitutional requirement that there be an individualized determination as to whether death is the appropriate penalty in any given case. In making this determination, the jury and judge must consider not only the circumstances of the offense and the degree and specific nature of the culpability of the defendant, but also evidence pertaining to the client's life and personal attributes, including the milieu in which he or she was raised and the effects of this environment, his or her abilities and/or contributions to society, and the nature and extent of any limitations and/or impairments from which he or she may suffer. *Hitchcock v. Dugger* enforced this requirement. The refusal of a court to admit or to consider all evidence of mitigation is now reversible error. In short, the defendant's entire life history is now relevant at the penalty phase. The defense attorney is now responsible for uncovering a massive amount of information. More important, this information must then be assimilated and presented to the jury and judge in a coherent, meaningful and compelling way, to explain what is almost always a very complicated series of events that began not at the time of the offense, but years, and sometimes generations, earlier.

The second reason that a thorough investigation of the facts has become so important is that most of the non-case-specific legal issues in capital cases have been litigated over the last few years. The implication of this development is critical: capital cases must be won at the trial level because the aperture for post-co viction relief continues to narrow. Indeed, the primary reas for granting post-conviction relief is ineffective assistance of counsel due either to a failure to investigate or to an improper or insufficient investigation.

## Tools of Mitigation Investigations

The two chief means of obtaining information in a life history investigation are intensive interviews and record searches. Life history investigations involve interviewing the client and virtually everyone who has ever known the client, and finding every piece of paper regarding the client ever generated. Both tasks require special knowledge and expertise which the attorney may not (and probably does not) possess. Therefore, one of the first steps in the preparation of any capital case is securing the assistance of an individual with the skills that make him or her competent to conduct the life history investigation.

The time required for mitigation investigations varies, it is essential that the attorney obtain the time necessary to complete the entire investigation. Investigations can take hundreds of hours to complete. Counsel should not proceed to trial until the mitigation specialist and other experts indicate that all necessary preparation is complete.

There are a number of factors which influence the length of time required to conduct a life history investigation. They include:

1. *Client Trust.* The client, unless too impaired to participate, is one of the most important sources of information in a life history investigation. Even if the client suffers from disabilities which leave her/him unable to remember entire segments of time, s/h is usually able to provide some preliminary information, such as the names and locations of a few relatives, friends and employers, schools attended, hospitals where treatment was provided, etc. The nature of the information sought as the investigation progresses will become much more frightening to the client and

# CAPITAL CASES

## Mitigation Investigations

*By Lee Norton*

**LEE NORTON, Ph.D. is a mitigation specialist in Tallahassee, Florida. A veteran with nine years of experience, she has been involved in over forty capital trials and post-conviction proceedings. She has been on the faculty of the Airlie and National Legal Aid and Defender Association seminars. She is the principal author of a chapter on investigation in a handbook of capital litigation published by the Florida Public Defender Association.**

0122

Exhibit A5 - California 1999

## CAPITAL CASES

is more likely to have been repressed.

Because of cognitive and other impairments and negative past experiences in the legal system, it is unlikely that the client will have immediate trust for members of the defense team. In many instances, the client's disabilities have been exploited and s/he has been deceived and manipulated by individuals s/he trusted to help her/him. As a result, the client does not know who you are or if you are to be trusted. Trust is developed over a period of time as the defense team demonstrates its commitment to protecting the client and providing the most thorough and effective defense possible.

In order to develop trust, it is necessary to spend time with the client. All members of the defense team should see the client on a regular basis. Initial time with clients is not devoted solely to substantive issues, but to understanding the nature and extent of their limitations, and how these contributed to the offense and now affect the client's ability to assist in the defense. Time must be spent identifying conditions which prevent the client from working on the defense. Many of these are mental and physical, such as the effects of withdrawal from drugs and alcohol, chronic depression and long-term mental illnesses which have gone undiagnosed and which the client has attempted to self-medicate with alcohol and drugs. Lack of appropriate medications and other treatment, combined with the stress of incarceration can cause the client to rapidly decompensate. They often become agitated, confused, depressed, and unable to concentrate on the simplest matters, with erratic moods and sleep disturbances. These conditions are not to be taken lightly. An individual withdrawing from life-long alcohol abuse can begin to have seizures. Individuals who suffer from bi-polar disorder can rapidly become psychotic simply through lack of sleep. The client's mental and physical status must be monitored carefully and appropriate medical and psychiatric care provided when needed.

Clients develop trust when the defense team demonstrates serious efforts to defend them rigorously by following up on all leads provided, even if the leads seem remote. When the client sees that her/his input is considered important and that the facts of the case are being fully investigated, the client develops confidence in the defense team and becomes more forthcoming with information.

II. *Client Impairments.* In most capital cases the client suffers from a combination of impairments, the most common of which are mental retardation, major mental illnesses, and organic brain damage. Many clients have experienced brain trauma through abuse, illness, accidents, or exposure to toxic substances, rendering them unable to process, retain and apply information. Many clients also suffer from psychiatric diseases, such as bi-polar disorder (manic-depression), schizophrenia and clinical depression, which so distort their perception of reality that they are unable to understand or comply with requests for information.

The defense team must work patiently and tenaciously with the impaired client. Some days are more productive than others, but the task should never be abandoned.

III. *Nature of Information Sought.* As the investigation progresses, it becomes necessary to delve into sensitive and intimate areas which are frightening and humiliating to the client. You will need to learn when the physical and sexual abuse began, who the abusers were, and the details of specific instances of abuse. In some cases these are memories that have been repressed for years and are being recalled and described for the first time—to a stranger. Such recollections often have a devastating effect on the client and may be followed by a period of time during which the client does not want to talk to anyone.

In addition to physical and sexual abuse, emotional and physical neglect is also often a major factor in the life of a capital defendant. This neglect can be as devastating as abuse and can be even more difficult to discover and document.

The defense must exercise patience and compassion when working with sensitive and painful areas and for the most part should allow the client to set the pace.

IV. *Three Generations Must Be Investigated.* In order to understand all the factors which have influenced the client, it is necessary to investigate not only him or her, but other relatives such as siblings and cousins in the same generation and relatives in preceding generations, including parents, aunts, uncles and grandparents. This means getting records for and interviewing each of these relatives to determine their mental and physical health and the environment in which they were raised. If the client has children, they must also be included in the investigation.

V. *Locating Lay Witnesses.* Since the client's whole life must be investigated, it is necessary to interview almost literally anyone who has ever known him or her, including relatives, neighbors, medical and mental health personnel, teacher friends, co-workers and employers, prison personnel and other inmates, military personnel, social service agency personnel, health personnel, etc. This generally means going back decades, and usually with very few clues by which to trace these people. Moreover, in many cases the people being sought are transient; they may have moved six times in as many months, and often do not have telephones or regular employment.

As a result of these and other barriers, locating witnesses is one of the most time-consuming and frustrating tasks involved in mitigation investigations. It usually involves travelling to a number of different cities and states, and running into numerous deadends along the way. In some cases a tremendous amount of time is invested only to learn the individual sought died just weeks ago.

Regardless of the amount of time and effort required, it is essential that all lay witnesses be located and interviewed because they invariably possess invaluable information about your client.

VI. *Gaining Lay Witness Trust.* Locating lay witnesses is only half the battle. Once you have found them, you must succeed in obtaining from them the information you need. In most cases lay witnesses are initially suspicious of people asking questions about the client because, like the client, their experiences have been with individuals wanting to hurt them. Thus, time must be spent demonstrating commitment and a sincere desire to save the client's life.

One of the greatest hurdles in communicating with and gaining the trust of lay witnesses is explaining that what they may have thought was "bad" about their friend or loved one is actually helpful information. For example, descriptions of the client's inexplicable outbursts from the age of about eight when he was involved in a near-fatal car accident help the mental health experts determine the presence and etiology of brain damage. In order to gain the cooperation of lay witnesses, the defense must take the time to explain not only what information is needed but why it is important.

VII. *Impairment of Lay Witnesses.* Many of the client's relatives and cohorts are similarly impaired. Active alcoholism and substance abuse are common, as are mental retardation and mental illness. Much more time is required to work with impaired witnesses, and often information is obtained only through numerous contacts over a long period of time.

VII. *Locating and Retrieving Records.* Unless your client is a juvenile, the records you need go back decades and are located in a variety of repositories. The records which must be obtained include:

- birth certificate (vital statistics, county health departments or hospital)
- birth records (hospital)
- mother's obstetric records (private physician, clinic)
- school records
- medical records (hospital, physician, emergency room, clinic)
- psychiatric/psychological records
- records of all priors (court, police, jail, attorney, pre-sentence investigations)
- parole/probation (especially field notes)
- prison (daily, psychological, medical)
- "training" schools/reformatories/ juvenile detention centers
- social services (food stamps, AFDC, WIC, welfare, Social Security, foster homes, counselling, reports of abuse)
- military (medical, psychological, training, tests/evaluations)
- lawsuits/involuntary commitments
- employment (tests, evaluations, medical, job assignment, worker's compensation, pay scale)

You must wade through a morass of bureaucracy, and most agencies have their own requirements for releasing information. For example, in some cases a notarized release form is sufficient, while in others a *subpoena ducas* or court order is necessary. When records are located out of state, it may be necessary to obtain a court order from the jurisdiction in which you are located and then have this "naturalized" by a judge in the jurisdiction in which the records are located. Some agencies will send a bill (as much as $1.50 per page) attached to the records. Other agencies will count the number of pages, notify you of the cost, and send the records only upon receipt of a money order. Some agencies return records in a matter of weeks; in other cases, especially with the military, it may take as long as six months to receive records.

Whenever possible, records should be obtained in person. This reduces the chances of a records custodian making a cursory search and reporting that the records do not exist. With old or difficult-to-find records, it is important to find the individual who has worked longest in the records department because there are usually archives of which the younger employees may not be aware. In some instances, conversations with records clerks cause them to recall the client which enables them to provide additional information about the client, or the client's family, case or community.

Each record obtained will refer to other records and reports and which must be obtained, and individuals who must be located and interviewed, thus expanding the investigation.

VIII. *Mitigation Investigations Are Cyclical.* The investigation is not complete until the information uncovered becomes redundant and provides no new insight. It is insufficient to talk to witnesses only once because each new individual recalls different facts and anecdotes; if an aunt provides an account of a head injury which the mother forgot to mention, it is necessary to go back to the mother to ask about it. Similarly, an interview may reveal records that must be obtained which in turn raise new questions, questions which necessitate interviewing several witnesses again. Several interviews of each witness may be necessary to obtain all the facts.

IX. *Data Must Be Triangulated.* Triangulation of data refers to obtaining data from more than one source and, preferably from more than one type of source. For example, a head injury should be documented by several witnesses and by medical records. This ensures the reliability of information, as well as providing more details for each incident.

X. *Integrating Data.* It is not enough simply to obtain the data. The data must be integrated in such a way as to explain why the offense occurred and how all the factors came together to bring your client to the point of killing someone. It is not that your client suffers from impairments, it is that the impairments were too much for him or her to overcome. More important, you must explain why other members of the same family, who presumably suffered similar hardships, did not kill anyone. This implies a thorough understanding of the client's entire family of the individuals who intervened and assisted in the lives of siblings but not in the life of the client.

As data are obtained they are analyzed, summarized and recorded in various ways. Two of the most prevalent ways of integrating data include chronologies and genograms. Chronologies consist of a narrative, historical account of the influences or events which had the most effect on a client's life. They extend over at least three generations and are updated as new data are found. Genograms are annotated family trees which depict the relationships between family members and patterns of impairments. They serve as references upon which experts can base concl and are very useful in explaining to juries the long-term effects of various influences on the client.

## Conclusion

The law requires that in making a determination as to whether death is the appropriate penalty in a capital case, the jury and judge must consider not only the circumstances of the offense, but also all evidence of mitigation. Failure of the attorney to present all mitigating evidence or of a court to allow or consider such evidence is reversible error. This means that the client's entire life history is relevant at the penalty phase. Thus, the attorney is responsible for uncovering a massive amount of information and for presenting it in a coherent, meaningful way so as to explain all the factors which have influenced the client's behavior.

Mitigation investigations must be conducted by individuals who possess special skills which include gathering records and interviewing witnesses who suffer from a variety of impairments and who tend to be distrusting and resistant. Mitigation investigators must also have a firm understanding of numerous medical and mental health issues and be able to integrate various kinds of data into a theory of defense.

Life history investigations require between 200-500 hours of intensive work depending on the complexity of the case, accessibility of lay witnesses and records, and the extent of mental impairment of the client and lay witnesses. Some of the factors which come to bear on the the length of time necessary to prepare a life history adequately include: the need to develop client and lay witness trust; the need to overcome the reticence of witnesses because of the sensitive nature of the information sought; the need to triangulate data to ensure reliability; the time required to locate and retrieve records and to locate and interview witnesses; the impairments of both clients and lay witnesses; the need to investigate at least three generations within the client's family; and the need to integrate massive amounts of data into a concise and understandable form.

It is essential that the attorney obtain all the time necessary to complete the mitigation investigation and that no shortcuts be taken. A partially completed investigation will produce just enough information to present a veneer of competence and it is likely to result in the client being sentenced to die. ∎

Exhibit A5 - California 1999

*1999 CACJ/CPDA*
*Capital Case Defense Seminar*

# TINKER WE MUST:

## CAPITAL LITIGATION AT THE CLOSE
## OF THE TWENTIETH CENTURY



### FEBRUARY 12 — 15, 1999
### MONTEREY CONFERENCE CENTER

*Sponsored by*
*California Attorneys for Criminal Justice*
*and*
*California Public Defenders Association*

Exhibit A6 - California 1999

# Joe Barthel & Denise Ferry

## The 1999 CACJ/CPDA Capital Defense Conference: Doing Our Best In These Hard Times.

### INVESTIGATING YOUR FIRST CAPITAL CASE

**0126**　　　　　**DEATH IS DIFFERENT**　　Exhibit A6 - California 1999

## Some basic considerations:
## Guilt Phase vs. Penalty Phase

1. The guilt phase is about an incident; the penalty phase is about the totality of a life. You will possibly be immersed in the life of the defendant, and in the lives of those around him (usually but not always *him*), for years. You will get to know those lives as deeply as anyone ever has. You are establishing relationships as well as gathering information, and the nature of the relationships will often determine the willingness and capacity of an informant to come forward and speak out at trial.

2. Trial level penalty phase consists primarily in uncovering and orchestrating the presentation of the stories that will help a jury answer the question: How could someone have done something like that? Whether the prosecution or the defense presents the most compelling images and stories in answering that question determines the outcome.

3. In preparing for penalty phase, you are anticipating the possibility of a guilty verdict. During the investigation, this inevitably provokes resistance. The family (and/or the defendant and others) will often regard this as a lack of faith in innocence, or as defeatism. You will have to explain, over and over, the nature of penalty phase preparation, and you will have to answer variations of these responses: "What, you already think he's going to be convicted?" "You're doing penalty phase preparation. You mean the lawyer is no good?" "Whose side are you on anyway, that you want all this stuff. Are you trying to get him convicted?"

4. In a capital case, more than in any other, you will be working as part of a team. The information and stories you uncover will contribute to psychological diagnoses and other assessments by specialized experts. This too generates new demands and relationships that have to be worked through carefully.

5. The case you undertake will affect you, emotionally and intellectually. You have to prepare for it as much as possible.

Page 2

2

Exhibit A6 - California 1999

## SO YOU'RE INTO THE CASE...

Read the California Penal Code about what can be presented. Basically, in a penalty phase you can introduce anything that might affect a jury. There is no other criminal proceeding in which the scope is so broad and flexible.

**ISSUES GENERATION:**

From the beginning, you are looking for patterns around which the defense presentation can be structured. This can be thought of as themes, or story lines, the underlying structures of a defendant's life, or of the incident at issue.  They generally fall into these areas:

**POSITIVE FEATURES:** The killing was an isolated and aberrational act, committed by a basically decent person under a unique set of circumstances. Here you will consolidate "good guy" evidence, buttressing the contention that the defendant is basically a decent person with many redeeming qualities and a history at variance with the nature of the act. You want to uncover and document every act of kindness, responsibility, and selflessness that the client has ever done. You want a parade of witnesses who will testify to character and decency, to the respect they have for him, and to the loss that his execution would cause them. The history will have to be thorough and up to date. It would not do to present someone as an Eagle Scout to age 18, only to have the prosecution alone cover the next six years as one long crime spree leading to the incident. You will also have to cover that period of time.

**FEATURES OF THE CRIME:** Look for extraordinary stress at the time of the crime (fear, exhaustion, sensory deprivation), emotional and mental health problems that shape judgement and behavior, external factors that do the same (drugs, misinformation, physical surroundings), subordination to another dominant party, hesitation expressed beforehand, and remorse expressed either during or immediately after the act.

**EMPATHY FACTORS:** Find the story tellers who can explain to a jury, in a way that they can relate to, all the pressures that deformed your defendant from the time he was an innocent child. This is limited only by your resources and imagination. Look at all areas of personal and social development, for family issues like abuse and

Page 8

instability, mental health issues, poverty and deprivation, institutional failure. These are developed not only to develop empathy, but to explain behavior.

**LWOP**: Remember that you have to make the case for life without possibility of parole (LWOP). Recognize that someone who has broken down in general society may still be a good and useful prisoner. Look for areas in which your defendant has done well or might do well in the structure of an institutional setting. Taken part in rehab programs? In religious programs (even though juries are skeptical of jailhouse conversions)?  Rejected pressures to gang up? Can teach/type/do plumbing? Maintained a positive role in the lives of his children while incarcerated?

## ON TO THE INTERVIEWS...

Capital case interviewing is much more demanding than any other you have done, in the length of the interviews, their scope, the emotional intensity, and the subtlety of evaluation that is required.

1. Remember: You are always forming relationships, not just trying to extract the most information you can in a single contact, the way you might in a more limited criminal investigation. You always want to leave the door open for a return. Some people need to be seen repeatedly. A key person whom you have only seen once, a year before trial, is not likely to be eager to become a witness, or to have the confidence and commitment to come across well on the stand.

2. It is often advantageous to do initial interviews as unannounced "drop-ins," and always important to do them one on one. You want to see people alone in the real conditions of their lives, before they've had a chance to clean up either their places or their stories.  When this is impossible (e.g. you find a number of people at home; you find you're not sure of the address after three trips and have to call) try to find a way to separate people out during the course of the interaction (have one person show you around the property, or go through family photos in the attic, or walk you to a car) so that they can open up privately. Ask them to go out with you for coffee or to meet you at a later time.

Page 9

3. Never assume that someone understands who you are or your role in the case. Explain everything carefully and simply. Not everyone knows that "a capital crime" means "facing the death penalty," for example.  People will often think of you as just another authority figure, even a cop or DA's investigator (especially when you ask about information they consider damaging to a defendant).

People often "space out" a half hour or so into an interview when they are beginning to realize the seriousness of the matter and the depth of information you you are going after. People may begin to question your role as a means of protecting themselves against your prodding. You have to respect these internal processes at work, and repeatedly make sure they know who you are and why you are there.

4. Keep the process simple and human. Accept simple hospitality when offered (though of course reject the intoxicating offerings). Avoid legal jargon. Refer to the defendant by first name, and be aware of all nicknames or street names (however, be careful not to "talk down" by relying on these). Be prepared to answer questions about the defendant's health, emotions, situation in jail, children, etc. Even close relatives may have had no contact for years.

5. Be sure to avoid situations in which power relations might distort the response: avoid interviewing the ex-wife when the current husband is listening in the next room; avoid interviewing employees when a boss is around; get correctional personnel away from their supervisors.  If necessary, abandon your interview expectations, and use this initial meeting to set up later private contact.

6. Explain over and over that the only "bad" information is information we don't have. Often someone will try to protect a defendant by withholding what they think is damaging.  For a variety of reasons, this is often the information that is most useful, particularly when trying to identify or substantiate mental health issues. Also, it is likely that if "bad" information is known to the family, it will be unearthed by the prosecution, and the defense needs to be prepared to meet it.

7. Be careful about making social assumptions and using language that makes people feel embarrassed and looked down on. It is better to ask, "Who was in the house when John

Page 10

was six?" than, "Where did your mom and dad sleep?" There may have been no dad present, but others may have been there.

8. People often think they have nothing to contribute. Remember and explain that small pieces often are critical. They may help fill out a pattern when set alongside other bits, help date an incident, or give a small glimpse of a period where no other sources are available. Also be aware of the opportunity to use "negative space"-- if a teacher or jailer doesn't remember your defendant, use that. Ask what would have stood out, and what wouldn't. "Yes ma'am, I don't remember a damn thing about him, not even his name. But if he was in my program, he must have been a real good student, 'cause  I remember every damn one who ever gave me trouble."

9. Always look for and use supporting documentation: photos, home videos, wedding pictures, family bible notes, baby books, old clothes, maps, school yearbooks, even old phono records and tapes that reveal what someone was into at a given age or period. Remember that people outside the immediate family may have some of these: the local library, the  mother of the ex-wife. Do not rely on others to pre-select what is useful, because they will either fail to understand what you need, or sanitize the process. Go through albums and letters with the source, using "post-it notes" to record dates, names, setting, etc. (Do not mark up originals, as they may be introduced into evidence, or shown to others who might remember them differently.)

10. Be prepared for differences in accounts, and DO NOT attempt to resolve them. People alter dates by years; sequences of events have been mentally reconstructed to give them internal coherence and meaning; people may not know who is really a biological aunt or an uncle, even a sibling. Have every individual create a family tree/genogram  with you. It's generally an icebreaker and something people like to do, and in the process you will find the different stories that people have been told or constructed. You will also find the best family historian this way, and learn the family dynamics. This is often a good thing to do in a cross- generational interview. At some point have the mother and grandmother (or some such combination) work with you together and the stories and surprises will begin to roll out.

11. Ask everyone for referrals to other sources of

Page 11

information. Put people to work- have them make lists of addresses, gather phone numbers, get things out of the attic. But remember that there may be dynamics that you don't understand: Aunt Mary might not be the best person to make calls for you if some people in the family distrust her.

12. Ask about general social and institutional background, not just the specific individual: Get class sizes and changes in the school; understand the racial dynamics encountered at all stages of a defendant's life; know how neighborhoods have been altered over time; find out about job opportunities, and plant closures; find out how special ed programs were funded, administered, and evaluated; get figures on the length of incarcerations, or the success rates in the rehab programs; read the newspaper coverage at the time of the priors, or the time your defendant left town (small town librarians are great sources, as are town historians who are retired teachers).

13. Call or go back a few days after an interview just to thank someone for their courtesy is seeing you, and allow them the time to bring up what has occurred to them since the interview, or what has been set in motion. Who have they spoken with about you and the interview? Who has called to check up on you?

14. If you say you are going to get back to someone, DO IT, even if it's just a call to say you won't be back when you thought you would. Be careful to note promises made during interviews, so that you can follow up on them. A pledge that seems minor to you may be very significant to someone else.

15. Always remember that every interview you do may have consequences. Family relations are altered, often dramatically, by the fact of having talked with you. Remember that you are asking about personal and difficult things that families may have spent generations concealing. Some may be willing to sacrifice their father/son/brother to protect the secrets. Remember also that a capital crime is a trauma for everyone touched by it. Divorces or reconciliations have been triggered; people who have had no contact for years have gotten together; close friends have fought and split; lies have been told and secrets revealed. This process of coming to grips with the trauma of the crime was underway before you arrived, and you are upsetting whatever balance of forces and answers have been

Page 12

arrived at. The process of investigation opens up all the wounds again, and sets things in motion.

## INFORMATION HANDLING:

The paper generated in a capital investigation is immense, and can feel inundating if not handled systematically from the start.  Do not rely on the same data formats as non-capital cases, or you will definitely be overwhelmed. Be sure that you know what you are expected to produce and maintain.

1. Reports of interviews? This is the first priority. You have to prepare detailed reports of all interviews held with defendants, family members, neighbors, friends, institutional employees, etc.  In addition to the "information received" you should note the social setting, demeanor, attitude to the defense, relations with others in the case, etc. Everything that can help advance the investigation and assess the likely impact of this person as a future source and/or witness. Reports of critical interviews can be very long; 3 or 4 page summaries will no longer do.

2. Family trees?  Genograms? These are useful tools for organizing information and evaluating what you have and what you are lacking. Do it yourself rather than regarding it as a clerical or support task.

3. Chronologies? A detailed chronology of the life of the defendant and other critical figures. Usually done with the date and defendant's age in a left-hand column, description of the event on the right.  Note the source of information after each entry. (See the examples in the Mitigation Manual.) The chronology should be revised and updated regularly, with the sequence and dates of revisions indicated clearly. (This may be the single most valuable contribution of computer technology to investigation.) The chronology integrates both documentary records (school records, CDC files, birth and marriage records, etc.) and material from interviews. Be sure to include events that impact on a defendant's life both directly and indirectly (date of eviction, father losing job, brother's death, loss of significant relationship, closing of schools, gang war in neighborhood, natural disaster, etc.) as these may turn out to correspond with and illuminate abrupt changes

# Juvenile Court Background: Dependency and Incarceration

Materials Submitted By
## Dan Macallair

Exhibit A6 - California 1999

## Presentation Summary

## Juvenile Institutionalization as a Mitigating Circumstance

This presentation will examine the impact of juvenile institutionalization on later behavior. Juvenile institutionalization has been the subject of controversy since the dawn of the juvenile court.. Despite the juvenile justice system's philosophy of rehabilitation, a plethora of studies and commentary over the past 150 years have documented inhuman and brutal conditions within juvenile institutions throughout the United States. Although the deficiencies within the institution-based systems are widely acknowledged and accepted, little effort has been made by policy makers to address the situation. Instead, juvenile reform school and training schools have evolved into warehouses of violence, where threats, intimidation, sexual assaults, and beatings by other youths and staff are part of a youthful inmate's everyday life.

Rather than individualized treatment consistent with modern methods of proper child rearing, youth are depersonalized and emotionally isolated. Punishment for even minor infractions usually involves solitary confinement in an isolation cell with little or no human contact. This form of depersonalization and emotional and sensory deprivation is considered child abuse when it occurs in a private home. However, emotional and sensory deprivation is a routine element of daily life in juvenile institutions.

A large percentage of individuals in capital cases spent much of their developmental years in juvenile correctional institutions. The effect of this confinement on later behavior is often an overlooked element in many capital cases. This workshop will analyze conditions within juvenile correctional facilities and address their potential psychological and emotional impact. Defense strategies for gathering and presenting relevant information will be emphasized.

# JUVENILE INSTITUTIONALIZATION AS MITIGATION IN CAPITAL CASES

## An Outline for Defense Attorneys

### GOALS OF INSTITUTIONAL MITIGATION

- Suggest an explanation as to why crime occurred
- Suggest a level of state culpability
- Create a climate of sympathy for defendant

Attorney Tasks and Responsibilities:

1.    Acquire and Review all Background Materials

- Social History
- Mental Health records
- Probation Reports
- School Records
- Child Protective Services Reports
- Institutional History/Performance Evaluation Reports

2.    Construct Institutional Chronology

- Age of Entry Into Juvenile Justice System
- Number of Prior Contacts
- Number of Prior Interventions
- Offense Escalation
- Age at First Institutionalization
- Types of Institutions Committed
- Length of Institutionalization
- Age at Release

**0136**                        **88**                        Exhibit A6 - California 1999

- Parole Progress Reports

3.    Interview Client About Institutional Experiences

- Age of Entry

- Disciplinary Practices

- Harassment by Staff

- Ethnic and Racial Hostility Between Wards

- Institutional Gang Involvement

- Noninstitutional Gang Involvement

- Number of Weekly Visits with Mental Health Professional

- Living Arrangements

- Number and Frequency of Visitors

- Relationships with Staff Members

- Relationships with Peers

- Addresses or Locations of Past Institutional Relationships

- Number of Institutional Infractions

- Reasons for Institutional Infractions

- Problems with Education Program

4.    Compile Institution History

- Year Constructed

- Facility Design

- Managing Agency

- Age and Number of Inmates

- Staff to Ward Ratio

- Parole Agent Case Load

- Education and Vocational Program
- Lawsuits Filed Against
- Grand Jury Reports
- Commission Investigation Reports
- Management Audits
- Newspaper Articles
- Internal Memos and Research Reports
- Academic Reports
- Film Documentaries
- Staff Commentaries
- National and State Correctional Association Standards
- Model Programs From Other States

5. Selecting Witness

- Defendant
- Former Inmate
- Family Members
- Corrections Staff and Institutional Professionals
- Civil Attorneys
- Corrections Experts
- Adolescent Development Expert

6. Publications

- Bodily Harm: The Pattern of Fear and Violence at the California Youth Authority, Common Knowledge Press, 1986.

- The CYA Report: Conditions of Life at the California Youth Authority, Common Knowledge Press, 1982

- Reforming the CYA: How to End Crowding, Diversify Treatment and Protect the Public without Spending More Money, 1988.

- I Cried, You Didn't Listen: A Survivor's Expose of the California Youth Authority, Feral House, 1991

- **Last one Over the Wall: The Massachusetts Experiment in Closing Reform Schools, Ohio State University Press, 1991.**

- **Serious, Violent, and Chronic Juvenile Offenders: A Sourcebook, Sage Publications, 1995.**

*2000 CACJ/CPDA*
*Capital Case Defense Seminar*

# LIFE
# OVER
# DEATH



## FEBRUARY 18 - 21, 2000
## MONTEREY CONFERENCE CENTER

*Sponsored by*
*California Attorneys for Criminal Justice*
*and*
*California Public Defenders Association*

Exhibit A7 - California 2000

# NEGOTIATION- by James McWilliams

## A. INTRODUCTION

We have always considered the topic of negotiation very important in representing clients charged with capital murder, and we have included a chapter on negotiations in each version of the death penalty manual.

Previous contributions from Richard Zimmer and the Tennessee Death Penalty Manual provided excellent chapters on this topic. I will be borrowing their ideas and adding some of my own.

There will be some cases that simply will not be open to settlement. However, there are many that can be resolved, or sadly could have been resolved but weren't. In fact although there is no definitive statistics, probably most cases that start off with a capital charge settle or take a different direction at some point in the litigation.

This chapter will try to address how to overcome obstacles that may be present in a capital case that prevent a case from settling-even when a settlement plea is offered.

The tragic fact is that many persons are waiting on death row in California and around the country because either they chose not to enter a plea to avoid the death penalty, or their attorney never effectively sought to

Page 1 of 12

832                    Exhibit A7 - California 2000

settle their case !

You would think that the first thought an attorney would have when a case charged as capital murder comes to them would be whether that case can be settled short of a death penalty trial and possible execution.

But that thought sometimes is delayed or occasionally never comes. My premise is that most capital cases are subject to serious discussions of settlement and the defense attorney should pause at the first moment in their representation and develop the beginnings of a plan to promote settlement-and not wait by the phone for the prosecution to call.

## B. START OFF RUNNING YOUR HARDEST-
## DON'T SAVE YOUR MAXIMUM ENERGY FOR THE FINAL LAP

An important-if not the most important-ingredient in settling a capital case is being the attorney most in control of the case facts and the client's background so that early on in the case you-and not the prosecution-are the most knowledgeable about the case. This means putting a significant amount of energy at the beginning of the case, when the facts may be more fluid, and the prosecution and client have not hardened their positions. So often, early investigation of the crime can lead to questions of proof. In my informal survey and my personal experience with many capital cases, issues of the provability of the crime and the special circumstances is the major factor in a settlement. It is not surprising that the prosecution does not want

Page 2 of 12

833

to put in a lot of energy, money and in many cases their reputation, on a capital charge that is not unquestionably established by the evidence. Issue of proof-even those they may be tenuous-may assist in resolving a difficult case.

How do issues of proof arise where they are not apparent on the early discovery?  They may be a product of prompt investigation, usually with the attorney leading the investigation and not playing the normal supervisory role.   You will find that "frontloading " your energy will generally pay great dividends.  As defense attorneys doing serious cases we should have years of practice in the art of court room cross-examination.  Who better to cross-examine the witnesses in an investigatory setting while the case is going through its early stages in the proceedings.  It is a time when the police have completed their part by submitting the case to the prosecution for charging. The prosecution-often busy with the day to day court cases-may be waiting for the discovery process to be completed before actual preparing to present the case in a preliminary hearing.

In this quiet period the defense attorney has the opportunity to be the only one in the streets tracking down witnesses or re-interviewing the important state witnesses.  Even though we usually rely on our investigators to do routine interviews, the fact that this is a capital case makes any interview "not routine."  The strength you gain by personally doing guilt phase investigation may be the most important thing you can do in preparing the case for settlement, or trial if settlement fails.  You can also guide the case with an understanding of your responsibility in providing reciprocal

834                    Exhibit A7 - California 2000

discovery.

With regard to penalty phase investigation, the same is true-that the personal involvement of the attorney is crucial.   Who else can explain the role of a penalty phase witness to a potential witness who may be reluctant to get involved.   Who else can see the plight of client and try to continue family and friends' loyalty and involvement with the client.   Such a preview of the defense's penalty phase witnesses may cause the prosecution to be less confident of an easy victory in penalty phase notwithstanding a clear case of guilt.

But the attorney must take an active role in preparing statements of mitigation.  The witnesses have to be completely interviewed and their own background needs to be check for veracity.  It is often a good idea to have witnesses sign waivers as to their own psychiatric, medical and criminal history.

Thus, one of the initial commitments is to have both the guilt and penalty phases fully investigated before the preliminary hearing date is set. This means a lot of work-not only chasing down witnesses and collecting background records on the client, but putting in the significant amount of energy at the beginning of the case.  How often do we find that in these most serious cases that the attorneys tend to reserve their surge of time and energy for the brink of trial when the likelihood of settlement is lost; in many counties the funding is designed for "backloading" the case near trial.  This may save some governmental funds when on occasion the special

Page 4 of 12

circumstances are dropped after the preliminary hearing, more often then not the case where capital sanction is not pursued after the preliminary hearing is where the attorney put in that early energy.

Thus you want to front load your energy to increase the chances of settlement before the case hardens and cannot be settled.

Your goal is to work so much harder then your opponent that by the time they start to look at the case, it is no longer a clear case of guilt or a clear case for a death verdict. Your early energy will uncover favorable investigation that cannot later be overlooked or changed by the late arrival of the prosecution.

# B. THE DEFENSE ATTORNEY AS THE OBSTACLE IN NEGOTIATIONS

Having the responsibility for a capital case is as tough a job as you can get. You will devote an enormous amount of time and your maximum skill to defend your client. You would never want to interfere with a chance that your client can settle their case. Still, the defense attorney is often the reason the case does not settle ! The attorney may view the case as non-negotiable; or view the case as very defensible. The attorney may not properly prepare a settlement presentation for the prosecution. The attorney may not spend the time necessary to prepare the client for a settlement.

Page 5 of 12

836

# 1. VIEWING THE CASE AS A DEATH PENALTY CASE

Often the defense attorney will feel the weight of representing a client on a capital case.  The attorney may tell their friends that they have a "death penalty" case.  The emotional  nature of the case will permeate contacts with the client and the client's family and friends.

This can cause others to agree that  this is a "death penalty" case.

The defense lawyer should try to do just the opposite-tell those involved with the case that this should never have been filed as a capital case.   The ultimate definition of many cases evolve in the early days after the case is charged.  We should do what we can to encourage a view that this is not an appropriate case for capital punishment, and start preliminary discussion on settling the case.

# 2. VIEWING THE CASE AS DEFENSIBLE

We have picked one of the hardest jobs you could have as an  attorney. Every case that is filed starts as a winner for our opponent and a loser for us. And yet as we get into our cases we find a basis for a full or partial defense so that by the time it comes to final argument  we are convinced in the merits of our cause.  This is also true with many capital cases.  The lawyer becomes convinced that they can either win the case outright or at least get a verdict of a lesser degree of  murder.  That enthusiasm is communicated  to the client and the client's family. This is a natural occurrence in many cases. The result is that though the defense attorney seeks a settlement, and makes the

Page 6 of 12

Exhibit A7 - California 2000

prosecution an offer, the offer is so low that it is not viewed by the prosecution as a serious offer. The weaknesses we hopefully uncover in the case can help settle the case but too often the defense attorney makes a very low offer. Offering anything short of a life sentence is usually going to be far too low an offer. The goal is to save the client's life. Often standing by and taking a hard, realistic look at how a jury will view the murder should show you the weakness of the defense. This is especially true with a death-qualified jury which tends to be a guilt prone jury, and the probability of an appellate reversal for trial errors appears more remote in capital cases.

## 3. FAILING TO PREPARE THE CLIENT AND THE CLIENT'S FAMILY FOR A LIFE SENTENCE PLEA

If you sent a older, educated person to three doctors all of whom found the person had a terminal disease, and a fourth doctor who felt that the person did not have the disease, the person would most likely believe the fourth doctor.

Our clients tend to be young, poorly educated and not prepared to see their youth and middle years spent in prison. They are distrustful of us and the court system, and they are often getting daily doses of bad advice from other prisoners. They often acquire unrealistic expectations about the outcome of their cases, feeling that either legal motions or a jury may lead to a success. They may feel a life sentence with or without parole possibilities, is as bad or worse in their minds than a death sentence.

Page 7 of 12

838

Exhibit A7 - California 2000

Trying to convince a client to settle the case for a life sentence is general harder than actual trying the case!   It may seem easier just to accept the client's refusal to settle for a life plea, then arguing with the client.

But we can see the future better then our client.  We can see that the best thing to expect out of most cases is a sentence of life without parole with a death sentence being a real possibility.

We need to make the client understand this.  It takes a lot of effort, and many visits.  It is not the type of discussions we are use to-often involving the value of life itself.  You may need to look for supportive persons to help convince your client that a hard decision at this time in life may eventual prove to be the right choice.

You need to find out who the client relies on for advise.  It is often a family member or good friend.  You then need to convince that person of the wisdom of settling the case, and use them to assist in convincing the client.

The client's inability to accept their legal situation is probably the single biggest problem in trying to settle their case. Without a client prepared to plead to high numbers you would not have anything to offer.

# 4. FAILING TO PROPERLY PRESENT THE SETTLEMENT TO THE PROSECUTION

Page 8 of 12

**0148**                                    839                  Exhibit A7 - California 2000

Unlike other cases, capital cases need a full case work up before a settlement offer can be properly presented.

You need to know as much as you can about the capital charging practices in your jurisdiction. Who makes the call and what does that person or committee feel is important. Usually issues of proving guilt is a major factor for the prosecution, but the likelihood of a death verdict is also important.

You first need the client to be ready to accept a long prison sentence. To market your offer you should consider providing all your favorable guilt and penalty phase material to the prosecution.

Many attorneys are reluctant to provide the prosecution such materials; this even when such witness names and statements will have to be revealed under reciprocal discovery ! It is true that in capital cases-unlike other cases-revealing information related to sentencing factors on your client will be of advantage to the prosecution if the case does not settle. Of course you have to use good judgment in determining whether your case is one of the few that will not ever be open for settlement.

For most of our clients, the plea settlement is the most important option that will ever come to them in their case-it deserves our greatest effort. The danger of revealing penalty phase material early, or revealing guilt phase material that is not covered by reciprocal discovery must be balance against the enormous importance of trying to persuade the prosecution to accept an offer of settlement.

 Exhibit A7 - California 2000

If you have gotten off to a full speed start at the beginning of the case then you will have all the background materials on our client and all the penalty phase character witness interviews ready for inclusion in your settlement package to give to the prosecution early in the case-long before the case is on the brink of trial. As a goal you will want to try to have your case completely prepared and investigated for both guilt and penalty phases before the preliminary hearing.

In some cases where a settlement isn't achieved the effect of early preparation and discussions may cause the prosecution to rethink their case and decide to pursue the case as either a non-capital special circumstance or straight murder.

A part of the preparation is to view the case from the vantage point of the prosecution. These cases involve serious acts of homicide. They are not always that easiest cases for the prosecution to plea bargain. They have the public and the victim's family's anger to deal with.

How can we help the prosecution address these problems ? Initially it is important to think about what factors are important to the prosecution's decision making process in this particular case. We have to assume that a great deal of thought goes into their decision to pursue a death penalty verdict.

We can try to address those concerns in a prepared letter of settlement. In addition I have found that to promote a settlement; delivering carefully reviewed character letters-often handwritten-from penalty phase witnesses to the

Page 10 of 12

Exhibit A7 - California 2000

prosecution earlier in the proceedings can be helpful. Such letters of support can be used by the prosecution to justify a settlement in the face of angry victims and public by providing something that can support a settlement less then the death penalty. (Also having potential penalty phase witnesses write a personal letter gets them involved and committed in the case.)

How the public views the case is often a matter of how the news services handle the reporting of the case. You should always know who the news reporters are who will be involved. You should always consider what input you can have on their story. If you have something to add, you should take the time to have it in written form. There is less chance for confusion about what your statement is, and given the often hectic schedules of the news people, you will find that many time your statement is included verbatim.

The victim's family and friends can have a significant influence on the course of the case. They will often come to court at the initial appearances on the case and given the busy world of the calendar prosecutor, you may be able to make an important contact because you may be the only person in the courtroom that will have the time to speak with them. You may assist them in scheduling court dates that are consistent with their schedules or explain to them the nature of the proceedings. These small kindnesses may pay off with more significant conversations later on. They often don't understand the parole matrix for first and second degree murder. You will find that a prosecutor will often indicate that a plea to first degree murder carries the bare statutory minimum, while an understanding of the parole matrix shows that for most capital murder crimes, a plea to first degree murder would carry a

Page 11 of 12

sentence of many more years then such minimum.

Keep in mind that the prosecution will be concerned whether the client may be innocent or at least not a cold blood as the facts first suggest. The prosecution will be concerned with whether this case is clearly more compelling to justify capital punishment then other cases they have prosecuted as non-capital cases. The prosecution will also worry that trying the case as a capital case may cause the jury to be more sensitive to reasonable doubt issues in a close case where they know that it could lead to a penalty phase.

They will also be concerned about the nature of the victim's background. This is something you will want to explore in all cases. Even if the case does not settle before trial, be alert to a sudden turn in the trial that may improve your position for getting a plea offer.

## CONCLUSION

Most capital cases we will handle are better off being settled by a plea agreement. Although some cases will never settle, many can be settled if we put a lot of energy and thought into that part of our representation. With a strong initial burst of energy in a case, you will find that you can often develop a bargaining position. Generally the most difficult issue is getting our client's to agree to a settlement. This requires a great amount of personal contact to obtain the degree of trust and confidence to get the client to see the wisdom of a settlement. Good Luck.

1999

843                    Exhibit A7 - California 2000

# CAPITAL CORNER
### by Terri Towery

### <u>Motions--Special Circumstances, Aggravation, and Penalty</u>

For anxiety reduction purposes, it would be nice if there were a "standard" set of motions applicable to the penalty phase of every capital case. Unfortunately, there is no such animal. Although there are a few generic motions that can be brought, such as attacks on the constitutionality of specific special circumstances or the death penalty statute as a whole, for the most part each motion you make which relates to the penalty portion of the case has to be tailored to your particular facts and issues. "Boilerplate" motions generally do not persuade anyone, and may not even raise or preserve the issues you have in mind.

Of course, anxiety need not run totally rampant. There are over 200 excellent motions in the California Death Penalty Defense Manual which can be used as starting points for your own work product. There are many more on Claraweb (http://www.cpda.org/claraweb/home.html) and other Internet sites. For example, the Louisiana Indigent Defender Board Online Information Center (http://www.lidb.com/) has a clever and funny section on capital defense, with some creative ideas for motions in both the guilt and penalty phases of a capital trial. A Capital Defender's Toolbox (http://members.aol.com/capdefense/index.html) is another potentially useful site. The Legal Information Institute site (http://www.law.cornell.edu/topics/death_penalty.html) and the Cornell Law School Death Penalty Project

1

(http://www.lawschool.cornell.edu/lawlibrary/death/index.html) are also quite helpful for legal research and general information, even though these sites do not provide any sample motions. These are just a few of the growing number of resources available to help you prepare motions specific to your case. So despite the lack of a tried and true "checklist" for penalty phase motion litigation, there is plenty of useful information out there--and it is accessible even at two o'clock in the morning (which seems to be the time many of us tend to do our most in-depth case analysis).

So how do you identify which motions should be made in your case? The first step is to determine what issues the penalty phase is likely to present. You should identify what evidence is likely to be offered in aggravation, what evidence you want to present in mitigation, the probable admissibility of such evidence, and potential rebuttal problems with respect to proposed mitigating evidence. This should be done as early in the case as possible, since in many if not most cases the penalty phase issues will dictate what choices you will make regarding the guilt phase. Thus, everything you do in the guilt phase, from venue and jury selection to witness examination and argument, will be impacted by your penalty phase decisions. In order to identify your penalty phase issues, it can be very helpful to review resource materials such as the ones mentioned above, if only to alert you to subtle issues that might not otherwise be immediately apparent, and to admissibility impediments to both aggravating and mitigating evidence.

The next step is to consider how you want your penalty phase issues resolved, and how the issues are likely to be resolved regardless of your wishes. In this regard, tactical

2

112

**0154**

Exhibit A7 - California 2000

decisions may need to be made in the alternative--i.e., "Plan A" and "Plan B." Again, available resources can give fresh ideas about potential solutions to a problem. The benefit of consultation with colleagues also cannot be overstated (this, however, is not recommended at two a.m. except it times of dire emergency.)

As you continue your case investigation, it is a good idea to maintain a comprehensive list of the issues as you identify them, and to add to or subtract from your basic list as the case progresses. Some motions should be made early in the litigation (e.g., Penal Code section 995 motions re: special circumstances), some will need to be made in response to unanticipated developments during trial (e.g., a last minute prosecution offer of "victim impact" video with hearsay narration). It feels good to eliminate from the list a motion that has already been made (especially if you won), and it helps you to keep your sanity if you have a running list of new motions that must be made as the issues arise.



3

**CENTER FOR CAPITAL ASSISTANCE**
529 Castro Street
San Francisco, California 94114
Telephone: (415) 621-8860
Facsimile:  (415) 621-8830

Memo to:        Defense Teams in Capital Cases
From:           Scharlette Holdman
Re:             Interviewing witnesses for life history information
Date:           Summer, 1999

## EXAMPLES OF OPEN ENDED QUESTIONS

This list of open ended questions is intended to help interviewers think of more effective ways of communicating with clients and their families in order to reveal information that will be useful for mitigation and other mental health claims. Traditional closed ended questions -- Was Johnny abused? -- seldom elicit the kinds of details and unique experiences that are needed to establish reliable mental health defenses.

This is not a complete list or even a guide to interviewing clients and potential witnesses in capital cases. It is only an exercise that may be helpful to you. Each person in a capital case is unique, and interviews have to be tailored to individual circumstances. No template is adequate for  interviews.

It usually take several interviews to establish trust and rapport with potential witnesses. Sensitive questions eliciting painful information should not be asked until the interviewer believes the witness is comfortable and willing to discuss shameful events and facts.

**Abuse**

Tell me about a time when your dad got really angry.

      **Not**: Was your daddy mean?

What did your dad's face look like when he got mad at you?

      **Not**: Did he whip you when he got mad?

When you were a child and really scared, where did you go to be safe?  What made you really scared?

      **Not**: Did your daddy just punish you like most kids are punished, you know, nothing that would amount to abuse?

What else did you do to be safe?

1

**0156**                                                    Exhibit A7 - California 2000